**EXHIBIT 8**

1
2
3
4
5
6
7            **INTERVIEW WITH EMIGDIO GONZALEZ**
8              **Q=Det. Josh Henderson**
9                  **Q1=Woman**
10                 **Q2=Woman**
11                 **Q3=Woman**
12                 **Q4=Woman**
13                   **Q5=Man**
14              **A=Emigdio Gonzalez**
15            **A1=(Annamaria Sanchez)**
16
17
18   Q:          Okay, uh, today's date's 9/30/2013. Uh, Report Number's 13-008988. Uh,
19               reference the investigation of Uncle Sam's. Uh, present is Detective
20               Henderson, badge number 1458, and Emigdio (Greels)?
21
22   A:          Emigdio Gonzalez.
23
24   Q:          Gonzalez. Uh, Emigdio, uh, you have your attorney here with you?
25
26   A:          Yes. Correct.
27
28   Q:          And that is?
29
30   A:          (Annamaria), uh...
31
32   A1:        (Sanchez).
33
34   A:          (Sanchez).
35
36   Q:          Okay, uh, I have, uh, county attorney present also Jamie Oliver. Uh, all right,
37               Emigdio, um, the first question is, uh, pretty open to you. Um, what
38               information did you have for us related to the investigation of Uncle Sam's?
39
40   A:          What information? I was told I was gonna be asked stuff and I'll answer the
41               questions.
42
43   Q:          Okay, that's - that's fine.
44
45   A:          You know what I mean then?

46

47    Q:      Yeah. Okay. Uh, how did you hear about the job?

48

49    A:      How did I hear about the job? Uh, from a friend, uh, my brother's friend told
50           my brother about the job.

51

52    Q:      Brother's friend. Okay.

53

54    A:      Yeah.

55

56    Q:      Um, from kind of beginning to end what was the hiring process like?

57

58    A:      Hiring process? You went there, got an application, showed two forms of ID,
59           filled it out. That's it.

60

61    Q:      Can I ask what kind of, uh, ID forms of ID that you had to present?

62

63    A:      Uh, my driver's license and a Social Security card.

64

65    Q:      Okay. Uh, as far as the hiring paperwork what - what kind of hiring
66           paperwork did you have to fill out?

67

68    A:      Oh, the first thing you fill - fill out an application. Then, they interview you
69           telling you about the job. You - they tell you about the rules, what you can,
70           uh, what they expect from you, what's tolerated, what's not tolerated. They
71           give you a, like, a drug thing. You have to sign a paper that you consent for a
72           drug test. You have to go and, uh, you come in, uh, to Uncle whatever you're
73           gonna be fired. No tolerance on that. Uh, drug use, sexual harassment, stuff
74           like that. You sign all that. You sign a paper that where you gonna get a
75           uniform and, uh, you'll get charged for that first shirt and, uh, that's it. You
76           know, they give you the basic, uh - uh, four or five pages about the rules and
77           that's it.

78

79    Q:      Okay. Um, and then how long after you filled out this paperwork, uh, did you
80           begin to start work there?

81

82    A:      The following day.

83

84    Q:      The following day?

85

86    A:      Yeah yeah.

87

88    Q:      Uh, do you know if anyone, like, verified information? E-verified anything
89           like that?

90

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 3

| 91 | A: | I didn't ask. I just filled it out and waited for get a job. |
| 92 | | |
| 93 | Q: | All right. Do you know who you had fill out the information? What was their |
| 94 | | position? |
| 95 | | |
| 96 | A: | Their position was manager. |
| 97 | | |
| 98 | Q: | Okay. Does he still work there? |
| 99 | | |
| 100 | A: | No, he doesn't. |
| 101 | | |
| 102 | Q: | No. All right. Um, do you know what he did with the - the information that |
| 103 | | you provided? |
| 104 | | |
| 105 | A: | No, I just filled it out, gave it to him and he said, "I'll let you know tomorrow |
| 106 | | if you can start or not." And he told me yes. And I came back the following |
| 107 | | day to work. |
| 108 | | |
| 109 | Q: | Okay. Uh, now your information that you provided, um, was it, uh, your |
| 110 | | information that you obtained somewhere or how did you come about the |
| 111 | | information that you provided for? |
| 112 | | |
| 113 | A: | My, uh, my driver's license. I went to the MVD and I applied for it when, uh, |
| 114 | | it was 1994 when I got it. Uh, my birth certificate and a, uh, at that time there |
| 115 | | was okay. They were - that was - they were accepted. I got my driver's |
| 116 | | license. Uh, the Social Security card it's somethin' that, uh, you get on the |
| 117 | | street. I didn't know who - I don't know who was the guy. I just had |
| 118 | | somebody that helped me out, you know, get it, 'cause that's all I needed. My |
| 119 | | driver's license was my other ID. |
| 120 | | |
| 121 | Q: | Was it somebody that you heard through the company or somebody that... |
| 122 | | |
| 123 | A: | No no no that. I've been here for a little bit over eighteen years. |
| 124 | | |
| 125 | Q: | All right. |
| 126 | | |
| 127 | A: | That's when I got it about eighteen years ago, a little bit less when I got that |
| 128 | | number that card. |
| 129 | | |
| 130 | Q: | Do you remember where about roughly you got it from? |
| 131 | | |
| 132 | A: | No, it was. And like I say, I didn't - the person that brought it was, uh. You |
| 133 | | know what, it was somebody somebody knew that, uh - that, uh, I never got to |
| 134 | | see the person. When I got it, it was just. And when I got it, it was, uh, when I |

| | | |
|---|---|---|
| 135 | | was trying to apply for a job in a field working at a farm. And, uh, that's when |
| 136 | | I got it and I used that one. |
| 137 | | |
| 138 | Q: | Okay and so you presented that to the - a manager... |
| 139 | | |
| 140 | A: | Yes. |
| 141 | | |
| 142 | Q: | ...the hiring manager? |
| 143 | | |
| 144 | A: | Yeah that and my ID, my driver's license. |
| 145 | | |
| 146 | Q: | Then he just probably copied it and gave it back or… |
| 147 | | |
| 148 | A: | I don't - I don't know. He just took it, took information, then brought it back |
| 149 | | to me and, uh, "I'll let you know." He sat down and told me, you know, rules, |
| 150 | | what they expect, what they don't want accepted and stuff like that. And, uh, |
| 151 | | they told me, "I'll let you know if, uh, if we, you know, we're, uh, needing." |
| 152 | | And the following day to come. |
| 153 | | |
| 154 | Q: | Okay. And - and just to - to kind of verify. You say your license was good |
| 155 | | because you got to MVD and… |
| 156 | | |
| 157 | A: | No my - my driver's legit. It's been - I got it since '94. |
| 158 | | |
| 159 | Q: | And the birth certificate you got too from? The birth certif- birth certificate? |
| 160 | | |
| 161 | A: | Yeah my birth certificate. I got mine. |
| 162 | | |
| 163 | Q: | Okay, um, all right. As far as, like, uh, the forms and stuff that you had to fill |
| 164 | | out did you completely fill them out or did you - did they have you just fill out |
| 165 | | a portion of it or? |
| 166 | | |
| 167 | A: | I filled out the application, but, uh, my attorney showed me the date is not the |
| 168 | | one I started to work there. I started to work there in 2010 in June. And I |
| 169 | | believe that application says 2007. I wasn't there in 2007. I was working in |
| 170 | | construction at that time. 'Cause I worked from '94 to 2009 in construction. I |
| 171 | | was framing. I was a framer... |
| 172 | | |
| 173 | Q: | Uh-huh. |
| 174 | | |
| 175 | A: | ...for 15 years. |
| 176 | | |
| 177 | Q: | Yeah. |
| 178 | | |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 5

| | | |
|---|---|---|
| 179 | A: | That company that I used to work when closed its doors when the economy |
| 180 | | went down and, uh, we all got let go pretty much. I struggled for a whole year |
| 181 | | without a job and, uh, I had to find something to support my family with. |
| 182 | | |
| 183 | Q: | So that - that form that they showed you that had the wrong date on it? |
| 184 | | |
| 185 | A: | Yeah. No, the one I see right here has the wrong date 'cause I didn't start there |
| 186 | | in 2007. I started there in 2010. |
| 187 | | |
| 188 | Q: | Okay, do - do you remember being handed a form like that when they... |
| 189 | | |
| 190 | A: | Yeah that seems p- the one that, uh, has that, uh, withholding and all that stuff |
| 191 | | yeah I remember that one. |
| 192 | | |
| 193 | Q: | Uh, do you remember puttin' a date on there? |
| 194 | | |
| 195 | A: | No. |
| 196 | | |
| 197 | Q: | No? So did they just have you sign it and that's it? |
| 198 | | |
| 199 | A: | I filled it out, put the date. I don't know if they crossed it out. I - I'm pretty |
| 200 | | sure I put the date that I started the day that I filled it out. |
| 201 | | |
| 202 | Q: | Uh-huh. |
| 203 | | |
| 204 | A: | But that date not the one I started there. |
| 205 | | |
| 206 | Q: | Okay. All right. I'm - I'm tryin' to kinda collect on how the date, you know, |
| 207 | | that - that's wrong obviously that you didn't put on there if there was a portion |
| 208 | | of that was not filled out. They left it blank and just had you sign. Is that what |
| 209 | | I'm kinda? |
| 210 | | |
| 211 | A: | I filled it out. I think I shoulda - I - I normally try to fill out or complete my |
| 212 | | stuff and, uh, I think I shoulda put the date correctly. I don't know but that |
| 213 | | date's not the one where I start. I can prove it with my, uh, my taxes form |
| 214 | | when I did my taxes. |
| 215 | | |
| 216 | Q: | Okay. So you're not sure if you completely filled it out? |
| 217 | | |
| 218 | A: | Mmm. |
| 219 | | |
| 220 | Q: | Or if? |
| 221 | | |
| 222 | A: | I'm - I think I did but if 'cause like I said that - that's not the date I put in |
| 223 | | there. 'Cause I didn't start that date. |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 6

224
225    Q:              Is there a signature on there?
226
227    A:              Yes.
228
229    Q:              Is that your signature? Does it look...
230
231    A:              Yes yes.
232
233    Q:              ...like your signature? Okay.
234
235    Q1:             When...
236
237    Q:              Go ahead.
238
239    Q1:             Detective when did e-, uh, verify come out?
240
241    Q:              Uh, 2006 October.
242
243    Q1:             And when was they were required t- to e-verify it?
244
245    Q:              It was 2007.
246
247    Q2:             January 1, 2008.
248
249    Q:              Yeah Octo-
250
251    Q2:             January 1, 2008.
252
253    Q:              Yeah October 2007 and then January 2008.
254
255    Q1:             Was the date of?
256
257    Q:              Effective.
258
259    Q2:             Effective date that, uh, Arizona was bound under the LAWA to...
260
261    Q1:             Two thousand.
262
263    Q2:             ...implement, uh, e-verify in Arizona. Every Arizona business had to do e-
264                    verify starting in 2008.
265
266    Q:              Yes.
267
268    Q2:             But there was a grandfathering clause for those who were likely hired prior...

| | | |
|---|---|---|
| 269 | | |
| 270 | Q1: | To 2008. |
| 271 | | |
| 272 | Q2: | ...to January 2008. |
| 273 | | |
| 274 | Q1: | Ah. |
| 275 | | |
| 276 | Q2: | Okay, so, that's very critical in terms of who was hired before, who was hired |
| 277 | | after. |
| 278 | | |
| 279 | Q: | Yeah, 'cause you're hired in 2010. |
| 280 | | |
| 281 | A: | Yes. |
| 282 | | |
| 283 | Q: | Yeah. Okay, now as far as you're - you're a manager correct? |
| 284 | | |
| 285 | A: | I was working as manager. |
| 286 | | |
| 287 | Q: | At which location, the Shea? |
| 288 | | |
| 289 | A: | I was, well, I was one year at 32nd and the last year I was in 32- in 83rd. |
| 290 | | |
| 291 | Q: | Okay so kinda get the (seek of). |
| 292 | | |
| 293 | A: | I started at 83rd and I was there for seven months as a cook and, uh, later on |
| 294 | | they offered me to help them out as management and they would train me. I |
| 295 | | said, "Yep." I needed the extra money. I was making $7.50. When I was in |
| 296 | | construction doing $25 an hour, I was strugglin' real bad so I - yes I'll take the |
| 297 | | step up. They trained me. Uh, they trained me at the other store they had. |
| 298 | | They had a 90th Street store that which is they sold already and, uh, they |
| 299 | | trained me there for a month and they finished trainin' me at 32nd. They left |
| 300 | | me there for a year and after that they moved management around 'cause they |
| 301 | | wanted to see if something would work better. You know, you know, not |
| 302 | | getting too comfortable in one area and so they moved me to 3- 83rd. And, uh, |
| 303 | | I was there for last year. |
| 304 | | |
| 305 | Q: | Now as, uh, the - the manager what kind of job duties did you have? |
| 306 | | |
| 307 | A: | It was not - my managing was just receiving merchandise, uh, making sure, |
| 308 | | like, everything was running smoothly, taking care of customers, taking - |
| 309 | | making sure everybody came to work, who didn't come to work. Try to, uh, |
| 310 | | sometimes we had to hire. I had to fire a few guys, uh, yeah that was it. We |
| 311 | | didn't order stuff. He ordered it or my boss' used to or- he'd get all the |
| 312 | | inventory. He did order everything. We just make sure we received what he |

| | | |
|---|---|---|
| 313 | | ordered or was it received? Mark it off and make sure everything went right |
| 314 | | good. |
| 315 | | |
| 316 | Q: | Okay, um, as far as you said you hired and fired guys. Uh, as far as that, uh, |
| 317 | | what kind of, uh, I mean did you have to go through somebody else to do that |
| 318 | | or did you have to clear it with the owner? |
| 319 | | |
| 320 | A: | No, they - the only thing we did was, like, we had application - the same |
| 321 | | application. When somebody came over ask for a job we filled it out. We |
| 322 | | asked only for two proofs of ID which some people brought me an ID, a |
| 323 | | Social Security card. Some people brought a resident's card, citizenship card. |
| 324 | | We just filled that out and that was all we did. |
| 325 | | |
| 326 | Q: | You just, uh, you when you say filled out you just copied the information on |
| 327 | | the IDs onto another form? |
| 328 | | |
| 329 | A: | They filled it out. |
| 330 | | |
| 331 | Q: | They filled it out? |
| 332 | | |
| 333 | A: | They filled it out. That's... |
| 334 | | |
| 335 | Q: | And you just took it? |
| 336 | | |
| 337 | A: | And we just took it. We'll put it in his - one of his, uh, he had a bag he put |
| 338 | | there. Put it there. At the end of the day, he always went everyday he'd run |
| 339 | | there to pick up his stuff. |
| 340 | | |
| 341 | Q: | When you say he who are you talking about? |
| 342 | | |
| 343 | A: | My, uh, Bret. |
| 344 | | |
| 345 | Q: | Oh okay. |
| 346 | | |
| 347 | A: | He went - everyday he went to pick up his stuff, like, all the credit cards that |
| 348 | | we were, you know, all the paperwork from the bank and stuff like that. |
| 349 | | Picked it up, checked, got everything with his bag, left. The, uh, only time he |
| 350 | | had a, like, stood and talked to us when he saw something was going wrong |
| 351 | | and he had to address it. Like, you know, did you do this? For example, if I |
| 352 | | didn't, if I checked in some merchandise and I missed something he will tell |
| 353 | | me, "Hey, you forgot something here. Make sure you keep an eye on it." |
| 354 | | That's it. It was, like, was, uh, no news was good news. If he didn't talk - tried |
| 355 | | to talk to me, I didn't. We just said, "Hi." "Hi." That was it. |
| 356 | | |
| 357 | Q3: | Emigdio did - did he require you to make copies of their identification? |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 9

358

359     A:              No.

360

361     Q3:             Is that a discussion that you guys had or is it he never asked?

362

363     A:              He never - he never told me to do that.

364

365     Q3:             Okay.

366

367     A:              He never asked me. He just told me make sure they bring two forms of ID and
368                     that's it.

369

370     Q:              So on the two forms ID, they just showed you and you looked at it?

371

372     A:              They just show me. They just show me and they filled it out and that's it.

373

374     Q:              Now on the, when you look at the ID, if you thought - did you ever think for
375                     once that if - if it was a good. I know you're not certified or anything like that,
376                     but was there - did you ever have question the ID or the?

377

378     A:              I - I never question nothin'. I just got it, filled it out, and I never.

379

380     Q:              Okay. Um, now if they couldn't provide one of the forms of IDs that they're
381                     required to, uh, would you call somebody and say, "Hey they, you know, can
382                     only provide this?"

383

384     A:              No, they fill out the application then, uh, the boss would tell us - he would tell
385                     us Bret, "Call him back, interview him." And that was it. We call 'em,
386                     interview 'em. We'd tell 'em what the rules were, you know, what we expect
387                     from them, we do- what we don't tolerate. And, uh, that's, uh, you know,
388                     what could happen if they just calls out and don't come to work one day that
389                     we need 'em. You know you know. And we told 'em the rules. They accept it.
390                     And, okay, if you want to work come and work.

391

392     Q:              Okay, just so I understand right, uh, you would get a call from Bret after he'd
393                     pick up the file?

394

395     A:              No, we don't. We would - the following day he'd come by and he'd say,
396                     "Okay."

397

398     Q:              Oh, he'd - he'd tell you in person.

399

400     A:              Yeah. He would come in...

401

402     Q:              Okay.

403

404     A:          ...the following day...

405

406     Q:          So then he would...

407

408     A:          ...and he, like, "Go ahead and, uh - uh, somebody quit. Hire somebody. Get
409                 somebody."

410

411     Q:          Okay, so he'd pick up the file and then the following day say, "Okay, he's
412                 good to go. Call him back and hire him."

413

414     A:          Yeah.

415

416     Q:          Okay, uh, and then the file paperwork you never saw that again once he
417                 picked it up?

418

419     A:          No, once it's gone, I never saw - I never know where his office was or
420                 nothin'.

421

422     Q:          You never knew that about him?

423

424     A:          Well I never asked. I never knew where his office was at. He just picked up
425                 his stuff, took it, and that was it.

426

427     Q:          Okay. And then as far as termination, when you had a problem with an
428                 employee or somethin' like that how did that process work?

429

430     A:          Depend. We had warnings because sometimes, you know, there were some
431                 guys that we found out what the reason they, you know, didn't come to work.
432                 You know, there were some reasons that were tolerated, some which they
433                 weren't. Like, if they went and they were out partying and they just let - they
434                 blew us off on a Friday when we're busy, we told them, you know. 'Cause we
435                 most of them everybody knew each other so they knew where they were at. So
436                 we found out they were doin' that, you know, you're done. You - we need you
437                 guys. There's a reason we have you here. But if we were find out it was a
438                 health issue or family issue, no problem. You know, we'll end up, uh, a
439                 person we can call somebody up and fill in the spot and, uh, the followin' day
440                 that person will come in. It was, like, we knew people that were playing with
441                 us and people that weren't because we find out with all the friends.

442

443     Q:          Right.

444

445     A:          Oh we were out at a concert. Oh we were out at the lake. Oh we were over
446                 here. And, uh, that day we had a hard time because we had especially on a
447                 busy day one day Fridays, Saturdays, or Sundays when we were missin' a

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 11

| | | |
|---|---|---|
| 448 | | person like a - a cook or a server whatever. Uh, it made us struggle through |
| 449 | | that day. So, the per- the employees already knew. If it was a non-call. No call |
| 450 | | no show and we found out they were just 'cause they don't want to show up |
| 451 | | then my boss said, "Oh they don't - they're not interested in a - in having a |
| 452 | | job. We don't - we need responsible people." |
| 453 | | |
| 454 | Q: | Okay so the let's just give an example. The no show no - no call. |
| 455 | | |
| 456 | A: | No call no show. |
| 457 | | |
| 458 | Q: | You let the owner know? |
| 459 | | |
| 460 | A: | Yeah. |
| 461 | | |
| 462 | Q: | Bret? |
| 463 | | |
| 464 | A: | Yeah. He would ask, "You guys ask around where they are. See if they're sick |
| 465 | | or they're flat tire. Do they, uh, ask. Find out what the problem is." And if it |
| 466 | | was because we find out they were at a party or whatever place then don't let |
| 467 | | 'em, don't take 'em back. Why? Because they gonna do it again and again... |
| 468 | | |
| 469 | Q: | Right. |
| 470 | | |
| 471 | A: | ...and again. And if it was a health issue we found out what happened. Oh, I |
| 472 | | have a flat tire. Okay. |
| 473 | | |
| 474 | Q: | So would he have you guys tell them in person when they show up the next |
| 475 | | day to work? |
| 476 | | |
| 477 | A: | Yeah he'll call. Because we had - he'd call us every morning, every afternoon, |
| 478 | | every night, you know, to keep updated. Who showed up? Who didn't show |
| 479 | | up? Everything good? |
| 480 | | |
| 481 | Q: | Bret did? |
| 482 | | |
| 483 | A: | Yeah, we were - we had constant communication daily. Like, if I was the |
| 484 | | opening manager he would call me in the morning, "Everything went okay |
| 485 | | last night? They close up?" Yep. Uh, did he find anything wrong? No, they - |
| 486 | | they left the coffee out. Then you have to, you know, tell the guys how to run. |
| 487 | | You have to make sure you wash everything. You know, he'll make - call me |
| 488 | | in the mornin', "Did everybody show up?" "Yeah, I've got everybody here. |
| 489 | | This guy's coming late because he's in traffic." "Okay." "Uh, well this person |
| 490 | | didn't show up." "Why is that? Yeah, find out what's going on and let me |
| 491 | | know." Then, uh, he'll call me again at 3:00 when we did bread order. And, |
| 492 | | uh, we order our bread and at the after- the shift change he'll call us again. |

| | | |
|---|---|---|
| 493 | | "Everybody in?" "Yeah." "Everything ok?" "Yeah." Okay. We were in |
| 494 | | constant communication the whole day. Find out everybody went in. |
| 495 | | |
| 496 | Q: | Now you're - you're talkin' to both places. Um, did you ever see or hear of an |
| 497 | | instance where, um, somebody was either terminated or never showed up or |
| 498 | | let go and they came back to work another time? |
| 499 | | |
| 500 | A: | What do you mean came back? |
| 501 | | |
| 502 | Q: | Like, not necessarily terminated. They, uh, somethin' where they just didn't |
| 503 | | show up. You didn't know what happened to 'em, um. You found out later w- |
| 504 | | was it kind of, like, one of those where they slept in or partied or somethin' |
| 505 | | like that. But l- what I'm tryin' to get to is was there ever an employee that, |
| 506 | | uh, that stopped workin' there for a while and then came back to work again? |
| 507 | | |
| 508 | A: | Sometimes if, uh, he found out what was the reason, like, that happened and it |
| 509 | | was, like, a legit explanation and we fired. He, you know, he - he thought the |
| 510 | | person was honest especially with some people that were there for a longer |
| 511 | | time. You know sometimes, uh, health or car problems would beat it and, uh, |
| 512 | | or somethin' because they got a better job interview at another place and they |
| 513 | | just didn't want to let us know. They would stop working, but even though |
| 514 | | they were good workers who became more and told, like, "I need I find |
| 515 | | another job and I didn't want to say it because you were gonna get mad at |
| 516 | | me." And stuff like that. And, uh, he thought it was a good employee, he'll let |
| 517 | | 'em come back. Sometimes, you know, the job right there was not that good |
| 518 | | pay $7.50. It - it was - it's $8 dollars right now that they're paying, but most |
| 519 | | of the people have two jobs. |
| 520 | | |
| 521 | Q: | And when those people came back, did they have to refill out hiring |
| 522 | | paperwork? |
| 523 | | |
| 524 | A: | That I don't know. |
| 525 | | |
| 526 | Q: | Okay. |
| 527 | | |
| 528 | A: | Because I - I was - I would let them. I'll - it was few about that happened like |
| 529 | | that because he normally didn't hire people again if they, you know, if they |
| 530 | | did it for a reason that, you know, blowin' us off for a - another job. If he'd |
| 531 | | say,"If you guys don't like it here, if you've got a better job. Okay, you can go |
| 532 | | ahead." |
| 533 | | |
| 534 | Q: | Yeah. Now at the, uh, the pla- the restaurants you worked at do you keep |
| 535 | | some kind of, like, um, timesheet or roster on who worked the day - that day? |
| 536 | | |
| 537 | A: | Yeah, there was a timesheet. |

| 538 | | |
|---|---|---|
| 539 | Q: | Okay and the - and the names on there, um, those names match the people |
| 540 | | that're workin' there? |
| 541 | | |
| 542 | A: | Yeah. |
| 543 | | |
| 544 | Q: | Okay, um. Can you think of anything else that, um, would be important for us |
| 545 | | to know as far as, um, I mean 'cause. Emigdio, what we're lookin' for is, I |
| 546 | | mean to be honest is, I want - I want information that I - that I can go after the |
| 547 | | owner Frimmel Management. |
| 548 | | |
| 549 | A: | Mm-hm. |
| 550 | | |
| 551 | Q: | Okay? Um, as far as, you know, normally hiring people that don't have good |
| 552 | | information. All right that's basically what I'm lookin' for. All right? Um, I |
| 553 | | mean most of the stuff that you told me, I - there's really nothing there that I |
| 554 | | can really go off of. I mean, do you know of anything that I can look into or |
| 555 | | kind of do - uh, investigate that would help me in that load? Because |
| 556 | | otherwise, I mean, I don't really see what - I - I com- completely, uh, |
| 557 | | appreciate you bein', you know, honest and telling me everything and that's |
| 558 | | what I expect. I don't want you to tell me stuff that 'cause, you know, to blow |
| 559 | | smoke up it. |
| 560 | | |
| 561 | A: | Uh-huh. That's the - that's the reason, like, I told her, you know, do you want |
| 562 | | to ask me stuff? I'll answer all I have, you know. I don't want to make up |
| 563 | | stuff from, you know. |
| 564 | | |
| 565 | Q: | Yeah. No. I don't want you to do that. |
| 566 | | |
| 567 | A: | I just want to answer that you guys want me. And I'll answer as honest as |
| 568 | | possible. I - th- my mistake was work without a permit. |
| 569 | | |
| 570 | Q: | Yeah. |
| 571 | | |
| 572 | A: | I've been doin' that for a while. I was brought here since I was 1 year old. Uh, |
| 573 | | they raised me here for, uh, 12, uh, 11 years. I went to school here. When they |
| 574 | | took me back to Mexico, I saw the difference. I didn't want to do that with my |
| 575 | | family so when I got married I decided to bring my family here. And I knew |
| 576 | | the consequences. But I knew what was taken away from me. And I wanted |
| 577 | | my family not to have that. I wanted my family to have a better opportunity |
| 578 | | than what I had. And, uh - uh, for my job, you know, he was pretty strict, he |
| 579 | | didn't, you know, we didn't get to much talk. You know, we were - all we did |
| 580 | | was work related. When he called me in the morning, just everybody in, |
| 581 | | everybody out everybody, you know. I didn't get to. The only thing I do know |
| 582 | | I never s- I never knew where his office was. He always picked up his stuff |

| | | |
|---|---|---|
| 583 | | here, took it and took care of it. Brought payroll back there and the - and the |
| 584 | | mail. I got it out, put it there. He picked it up, separated the checks from each |
| 585 | | place, each restaurant. Took 'em. And, uh, pretty much basically that's it. |
| 586 | | |
| 587 | Q: | So he didn't say much other than? |
| 588 | | |
| 589 | A: | No, you could - you - it was hard to get him at the place. He was just there |
| 590 | | and, uh, get his stuff and out. That was one visit a day. |
| 591 | | |
| 592 | Q: | Okay. |
| 593 | | |
| 594 | A: | And that was it, and fill out the paperwork, uh, I just like I said my job was to |
| 595 | | receive merchandise all the beer, all the wings, all the produce that came in. |
| 596 | | Check it in, make sure everything was right. And the only time he talked to |
| 597 | | me when I - I did somethin' wrong. And, "You did this wrong. You need to |
| 598 | | pay attention. Next time, make sure you check this, check that." Okay and I |
| 599 | | just try to learn the way he wanted his stuff done. Fill it out and he used to |
| 600 | | say, "If I don't talk to you that mean everything is good. If I talk to you, then |
| 601 | | you did somethin' wrong." And that was it. |
| 602 | | |
| 603 | Q: | Was there anybody out there that he talked to a lot? |
| 604 | | |
| 605 | A: | Uh, a lot. With, uh, 3- uh, 83rd we were the three managers which was |
| 606 | | (Derek), (Ken) and me. He only - whenever he had a talk with us and, uh, let's |
| 607 | | say address a problem. He would just take us to the patio, "What happened |
| 608 | | with this pr- uh, this order? Why you just crush 'em and call 'em back?" And |
| 609 | | that was it. With us, he didn't talk that much. The only person that he had |
| 610 | | more communication with was, uh, Lisa. Him and Lisa were pretty much, uh, |
| 611 | | both of were running the business. She would come in too, you know, check |
| 612 | | us out. Everything was okay. If not, she'll tell us, "You guys are doing this |
| 613 | | wrong, that wrong." |
| 614 | | |
| 615 | Q: | Okay. |
| 616 | | |
| 617 | A: | Yeah. |
| 618 | | |
| 619 | Q: | All right. |
| 620 | | |
| 621 | ((Crosstalk)) | |
| 622 | | |
| 623 | Q4: | Go ahead. Go ahead. |
| 624 | | |
| 625 | Q2: | Oh, um, Emigdio (unintelligible) in court. |
| 626 | | |
| 627 | A: | Oh okay. |

| | | |
|---|---|---|
| 628 | | |
| 629 | Q2: | Um, did, um, were there ever in the place of employment at Uncle Sam's at |
| 630 | | either one of the two stores, either by Bret or by Lisa, were there - did they |
| 631 | | ever direct any racial slurs at you or any of the employees? |
| 632 | | |
| 633 | A: | Uh, him no. He was real respectful even. Uh, with me, he was real - I never |
| 634 | | had any problem with him. He was, like I said, respectful, never did. Uh, he |
| 635 | | was loud when somebody made a mistake. You know, he made 'em know that |
| 636 | | they were doin' wrong, but I never saw him, you know, from him out of hand |
| 637 | | no. It was like somethin', you - you're not doing it right and you're, like, |
| 638 | | stubborn he would yell, you know. "Why?" You know? But, Lisa was a little |
| 639 | | bit more harsher. |
| 640 | | |
| 641 | Q2: | Okay, how so? |
| 642 | | |
| 643 | A: | Sometimes she would like, you know, yell for a little thing and they used to |
| 644 | | say that they have to make little things big so that person won't continue doin' |
| 645 | | it. You know, make it a big deal even though they were small things, you |
| 646 | | know, like, not taking to a refrigerator somethin' that's gonna to get go bad, |
| 647 | | even though it's one little thing. She was a little bit more. She took it a little |
| 648 | | bit step - a little step further. |
| 649 | | |
| 650 | Q2: | And did they ever know your - your legal status or ability to work in the |
| 651 | | United States? |
| 652 | | |
| 653 | A: | I never, you know, it was somethin' I was tryin' not to them to know. I don't |
| 654 | | know if they did know, but I'm pretty sure they did. That - that, I'm trying not |
| 655 | | to. You know, if everybody thought was okay because I speak English and I |
| 656 | | have an ID. And so I always try to, like, I guess not to sh- how - how can I put |
| 657 | | it? I wanted to protect I have my job so I just tried not to. You know, if they |
| 658 | | didn't ask me, I wouldn't say nothin'. |
| 659 | | |
| 660 | Q2: | Were you treated any different than the other employees that were more - that |
| 661 | | - that were not as assimilated as you or didn't speak English as well as you? |
| 662 | | |
| 663 | A: | Not from him. Lisa was a little bit more when they didn't understand |
| 664 | | somethin'. Like, when she was trying to ask 'em something, "Don't you |
| 665 | | understand?" You know, a little bit more. |
| 666 | | |
| 667 | Q2: | And she didn't say anything else? |
| 668 | | |
| 669 | A: | Well, uh, like what? |
| 670 | | |
| 671 | Q2: | No, I'm asking you. |
| 672 | | |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 16

| | | |
|---|---|---|
| 673 | A: | Not that I heard of, you know? Because, like I said, towards me I only from |
| 674 | | them was respectful. She was a little bit more when she used to yell at me. |
| 675 | | Not, she didn't yell at me but when I did somethin' wrong she, like, make it |
| 676 | | exaggerated. So I used to go and tell him, you know, just tell me what I did |
| 677 | | wrong. I'll work on it and I'll fix it, you know? Let's try to get better but, you |
| 678 | | know. |
| 679 | | |
| 680 | Q2: | Okay. |
| 681 | | |
| 682 | A: | But don't go too far. |
| 683 | | |
| 684 | Q5: | Let me ask you this. Did - you said you were a little bit different because you |
| 685 | | spoke English very well and you had some IDs. So, were there the rest of the |
| 686 | | people most of the people... |
| 687 | | |
| 688 | A: | What differently? Not differently. |
| 689 | | |
| 690 | Q5: | No no. I'm saying did the rest of the workers speak English as well as you? |
| 691 | | |
| 692 | A: | Uh, some. Some did, some don't. |
| 693 | | |
| 694 | Q5: | Were there some that didn't speak any? |
| 695 | | |
| 696 | A: | Yeah there were some that don't speak any at all. |
| 697 | | |
| 698 | Q5: | What about did any of those guys have IDs as far as you know? |
| 699 | | |
| 700 | A: | Not that - not - 'cause I - whenever I got there they were already there so I |
| 701 | | didn't - I never asked them for ID or nothin' like that. |
| 702 | | |
| 703 | Q5: | Now tell me if this is true, I - I've talked to some people who said, "Well, |
| 704 | | everybody knew. Every-" Well, hang on, let me finish. |
| 705 | | |
| 706 | A: | Yeah. |
| 707 | | |
| 708 | Q5: | They said that, "Everybody knew that the papers that we had were fake. |
| 709 | | Management knew, Bret knew, uh, you know, everyone knew that if we didn't |
| 710 | | have 'em, we'd go get 'em and give 'em bad papers and they'd never check. |
| 711 | | And when he needed more employees, he would just call or he would tell us |
| 712 | | because he knew we could get more people like this." Uh, and so essentially |
| 713 | | the culture was that everybody sort of knew what was happening, but, you |
| 714 | | know, they - they sort of pretended by turning in these fake papers. Were you |
| 715 | | aware that that was happening? |
| 716 | | |

| | | |
|---|---|---|
| 717<br>718<br>719<br>720 | A: | Among us - among us employees we all used to ask ourselves, you know, are you oh this and that. We knew, you know among, but we never, like, talked with them or nothin' like that. |
| 721<br>722 | Q5: | Like what with them? |
| 723<br>724<br>725<br>726 | A: | When we were like, y- you know, we used to ask each other, you know, are you ok? Are you this? Are you that? Everybody the employees did know. They say that... |
| 727<br>728<br>729 | Q5: | Hold on. You started speaking in - in without specifics. Are we talkin' about we all knew that we didn't have papers? |
| 730<br>731 | A: | No, we know. Now, I'm talkin' about the cooks. |
| 732<br>733 | Q5: | Sure. |
| 734<br>735 | A: | The cooks. You know, they talk to each other. |
| 736<br>737 | Q5: | What did they say? |
| 738<br>739<br>740<br>741 | A: | And because I talk and spoke Spanish they told me, you know, I - they - we used to talk and they used to like, "Hey do you know this guy? Know that guy and this?" Among us, we did talk about that - having that situation. |
| 742<br>743 | Q5: | What situation? |
| 744<br>745 | Q2: | What situation? |
| 746<br>747 | A: | That didn't have legal papers. |
| 748<br>749 | Q5: | Right. So the employees all knew right? |
| 750<br>751 | A: | Yeah yeah. Everybody took, all the employees talked to each other. |
| 752<br>753<br>754 | Q5: | Okay, so among you - among all of the employees essentially everybody knew that most of the people there didn't have papers? |
| 755<br>756<br>757 | A: | Not most of them, uh, most of the cooks, uh, you know, the, uh, servers they were all women. They all were. |
| 758<br>759 | Q5: | Okay, what about that were... |
| 760<br>761 | A: | The cooks were the ones that were not legal. |

| 762 | Q5: | Okay. |
|---|---|---|
| 763 | | |
| 764 | A: | Most of 'em. Most of 'em. Not all of 'em. |
| 765 | | |
| 766 | Q5: | What about the dishwashers? |
| 767 | | |
| 768 | A: | The dishwashers too. Uh, cooks and bussers. |
| 769 | | |
| 770 | Q5: | Everyone knew they were not legal? |
| 771 | | |
| 772 | A: | You're talking about everybody- all of us in there, yeah. You know, the cooks |
| 773 | | and us, you know, my copartners. Yeah. |
| 774 | | |
| 775 | Q5: | Sure. |
| 776 | | |
| 777 | A: | Yeah. |
| 778 | | |
| 779 | Q5: | Okay, what about the servers? |
| 780 | | |
| 781 | A: | Some servers, not all of 'em had an ID. Some of 'em did. But it never asked, |
| 782 | | you know. You know, "Do you have an ID of someone?" But, uh, they never |
| 783 | | like, it was not, like, um, a thing to be talkin' about. You know, if someone |
| 784 | | knew, they'd think, "Okay." They didn't care. |
| 785 | | |
| 786 | Q5: | Okay. What about the manager? Did they ever train you, uh, to let them know |
| 787 | | if you knew somebody was there without papers? To let Bret know or to let |
| 788 | | Lisa know so that they could turn... |
| 789 | | |
| 790 | A: | Training, no. They didn't train us for that. |
| 791 | | |
| 792 | Q5: | Okay. |
| 793 | | |
| 794 | A: | They only trained us how to make sure stuff was received and, uh, make sure |
| 795 | | all the food had to go out. And, uh. |
| 796 | | |
| 797 | Q5: | What about when you were trained to hire people? |
| 798 | | |
| 799 | A: | They never trained me to hire people. They just told me to fill out an |
| 800 | | application, bring two forms ID, that's it. |
| 801 | | |
| 802 | Q5: | Okay, so they did something. |
| 803 | | |
| 804 | A: | They did. |
| 805 | | |
| 806 | Q5: | They told you to look for something. |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 19

807
808      A:      Yeah.
809
810      Q5:      Just they were telling you if - if you know that the person is not clear legally,
811           or if you're turning in false papers to, uh, put a note on it or let us know? To
812           let Bret know right?
813
814      A:      No, just bring two forms of ID, have them fill it out, put it in his folder and he
815           can take it.
816
817      Q5:      Without copying the IDs?
818
819      A:      Yeah, we didn't copy nothin'.
820
821      Q5:      And did you ever have to do any follow up with any of the employees?
822
823      A:      No.
824
825      Q5:      What percentage of the employees would you say spoke Spanish?
826
827      A:      Spoke Spanish? The whole kitchen.
828
829      Q5:      What about the rest of the employees?
830
831      A:      Mmm, no. 'Cause the cooks and the bussers spoke Spanish. The servers they
832           all spoke English because they needed to speak English to people to be on the
833           floor.
834
835      Q5:      If somebody didn't have papers and they needed some, where - where would
836           they want to go?
837
838      A:      Don't know.
839
840      Q5:      No one ever told you where they?
841
842      A:      No. I never asked. I never.
843
844      Q2:      So when you got hired, um, give me estimate of how much you started - what
845           was your wage?
846
847      A:      $7.50 an hour.
848
849      Q2:      Okay and you said that you were moved up to manager right?
850
851      A:      Yes.

| 852 | | |
|---|---|---|
| 853 | Q2: | In the kitchen right? |
| 854 | | |
| 855 | A: | Manager in the restaurant, the whole thing. |
| 856 | | |
| 857 | Q2: | Manager in the restaurant? Oh not just the kitchen? |
| 858 | | |
| 859 | A: | No, not the kitchen, the whole thing. |
| 860 | | |
| 861 | Q2: | And were you given a raise? |
| 862 | | |
| 863 | A: | Yes. |
| 864 | | |
| 865 | Q2: | What was your raise? |
| 866 | | |
| 867 | A: | Uh, from $7.50 it went up to $3200 - $3200 - $3 - $3, uh, $32 hundred |
| 868 | | thousand five hundred. It was a - a salary. |
| 869 | | |
| 870 | Q2: | That's a nice salary. |
| 871 | | |
| 872 | A: | It was a salary, $32,500. |
| 873 | | |
| 874 | Q2: | Okay. |
| 875 | | |
| 876 | A: | I was gonna divide it in, uh, the whole year. |
| 877 | | |
| 878 | Q2: | Right. |
| 879 | | |
| 880 | A: | It just broken up in, uh, biweekly checks. |
| 881 | | |
| 882 | Q2: | And how long were you in that position before you... |
| 883 | | |
| 884 | A: | Two years. How long was I a cook? |
| 885 | | |
| 886 | Q2: | At $7.50? |
| 887 | | |
| 888 | A: | Seven months. |
| 889 | | |
| 890 | Q2: | You must have been a very reliable employee. |
| 891 | | |
| 892 | A: | Yep. 'Cause what I was making in construction $25 was still not enough. |
| 893 | | |
| 894 | Q2: | Sure, I know. |
| 895 | | |
| 896 | A: | I had to work. |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 21

897
898    Q3:    Emigdio, did - did Lisa ever, um, pick up any of the applications?
899
900    A:    Lisa?
901
902    Q3:    Yes.
903
904    A:    No. Everything was picked up by Bret.
905
906    Q3:    Okay, and - and...
907
908    A:    She just make sure that everythin' was for 83rd. She had to put the 83rd
909        number on the bottom, you know if it was going to be for, uh, 32nd, you put
910        the which store you gonna work.
911
912    Q3:    And did sh- um, did Bret tell you specifically what type of IDs you needed to
913        collect when someone was filling out an application? Did he say, "I need a
914        Social Security card and then I need to have verification that they are, um,
915        legally able to work in the United States?"
916
917    A:    No.
918
919    Q3:    Did he ever explain to you that process?
920
921    A:    No. He just said two forms of ID. That was it.
922
923    Q3:    And what kind of forms of ID could they bring?
924
925    A:    He said driver's license, Social Security card, something that had a picture on
926        it was one. And the other was a Social Security card. That was it.
927
928    Q3:    Okay.
929
930    A:    Some brought like I said a - uh, driver's license, an ID. Some brought a, uh,
931        the resident card and a Social Security card. One or the other one. And that
932        was it.
933
934    Q3:    And then you would allow them to put that information on the application?
935
936    A:    Mm-hm.
937
938    Q3:    Um, did you have to put that information on the application?
939
940    A:    We just have to make sure that we saw it, what they were puttin' on there.
941

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 22

942  Q5:        How did the people that didn't read English fill those out?
943

944  A:         They have friends at home.
945

946  Q5:        Oh so they would take them home?
947

948  A:         Yeah we'll give the applications, they'll take it home and they could bring it
949             back.
950

951  Q3:        I don't have any other questions. Thank you.
952

953  Q2:        I'm good too.
954

955  Q:         Uh, I had one, um. When you said that everybody talked about it right,
956             amongst the cooks or the servers that they were, you know, they suspected
957             each other being there not legal - illegally, um, was that, like, uh, a just a, I
958             mean, a question of well did you have a Social Security card? Did you have a
959             fake Social Security card, a real Social Security card?
960

961  A:         No, it would be like when they, uh, sat down or whenever they were, you
962             know, out of work or whatever, it was just ask each other 'cause everybody
963             had the cur-, that, uh, how do you call it? The curiosity of what's going, you
964             know, the new guy. And ask him questions. It was not like a conversation that
965             was going on a daily business. It was somethin' like when he first starting
966             people ask him, you know, questions. Where you from? Where you come
967             from? What are you doin'? Uh, stuff like that and they were I little hear there
968             this and that. And they were talking just among them.
969

970  Q:         They ever ask each other, like, "Did - hey the Social Security card is it a good
971             one? Is it a fake one? Uh, the ID that they have, is it good ID or fake ID?"
972             Was that ever brought up?
973

974  A:         Um, I'm pretty sure among them they did.
975

976  Q:         When you say pretty sure, somethin' you overheard or that somebody told
977             you?
978

979  A:         Uh, not told me but, uh, let's say, uh, let's say they talked two days ago and
980             later on they say, "Do you know this guy?" It's like, "Well, I don't know if he
981             is or not. You know? A lot of question but he told me. He told me."
982

983  Q:         So another employee would come and tell you that?
984

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 23

| | | |
|---|---|---|
| 985 | A: | Yeah, he's tell me. He'd say, "Well, if he's not, I'm not gonna." It's not my |
| 986 | | job to go question if he is or not, you know. Uh, the person that needs to do it |
| 987 | | is the one that pays the check. So, I'm not gonna question it. |
| 988 | | |
| 989 | Q: | Right well yeah. Uh, and when that was brought to your attention would you |
| 990 | | take that to Bret at all? |
| 991 | | |
| 992 | A: | No I wouldn't. |
| 993 | | |
| 994 | Q: | No? Okay. |
| 995 | | |
| 996 | A: | 'Cause I'm afraid of my job being lost too. |
| 997 | | |
| 998 | Q: | Did he tell you that your job would be lost if you brought somethin' like that |
| 999 | | to him? |
| 1000 | | |
| 1001 | A: | No he never. Like I said, with him I didn't get to talk that much but I was, |
| 1002 | | like, always trying to avoid that hassle. He wouldn't ask me or I wouldn't |
| 1003 | | have to tell him either. |
| 1004 | | |
| 1005 | Q: | Okay. |
| 1006 | | |
| 1007 | Q3: | Um, was there - did he specifically tell you not to make copies of their forms |
| 1008 | | and identifications? |
| 1009 | | |
| 1010 | A: | No, I just asked one of the other managers, "Do we make copies of this or |
| 1011 | | not?" "No. Just make sure that's put it right year here and that's it." You |
| 1012 | | never, like I said, they - he never told me how to do it. I just asked the other |
| 1013 | | guys, "How you guys do one of these?" And they, "Okay, just make sure they |
| 1014 | | bring two forms of ID and that's it." "Okay, do we have to make copies?" |
| 1015 | | "No." |
| 1016 | | |
| 1017 | Q2: | Okay Emigdio just one thing. You said you were a cook for seven months. |
| 1018 | | Where? At what store? |
| 1019 | | |
| 1020 | A: | At 83rd. |
| 1021 | | |
| 1022 | Q2: | 83rd and? |
| 1023 | | |
| 1024 | A: | Union Hill. |
| 1025 | | |
| 1026 | Q2: | Okay and you worked there from when to when? |
| 1027 | | |
| 1028 | A: | July, no it was June. |
| 1029 | | |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 24

| 1030 | Q2: | June? |
|---|---|---|
| 1031 | | |
| 1032 | A: | Through December. |
| 1033 | | |
| 1034 | Q2: | June through December of? |
| 1035 | | |
| 1036 | A: | Uh, 2010. 2010. |
| 1037 | | |
| 1038 | Q2: | 2010. And you became the manager? |
| 1039 | | |
| 1040 | A: | At, uh, the beginning of 2011 that's when it started training in January. |
| 1041 | | |
| 1042 | Q2: | In January of 2011 until the present time? |
| 1043 | | |
| 1044 | A: | Uh-huh. |
| 1045 | | |
| 1046 | Q2: | Okay you were at which store? Still on 83rd and Union Hill? |
| 1047 | | |
| 1048 | A: | No, they trained me. They took me to 90th in January for a month and I have |
| 1049 | | to train. |
| 1050 | | |
| 1051 | Q2: | Okay wait wait. I'm sorry. 90, uh, 90th and what?  Shea? |
| 1052 | | |
| 1053 | A: | Shea. I trained there for a month and a half. |
| 1054 | | |
| 1055 | Q2: | For one month and a half. |
| 1056 | | |
| 1057 | A: | Uh, then they took me to 32nd to finish my training. |
| 1058 | | |
| 1059 | Q2: | And then 32nd... |
| 1060 | | |
| 1061 | A: | I stayed there at 32nd... |
| 1062 | | |
| 1063 | Q2: | ...and Shea. |
| 1064 | | |
| 1065 | A: | ...until August. |
| 1066 | | |
| 1067 | Q2: | You stayed there from February? |
| 1068 | | |
| 1069 | A: | Uh-huh. |
| 1070 | | |
| 1071 | Q2: | To August? |
| 1072 | | |
| 1073 | A: | Uh-huh. |
| 1074 | | |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 25

| 1075 | Q2: | Of 2011? |
| 1076 | | |
| 1077 | A: | 2012. |
| 1078 | | |
| 1079 | Q2: | 2012? |
| 1080 | | |
| 1081 | A: | Yeah. |
| 1082 | | |
| 1083 | Q2: | Yep. Mm, no. I lost it. 83rd and Union Hill's June to December of 2010. |
| 1084 | | |
| 1085 | A: | Uh-huh. |
| 1086 | | |
| 1087 | Q2: | Then 2011? |
| 1088 | | |
| 1089 | A: | Uh-huh that whole year. |
| 1090 | | |
| 1091 | Q2: | 90th and Shea you said one month you were there. |
| 1092 | | |
| 1093 | A: | Month and a half yeah. |
| 1094 | | |
| 1095 | Q2: | Month and a half at 90th and Shea and then? |
| 1096 | | |
| 1097 | A: | I finished my training at the, uh, 32nd. |
| 1098 | | |
| 1099 | Q2: | And - and then you were there from 2011? |
| 1100 | | |
| 1101 | A: | Yep from there until 2012 August. |
| 1102 | | |
| 1103 | Q2: | Okay so you went to 32nd and Shea and there you at 32nd and Shea you were |
| 1104 | | right there as the store manager? |
| 1105 | | |
| 1106 | A: | Uh-huh. There was three of us. |
| 1107 | | |
| 1108 | Q2: | Store manager and then 90th and Shea you were only there for a month and a |
| 1109 | | half. |
| 1110 | | |
| 1111 | A: | Yeah. |
| 1112 | | |
| 1113 | Q2: | Who trained you? |
| 1114 | | |
| 1115 | A: | Uh, Lisa. 'Cause I worked - I worked in the kitchen for seven months, but I |
| 1116 | | didn't know all the kitchen. So they wanted me to train in the rest, you know, |
| 1117 | | how to open in the morning and how to close at night, you know. Cleaning |
| 1118 | | tosses and opening tosses. |
| 1119 | | |

| 1120 | Q2: | And then 83rd and Union Hill? |
| 1121 | | |
| 1122 | A: | I was there from August until July when I got arrested. |
| 1123 | | |
| 1124 | Q2: | Then at 83rd and Union Hills you did as cook? |
| 1125 | | |
| 1126 | A: | At the beginning as I said and after that from August from last year until this |
| 1127 | | July I was manager. |
| 1128 | | |
| 1129 | Q2: | At 32nd? |
| 1130 | | |
| 1131 | A: | No at 83rd. I went back to 83rd. |
| 1132 | | |
| 1133 | Q2: | Okay. |
| 1134 | | |
| 1135 | A: | Make sense? |
| 1136 | | |
| 1137 | Q2: | I- I think everybody else got it. |
| 1138 | | |
| 1139 | A: | I want - let me see. Where doesn't it make sense? |
| 1140 | | |
| 1141 | Q2: | No no it's okay. It's okay. Don't worry about it. |
| 1142 | | |
| 1143 | ((Crosstalk)) | |
| 1144 | | |
| 1145 | Q5: | Um... |
| 1146 | | |
| 1147 | Q2: | Did... |
| 1148 | | |
| 1149 | Q5: | Did the people that worked in the kitchens have to have a food handler's card? |
| 1150 | | |
| 1151 | A: | Yes. |
| 1152 | | |
| 1153 | Q5: | How did they get those if they weren't legal? |
| 1154 | | |
| 1155 | A: | I don't know. |
| 1156 | | |
| 1157 | Q5: | How did you get yours? |
| 1158 | | |
| 1159 | A: | I got mine? I have an ID. I go over there and I get my - my food handler's |
| 1160 | | card. If you have a li- an ID, you can get your food handler's card. |
| 1161 | | |
| 1162 | Q5: | Okay. Did, uh, did they require everyone to have those? |
| 1163 | | |
| 1164 | A: | Yes. |

INTERVIEW WITH EMIGDIO GONZALEZ
Interviewer: Det. Josh Henderson
9-30-13
Case # CR2014103633
Page 27

1165

1166   Q5:        And did you guys make copies of those?

1167

1168   A:         He has a book at the store with all of those.

1169

1170   Q5:        The food handler's cards.

1171

1172   Q3:        Emigdio, you said you, in - in going back to this thing where you were
1173              surprised that the date was, uh, May 27, 2007, you do have, um, when you did
1174              your taxes, have you used your EIN number?

1175

1176   A:         Yes.

1177

1178   Q3:        Okay and then that would reflect that you actually did start here in - in 2010
1179              instead of 2007?

1180

1181   A:         Yes. Yeah, I started doing my taxes as soon as the begin the issue the AT
1182              numbers. That was in 1996. I started and I was able to do my taxes ever since.

1183

1184   Q3:        Oh.

1185

1186   Q:         Do you remember the name of the manager that hired you?

1187

1188   A:         The name of the man? (Manuel).

1189

1190   Q:         (Manuel Rodriguez)?

1191

1192   A:         I don't know his last name. I just know that they called him (Manny).

1193

1194   Q3:        And how soon when you were hired, um, did you meet Bret?

1195

1196   A:         Uh, I saw him coming in, you know, when I was in the kitchen. Saw him
1197              come in and do the procedures, but, uh, he didn't talk to me until, like, in
1198              January when they - he started asking around that if, uh, they knew somebody
1199              that, uh, was want- that wanted to step up and that had a little bit of a
1200              knowledge in the kitchen. And, uh, this (Manny) and there was another, uh,
1201              manager there told him about me. At the beginning, he wasn't sure. He said I -
1202              I looked too soft. Not enough firm to be with the, you know, to - that he
1203              wanted somebody to make sure you things got done right. So I told him that,
1204              uh, they made me do, like, uh, like, a resume.

1205

1206   Q3:        Mm-hm.

1207

1208   A:         You know and I told him where I was working before, what I was doing. And,
1209              uh, he said, "Well, I'll try - I'll try training you. And then, uh, when can you

TRANSCRIPT-48

| | | |
|---|---|---|
| 1210 | | start?" |
| 1211 | | |
| 1212 | Q4: | More questions? No? Detective? |
| 1213 | | |
| 1214 | Q: | No, I don't have any further questions. Um, all right time is 2:52. Going off |
| 1215 | | tape. |
| 1216 | | |
| 1217 | | |

1218    The transcript has been reviewed with the audio recording submitted and it is an accurate
1219    transcription.
1220    Signed_____

**EXHIBIT 9**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

BRET FRIMMEL; PISHKA, INC.;  )
and BRF ENTERPRISES, LLC;    )
LISA AND WILLIAM BRUCE       )
NORTON, wife and husband,    )
                             )
        Plaintiffs,          )   No. 2-15-cv-00087-SPL
                             )
                             )
             vs.             )
                             )
                             )
JOSEPH M. AND AVA ARPAIO,    )
et al.,                      )
                             )
        Defendants.          )
_____)


VIDEO DEPOSITION OF JAIMEE OLIVER


Phoenix, Arizona
September 22, 2016
9:34 a.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 2415 E. Camelback Road
Certified Realtime Reporter     Suite 700
Certified LiveNote Reporter     Phoenix, AZ 85016
AZ CR No.  #50574               (480) 429-7573
carrie@carriereporting.com
(COPY)

1  in a document of some sort?

2      A.    It was an e-mail.

3      Q.    Is your understanding then that any e-mails that

4  you received from Josh Henderson or that you sent to Josh

5  Henderson would have been put into that folder that you

6  put onto the shared drive when you left the county

7  attorney's office?

8      A.    My understanding of the litigation hold was that

9  I wasn't -- that I was to preserve everything.  So yeah,

10  every e-mail that I sent or received regarding the case

11  went into a folder in Outlook.  And then when I left, I

12  transferred that folder onto the shared drive so it

13  wouldn't get destroyed.  My -- my hope would be somebody

14  in IT would have made sure that that didn't happen,

15  but ...

16      Q.    One would hope.

17      A.    Yeah.

18      Q.    Before you left the county attorney's office,

19  did you know whether Mr. Frimmel and Mrs. Norton had filed

20  a notice of claim with the county?

21      A.    No.  I think my knowledge of the notice of claim

22  came after I left.

23      Q.    Were you present at any of the Sheriff's Office

24  interviews of witnesses in this case?

25      A.    Only the free talk that was done prior to the

1  charging.

2      Q.    Do you recall how many free talks there were?

3      A.    Just one.  One that I attended.

4      Q.    Do you know who that was?

5      A.    It was the four employees, and their attorneys

6  were there.

7      Q.    Okay.  So one session, but four individuals were

8  interviewed?

9      A.    Yes.

10     Q.    Do you know whether those individuals were

11  interviewed before the free talks?

12     A.    I assume they were interviewed when they were

13  arrested for their own charges, so yes.  I mean, they were

14  interviewed regarding their own criminal cases that they

15  had.  I don't know if they were questioned about

16  Mrs. Norton and Mr. Frimmel's involvement prior to that

17  free talk.

18     Q.    What was the purpose of those free talk

19  interviews?

20     A.    The purpose of a free talk is to give an

21  individual an opportunity to provide law enforcement with

22  any information that they may have about other crimes

23  other than their own crime that they are being arrested

24  for.  Or sometimes even their own crime, but in this case

25  it was an opportunity for them to give the Sheriff's

1   Office any information that they may have about another

2   crime with the understanding that those statements can't

3   be used against them.

4       Q.    Do you know why there were free talks done of

5   just those four and not other people who were arrested at

6   Uncle Sam's?

7               MS. IAFRATE:  Form.

8               THE WITNESS:  My understanding is we

9   couldn't locate any of the other employ- -- there were,

10  like, 16 employees that were arrested at that original

11  warrant, but only four, maybe five were charged.  And at

12  that time we only had four.  And we -- I would have loved

13  to have talked to everybody that worked there, but the

14  current employees were protected, and the other people we

15  couldn't locate.  So it was just those four; that's all we

16  had.

17  BY MR. JACOB:

18      Q.    What do you mean "the current employees were

19  protected"?

20      A.    My understanding was that we -- that they

21  weren't able to be questioned and so -- because

22  Mr. Frimmel had counsel.

23      Q.    Why were you present at the free talk

24  interviews?

25      A.    I went to that free talk because I was new to

1    Q.    For Mrs. Norton, did the Sheriff's Office tell

2    you for each of the cooperating witnesses that she was

3    charged with knowing that they did not have a valid Social

4    Security Number; that she had a communication on

5    immigration status with each of those four cooperating

6    witnesses?

7    A.    For the ones that she was charged with, they

8    commun- -- the Sheriff's Office provided me with

9    information that she was aware of their immigration

10   status.  I can't say whether she had a conversation with

11   them about it, but she was aware.  She had knowledge that

12   they were not legally authorized to work in the United

13   States for the ones that she was charged with.  I know

14   that she wasn't charged with everything that Bret was

15   charged with.

16   Q.    And do you recall what that evidence was that

17   she knew -- for those that she was charged with, that she

18   knew about their immigration status?

19   A.    It was the culture of the restaurant.  Again, it

20   was the conversations that they had about the waitresses

21   going on vacation but the cooks couldn't go because they

22   don't have valid ID and they can't fly post 9/11.  You

23   know, you have to have a valid driver's license to fly.

24   And, you know, that "Watch out, the Sheriff's Office is

25   coming in to eat, and if you don't get busy, I'm going to

1    report you."  Those types of things that happened in the

2    restaurant, the culture, that indicates she had knowledge

3    that they weren't in the country legally.

4         Q.    For all the employees who didn't have valid

5    Social Security numbers?

6         A.    For the ones that she was charged with, yes.

7    There was enough evidence in what I was given to indicate

8    she knew -- she had knowledge for the ones that she was

9    charged with.  I wouldn't have charged her if I didn't

10   feel that there was probable cause to believe that she had

11   knowledge.

12        Q.    And your probable cause then, that you've opened

13   this up, your probable cause was that she had a general

14   knowledge that many of the employees didn't have valid

15   Social Security numbers?

16             MR. EAVES:  Hold on.  I don't think she

17   opened it up.  I think you asked her what evidence she was

18   presented with, and she told you what evidence she was

19   presented with.  So I'm not going to sit here and say she

20   waived that.

21   BY MR. JACOB:

22        Q.    Let me ask you one more time so I understand

23   because I believe you're saying, "I wouldn't have done

24   if."

25             Okay.  Valentin Villanueva Fernandez.

1        Q.    As you sit here today, do you think the

2    Sheriff's Office gave you a fair appraisal of their

3    investigation and the evidence that they had to support

4    charging Mr. Frimmel and Mrs. Norton?

5                    MS. IAFRATE:   Form.

6                    MR. EAVES:   Form and foundation.

7                    THE WITNESS:   Yeah.   I -- yes.   I think --

8    as I sit here today, I still absolutely think he knew what

9    was going on in his restaurant.   And I think even if there

10   were, you know, discrepancies in the work, the overall

11   evidence that was presented to me is -- I would probably

12   still charge it like -- I still think he knew.   He knew

13   his kitchen staff wasn't legal, and he still processed

14   their payroll with Social Security numbers that could not

15   possibly belong to them; that belonged to real people,

16   real victims.   Absolutely.

17                   MR. JACOB:   Thank you.

18                   MS. IAFRATE:   I have nothing.

19                   MR. EAVES:   Nothing from me.

20                   THE VIDEOGRAPHER:   This concludes the

21   videotaped deposition of Jaimee Oliver.   Today's date is

22   9 -- is September 22, 2016.   The time is 12:22 p.m.

23                   (WHEREUPON, this deposition concluded at

24   12:22 p.m.)        _____

25                            JAIMEE OLIVER

**EXHIBIT 10**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

LISA NORTON, et al.,            )
                                )
        Plaintiffs,             )
                                )
vs.                             ) No. CV
                                ) 15-00087-PHX-SPL
JOSEPH M. ARPAIO, et al.,       )
                                )
        Defendants.             )
                                )

VIDEOTAPED DEPOSITION OF BRET RICHARD FRIMMEL

Phoenix, Arizona

September 29, 2016

Reported by:  Cathy A. Miccolis, RPR/CRR

Certified Reporter, No. 50068

Norton v. Arpaio                                    Bret Richard Frimmel

1          Q.   Did they fill out new paperwork?

2          A.   Yes.

3          Q.   Did you do anything in order to determine if

4     they were lawfully working in the United States?

5          A.   They were E-Verified.

6          Q.   When did you start E-Verifying?

7          A.   Personally?  The day after the government shut

8     down, whenever that was.

9          Q.   When you say day after government shutdown, are

10    you talking about MCSO?

11         A.   No.

12         Q.   Okay.  So what are you talking about?

13         A.   I mean the federal government was shut down for

14    a period of time and couldn't use any system.

15         Q.   Okay.  Okay.  I had my terminology mixed up.

16    Okay.  So there was a point where you started using

17    E-Verify; right?

18         A.   No.  I -- I always thought it was being done.

19         Q.   But it wasn't; right?

20         A.   It wasn't being done the way I was paying for

21    it to be done.

22         Q.   Was E-Verify being done at Uncle Sam's for your

23    employees prior to what you call the government shutdown?

24         A.   It was supposed to be being done.

25         Q.   But it wasn't being done, was it?

Norton v. Arpaio                                    Bret Richard Frimmel

 1       A.   We came to find out later it was not being done

 2  appropriately.

 3       Q.   Was it being done at all?

 4       A.   I don't know to be honest with you what the

 5  final fact of that is.  We had never finished looking at

 6  it.

 7       Q.   What do you mean "we never finished looking at

 8  it"?

 9       A.   There was nowhere to go with it.  My

10  understanding was there was no recourse.

11       Q.   Did you ever receive any verbal or written

12  communication that your employees were being E-Verified?

13       A.   Yes.

14       Q.   From whom?

15       A.   ADP.

16       Q.   Who told you?

17       A.   A representative from ADP.

18       Q.   What's his name?

19       A.   I don't remember her name.  It was a her.  I do

20  remember that, but I don't remember her name.

21       Q.   When did this person tell you that?

22       A.   It was the beginning of '08.

23       Q.   You remember that?

24       A.   Yes.

25       Q.   Do you remember reading that contract that we

Norton v. Arpaio                              Bret Richard Frimmel

Page 101

1        A.    Yes.

2        Q.    Was there any contract or document that you

3   filled out with ADP following when E-Verify was

4   implemented?

5        A.    No.

6        Q.    Let me go back.

7              We talked about either nine or 10 employees,

8   and the understanding that I have is that nine were the

9   result of the investigation that was ongoing regarding

10  Uncle Sam's and one arrest was related to an outstanding

11  search warrant.  Some of those people never came back to

12  Uncle Sam's; correct?

13       A.    Correct.

14       Q.    In fact, if there were 10, you say you recall

15  two coming back; correct?

16       A.    I believe the one with the warrant tried to

17  come back and I just didn't -- wasn't having it.

18       Q.    Okay.  Fair enough.  So as you sit here today

19  you do recall reemploying two of the individuals that were

20  arrested?

21       A.    Yes.

22       Q.    Following the execution of the search warrants

23  by Maricopa County Sheriff's Office, did you or anyone on

24  your behalf do anything to determine if the remainder of

25  the individuals that you employed were here illegally?

Norton v. Arpaio                                    Bret Richard Frimmel

Page 177

```
 1   STATE OF ARIZONA          )

                               )  ss.

 2   COUNTY OF MARICOPA        )

 3              BE IT KNOWN that the foregoing deposition was

 4   taken before me, Cathy A. Miccolis, RPR, a Certified

 5   Reporter, Certificate #50068, for the State of Arizona,

 6   and by virtue thereof authorized to administer an oath;

 7   that the witness before testifying was duly sworn by me to

 8   testify to the whole truth; that the questions propounded

 9   to the witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   print by computer-aided transcription under my direction;

12   that pursuant to request, notification was provided that

13   the deposition is available for review and signature; that

14   the transcript consisting of 177 pages is a full, true and

15   accurate transcript of all proceedings and testimony had

16   and adduced upon the taking of said deposition, and

17   preparation, production and distribution of the transcript

18   and copies comply with law and code as required by ACJA

19   7-206(F)(3), all done to the best of my skill and ability.

20              I FURTHER CERTIFY that I am in no way related to

21   nor employed by any of the parties hereto nor am I in any

22   way interested in the outcome hereof.

23   DATED at Phoenix, Arizona, October   , 2016.

24   _____      _____
     Bamford Reporting Service, Inc.      Cathy A. Miccolis, RPR/CRR

25                                        Certified Reporter #50068
```

BAMFORD REPORTING SERVICE 602-265-5974

**EXHIBIT 11**

1

```
 1              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

 2                  IN AND FOR THE COUNTY OF MARICOPA

 3

 4    STATE OF ARIZONA,            )
                                   )
 5                 Plaintiff,      )
                                   )
 6          vs.                    )    No. CR 2014-103633-001
                                   )
 7    BRET RICHARD FRIMMEL,        )
                                   )
 8                 Defendant.      )
      _____)
 9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        FRANKS HEARING
11

12        BEFORE:  THE HONORABLE SAM J. MYERS, Judge

13

14    APPEARANCES:       Michael A. Anderson
                         Michael Gingold
15                       Deputy County Attorneys
                         Represented the State
16
                         Paul K. Charlton
17                       Quintin H. Cushner
                         Lawfirm of Steptoe and Johnson
18                       Leon B. Silver
                         Lawfirm of Gordon and Rees
19                       Represented the Defendant

20

21                                      March 6, 2015
                                        9:17 a.m.
22    COPY                              Phoenix, Arizona

23

24    LAURIE R. YAZWA
      Official Court Reporter
25    Certified Reporter #50184
```

```
 1               THE COURT:  Sir, if you'll please take a walk
 2     around the court reporter, up the steps, and have a seat
 3     here on the witness stand.
 4               Counsel, whenever you're ready.
 5               MR. CHARLTON:  Thank you.
 6
 7               SERGEANT JOSHUA HENDERSON,
 8     called as a witness, testified on his oath as follows:
 9
10                    DIRECT EXAMINATION
11     BY MR. CHARLTON:
12          Q    Your name for the record, please?
13          A    Joshua Henderson.
14          Q    What is it you do for a living, Mr. Henderson?
15          A    I'm a sergeant with the Maricopa County
16     Sheriff's Office.
17          Q    How long have you been so employed?
18          A    For approximately 14 years.
19          Q    How long have you been a detective?
20          A    From October 2012 to December of 2014.
21          Q    What was your first position as a detective
22     within the Maricopa County Sheriff's Office?
23          A    It was with the Criminal Employment Unit.
24          Q    You were assigned as a detective to that unit?
25          A    Yes, I was.
```

1   Detective.

2        A    Okay.

3        Q    Is it your testimony here today that sandwiches

4   were sold at the Cochise Road address?

5        A    No, that's not what I'm saying.

6        Q    Were sandwiches sold at the Cochise address?

7        A    I don't know that.

8             MR. CHARLTON:   00849, please.  First paragraph

9   highlighted, please.

10       Q    BY MR. CHARLTON:   Take a look at 00849,

11  please, Detective, on Exhibit 2A.  You see that first

12  paragraph, "On January 24, 2013 your Affiant conducted an

13  interview with a complainant who wishes to remain a

14  confidential source"?  You see that?

15       A    Yes, I see that.

16       Q    "In reference to Uncle Sam's, the complainant

17  stated they wanted to remain a confidential source due to

18  fear of retaliation."  You see that, sir?

19       A    Yes, I see that.

20       Q    And you see "The complainant told your Affiant

21  that they had been employed prior to resigning work at the

22  restaurant located at 18913 N. 83rd Ave."  You see that?

23       A    I see that.

24       Q    That individual, that confidential source, is

25  in fact Denee Porter Ishak; is that correct?

1          A    At the time that this affidavit was authored, I
2     did not know that information.
3               MR. CHARLTON:  Your Honor, the answer calls for
4     a yes or no.  I'd ask the witness to be instructed when I
5     ask a yes or no question to answer yes or no, or if he
6     can't to simply say, "I can't answer."
7               THE COURT:  Mr. Henderson, his questions are
8     going to be very specific.  So make sure you're listening
9     to what he's asking and make sure you're answering what
10    he's asking.
11              THE WITNESS:  Yes, Your Honor.
12         Q    BY MR. CHARLTON:  Detective, the confidential
13    source here listed is in fact Denee Porter Ishak; is that
14    not correct?
15              MR. ANDERSON:  Objection, Your Honor,
16    foundation as to what time frame we're talking about.
17              THE COURT:  Overruled.  The witness may answer
18    if he's able.
19              THE WITNESS:  That in fact is Denee Porter.
20         Q    BY MR. CHARLTON:  And you tell the Court that
21    Denee Porter Ishak resigned from work, correct?
22         A    Yes, I put -- yes, I told that.
23         Q    And when you make these statements in an
24    affidavit, Detective, you're swearing to these statements,
25    correct?

1            A    That's correct.

2            Q    Your right hand was raised when you took the

3    oath, correct?

4            A    That's correct.

5            Q    Just as you did here today, correct?

6            A    That's correct.

7            Q    In fact, what you don't include inside that

8    affidavit is that Ms. Porter Ishak had left the employment

9    of Uncle Sam's on January 7th of 2011, correct?

10            A    I don't see that in the affidavit.  Can you

11    show me where you're talking about?

12            Q    That's precisely my question, sir.  Nowhere in

13    this affidavit does it say that the confidential source

14    here, Miss Denee Porter Ishak, left the employ of Uncle

15    Sam's in January of 2011, does it?  Nowhere.

16            A    No, it's not in there.

17            Q    Correct.  But you do say she resigned, correct?

18            A    Correct.

19            Q    So you knew the confidential source had

20    resigned, correct?

21            A    Correct.

22            Q    And in fact you knew she'd resigned in 2011,

23    correct?

24            A    I would say I don't recall knowing that

25    information.  I don't -- can I refer to my supplement

```
 1                 THE COURT:  Mr. Anderson, if you need to
 2    approach and look at the exhibit, you're free to do that.
 3                 MR. ANDERSON:  The State will stipulate, Your
 4    Honor.
 5                 THE COURT:  Exhibit 26 is admitted.
 6         Q    BY MR. CHARLTON:  You see 03604, Detective?
 7         A    Yes, I do.
 8         Q    You see the initial contact date, August 2nd,
 9    '12?  You see that?
10         A    Yes, I do.
11         Q    You see above that where it says complainant,
12    it has two names, correct?
13         A    Yes.  It has one crossed out and another one
14    above it.
15         Q    Right.  The one above it is Said, correct?
16         A    Correct.
17         Q    The one below it is Denee, correct?
18         A    Correct.
19         Q    They are in a relationship, correct?
20         A    Are you asking about their status now or
21    when -- can you kind of specify what time you're talking
22    about?
23         Q    During the January 24th, 2013 phone call that
24    you had with Miss Porter Ishak, she was in a relationship
25    with Said Ishak, correct?
```

1           A    That's incorrect.  I didn't know that at that

2     time.

3           Q    Well, I'm not asking what you knew.  I'm asking

4     if she was or not.

5           A    I learned that -- I learned that they were in a

6     relationship in February of 2014.

7           Q    So, on the February 20th, 2013 phone call, is

8     it your testimony that you did not know that she was in a

9     relationship with Said Ishak?

10          A    That's correct.

11          Q    These two names appear together, correct, Said

12    and Denee, on the tip sheet, correct?

13          A    That's correct.

14          Q    And the date she makes the call is August 2nd

15    of 2012, correct?

16          A    That's correct.

17          Q    What is the significance of August 12, 2012?

18          A    That's the day she called and made a complaint.

19          Q    It's also the date, is it not, Detective, that

20    Said Ishak was arrested?  Is that not correct?

21          A    To the best of my recollection, I believe

22    that's correct.

23          Q    And he was arrested, is it not correct,

24    Detective, for stealing, stealing from Mr. Frimmel?  Is

25    that not correct?

```
 1          A    That -- to the best of my recollection, that's
 2    correct.
 3          Q    And he eventually pled guilty for stealing from
 4    Mr. Frimmel; is that not correct?
 5          A    I don't know what the plea -- I can't -- I
 6    don't recall what the plea arrangements were with that.
 7          Q    So the date that Denee Porter Ishak makes a
 8    phone call to the Sheriff's Office with a tip about alleged
 9    wrongdoing by my client is the date her husband is arrested
10    for stealing from my client, correct?
11          A    But at the time I did not know that
12    information.
13          Q    I'm not asking you that question.
14          A    Okay.  Okay.
15          Q    Is that correct?
16          A    Yes, that's correct, that I learned that on --
17          Q    No, that's not the question.
18          A    -- 2014.  Okay.
19          Q    Is it not correct -- I'll ask the question
20    again, Detective.  Is it not correct that Denee Porter
21    Ishak calls in a tip to the Sheriff's Office complaining
22    about wrongdoing by my client on the date that her husband
23    is arrested for stealing from my client?  Is that not
24    correct, sir?
25          A    That's correct.
```

1          Q    Show me anywhere in Exhibit 2 where that

2    information is given to the magistrate.

3          A    Well, it's not in there because I didn't have

4    that information.

5          Q    I didn't ask you why it's not in there.  I

6    asked you is it in there.

7          A    Okay, it's not in there.

8          Q    Let's go to the February 20th interview that

9    you do with Denee Porter Ishak.

10              MR. CHARLTON:  Exhibit 23, please.

11              May I approach, Your Honor?

12              THE COURT:  You may.

13              MR. CHARLTON:  Exhibit 23 before the witness

14    now.

15          Q    BY MR. CHARLTON:  You recognize Exhibit 23,

16    Detective?

17          A    Yes, I do.

18          Q    What is Number 23?

19          A    It's a supplement report reference a contact by

20    telephone with Denee Porter Ishak on February 18th, 2014.

21              MR. CHARLTON:  Move the admission of Exhibit

22    Number 23, Your Honor.

23              THE COURT:  Is there any objection?

24              MR. ANDERSON:  No, Your Honor.

25              THE COURT:  Exhibit 23 is admitted.

1    top part there.

2         Q   BY MR. CHARLTON:  In fact, you contact him on

3    the very same day, correct?

4         A   The best of my recollection, that was a

5    mistype.  That was a mistake on my part.  It should have

6    been the next day, the 21st, not the 20th.

7         Q   Is that a mistake on your part because

8    Detective Whelan told you it was a mistake, or is that a

9    mistake on your part because you really think it's a

10   mistake?

11        A   No, that's a mistake because I really think

12   it's a mistake.

13        Q   Because if it took place on the 20th, what

14   actually happened, Detective, is that Denee Porter Ishak

15   took the phone from her and gave it to her husband on the

16   20th.  Isn't that what happened?

17        A   No, that's not what happened.

18        Q   But what you're saying is when it says on the

19   20th, that's not accurate; you actually called 24 hours

20   later, correct?

21        A   No, I just -- I put the wrong date, because if

22   you look previous to what you stated, on the page before

23   it's the same date and time.  I just didn't update that

24   date and time.

25        Q   Because the story's a better one this way,

1    correct?

2         A    No.  That's the truth.

3         Q    Your memory is better as it relates to this

4    fact, correct?

5         A    I just remember talking to him the next day.

6         Q    Correct.  That's a pretty good memory, right?

7              You knew by February 20th of 2013 that these

8    two were living together, correct?

9         A    That's incorrect.

10        Q    You knew that they were married, correct?

11        A    That's incorrect.

12        Q    And you knew that she hadn't been working there

13   since 2011, correct?

14        A    I can't -- I can't answer that without me

15   looking through my supplements.

16        Q    You have a supplement there right in front of

17   you.  You have a supplement there that says whether or not

18   she had been working there in 2011.

19        A    May I take a moment to read through this?

20        Q    Please.

21        A    Okay.  To answer your question if I knew that

22   she resigned or quit working in 2011, the answer was no, I

23   did not know that information.

24        Q    You never asked her that information?

25        A    I don't recall the specific conversations that

 1    next witness.

 2               MR. CUSHNER:  We call Detective Hechavarria.

 3               THE COURT:  Sir, if you'll please come forward

 4    and approach the clerk that's standing to my left.

 5               (The clerk administered the oath to the

 6    witness.)

 7               THE COURT:  Sir, please take a walk around the

 8    court reporter, up the steps.  Have a seat here on the

 9    witness stand.

10               Counsel, whenever you're ready.

11

12               DETECTIVE CHRIS HECHAVARRIA,

13    called as a witness, testified on his oath as follows:

14

15                    DIRECT EXAMINATION

16    BY MR. CUSHNER:

17         Q    Detective Hechavarria, good afternoon.

18         A    Good afternoon.

19         Q    Detective Hechavarria, you're a deputy sheriff

20    with the Maricopa County Sheriff's Office, correct?

21         A    Yes.

22         Q    And if I could ask your indulgence, if you

23    could dig through that pile of exhibits, there should be an

24    exhibit labeled Number 4.  If you could retrieve that,

25    please.  Let me know once you've retrieved it.

1           A    No problem.

2                THE COURT:  Mr. Cushner, if you want to assist,

3      it might make things go a little more quickly.

4                MR. CUSHNER:  Sure.

5                There we go.

6                THE WITNESS:  Thank you.

7           Q    BY MR. CUSHNER:  Detective Hechavarria, do you

8      see the numbers in the bottom right-hand corner of the

9      exhibits?

10          A    I do.

11          Q    I'm going to be referring to those.

12          A    Okay.

13          Q    Detective Hechavarria, you prepared the search

14     warrant affidavit that's at Exhibit 4 pages 2364 to 2368,

15     correct?

16          A    Yes, I did.

17          Q    And you signed the search warrant at Exhibit 4

18     page 2368, correct?

19          A    Yes, I did.

20          Q    And you signed this affidavit under oath,

21     correct?

22          A    That is correct.

23          Q    And you intended the commissioner who signed

24     the search warrant to rely upon your signed affidavit made

25     under oath, correct?

1          A    That's correct.

2          Q    If you could go to page 2367.  You advised the

3     Court on page 2367 that the facts in your probable cause

4     statement were provided by Detective Henderson; is that

5     correct?

6          A    Correct.

7          Q    And Detective Henderson provided you these

8     facts in what you called an affidavit, correct?

9          A    Correct.

10         Q    And you intended the commissioner to rely on

11    the affidavit that Detective Henderson provided and that

12    was included in your search warrant affidavit, correct?

13         A    Correct.

14         Q    And you did not retain the affidavit that

15    Detective Henderson provided, correct?

16         A    I did not.

17              MR. CUSHNER:  If you could zoom out and go to

18    the bottom of that page.

19              Go to page 2367, and, if you could highlight

20    it.  There you go.

21         Q    BY MR. CUSHNER:  The bottom of page 2367, and

22    this paragraph bleeds into 2368, states, "It is also my

23    experience that people who deal in quantities of illegal

24    drugs have to communicate to successfully control, operate,

25    and facilitate an illegal drug trafficking organization.

1   Telephones, pagers, and cellular telephones are some of the

2   common forms of electronic communication used by drug

3   trafficking organizations.  They communicate by voice,

4   text, video, instant messaging, push-to-talk walkie-talkie

5   style communication and photographs to avoid police

6   detection."

7           Do you see that, Detective Hechavarria?

8       A   I do.

9       Q   There's no evidence, Detective Hechavarria, in

10  the four corners of this affidavit regarding illegal drugs,

11  correct?

12      A   That's correct.

13      Q   And there's no information in this case

14  involving illegal drugs, correct?

15      A   Correct.

16          MR. CUSHNER:  Nothing further.  Thank you.

17          THE COURT:  Thank you.

18          Cross-examination?

19

20                      CROSS-EXAMINATION

21  BY MR. ANDERSON:

22      Q   In the body of your affidavit it refers to an

23  affidavit that was provided to you by Detective Henderson?

24      A   Yes.

25      Q   No sworn statement was ever given to you by the

1

2

3

4

5              I, LAURIE R. YAZWA, hereby certify that the

6    foregoing 237 pages are a true and accurate transcription

7    of the proceedings, prepared to the best of my ability.

8

9                              _____/s/_____

10                             LAURIE R. YAZWA

11                             Official Court Reporter

12                             Certified Reporter #50184

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 12**

*[handwritten annotations:]* Received 5 copies, 1 for each D.  SERVED IN PERSON BY: JOE BEACOM @ 1347 Hours  Accepted FOR MCSO – KLT APPO  RECEIVED JUL 21 2014  DB Nou P.S.  2010 8259 LN.  KAT X3615 7/23/14

# POLSINELLI

CityScape, One E. Washington St., Ste. 1200, Phoenix, AZ, 85004   602.650.2000

July 21, 2014

Leon B. Silver
(602) 650-2066
(602) 264-7033
lsilver@polsinelli.com

## Notice of Claims Pursuant to A.R.S. § 12-821.01

Fran McCarroll, Clerk of the Maricopa Board of Supervisors

*1* Joseph M. Arpaio, Maricopa County Sheriff's Office

*2* Joseph M. Arpaio   *S0991*

*3* Joshua Henderson   *S1458*

*4* Brandon Jones   *A7823*

*5* Christopher Hegstrom   *B1798*

Re:   **Notice of Claim of Lisa and Bruce Norton for, *inter alia*, Defamation**

To the Addressees:

Pursuant to A.R.S. § 12-821.01 this letter constitutes notice of the claims of Lisa and Bruce Norton, against Maricopa County, the Maricopa County Sheriff's Office (MCSO), and its individual employees, Sheriff Joseph M. Arpaio, Detective Joshua Henderson, Brandon Jones and Christopher Hegstrom.

These claims arise from specific harm that occurred during the course of the MCSO's ongoing notorious, illegal and abusive attempts to enforce immigration laws in the face of a Federal Court issued injunction prohibiting them from doing the same. MCSO has openly demonstrated contempt for the Federal Court order, calling the orders of that Court "ludicrous" and "absurd," and referring to the order itself as "this crap."



July 21, 2014
Page 2

In furtherance of its feud with the Federal Court, in July 2013, MCSO raided two restaurants that operate under the name "Uncle Sam's" purportedly to investigate alleged identity theft. The Uncle Sam's restaurants are owned and operated by Mr. Frimmel through his companies, Pishka, Inc. (owner of the restaurants), and BRF Enterprises, LLC (owner of the real estate and landlord to Uncle Sam's as well as other tenants). Lisa Norton is a long time employee of Uncle Sam's and is the general manager.

During those raids, MCSO arrested nine undocumented immigrant workers under the pretext of identity theft charges. (A tenth employee was arrested on an outstanding auto theft warrant.) Only four of the arrested employees were charged with identity theft. The other five were released with no charges. These raids were conducted on the basis of false affidavits and testimony of MCSO Det. Henderson, who was the agent in charge of the investigation and raids.

Shortly after the raids, the U.S. Department of Justice ("DOJ") reached out to Mr. Frimmel to see if he would cooperate in its investigation of MCSO and Sheriff Arpaio. Mr. Frimmel has a first amendment right to speak to DOJ. However, in an attempt to intimidate Mr. Frimmel from exercising that right and cooperating with law enforcement, MCSO arrested Mr. Frimmel, and the general manager of the Uncle Sam's restaurants, Ms. Norton, on fabricated charges of accepting the identity of another, trafficking in fraudulent identity documents, forgery and conspiracy.

Subsequent to the arrests, the County Attorneys' office obtained grand jury indictments of Mr. Frimmel and Ms. Norton on 13 unfounded felony charges. The indictments were obtained solely based on the flawed investigation and false testimony of MCSO Det. Henderson. And as is standard for MCSO, Sheriff Arpaio engaged in a media campaign surrounding the arrests, defaming Ms. Norton with false allegations of illegal activity and proudly touting that MCSO was now going after employers just as it has always gone after undocumented workers.

Subsequent discovery revealed that the results of MCSO's investigation showed unequivocally that neither Mr. Frimmel nor Ms. Norton committed any crime, and no reasonable person would have pursued these charges. Rather, the evidence obtained in the investigation was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging Mr. Frimmel and Ms. Norton no matter what. It can be logically concluded that Sheriff Arpaio saw this as an opportunity to both intimidate Mr. Frimmel and engage in a public relations ploy that served his political purposes and chose to pursue Ms. Norton in order to get her to turn on Mr. Frimmel. In either case, Ms. Norton's rights were violated.

Lisa and Bruce Norton's lives were then forever changed. They suffered, and continue to suffer emotional distress, reputational damage, and financial damage, including incurring over $100,000 in attorneys' fees as a result of the unfounded charges. The Uncle Sam's restaurants



July 21, 2014
Page 3

suffered, and continue to suffer substantial losses in lost customer revenue, good will, reputational damage and lost value. Mr. Frimmel's real estate company has also been significantly damaged by MCSO's ill-conceived and legally unsupported raids.

The search warrants, arrest, probable cause statements and grand jury proceeding teem with false and misleading testimony by MCSO and in particular, Det. Henderson. The grand jury proceeding was further marred by the Deputy County Attorney's decision to refrain from presenting clearly exculpatory evidence as required by law.[1]

Lisa and Bruce Norton submit this notice of claim for the claims set forth in detail below and summarized as the defamation, false light invasion of privacy, intrusion upon seclusion, negligent supervision, interference with business expectancy, violation of civil rights, including 42 U.S.C. § 1983, Free Speech, Law Enforcement Retaliatory Conduct, Abuse of Process, Abuse of Power, Equal Protection, Unconstitutional Policies, and Failure to Train, committed against him commencing on January 22, 2014.

This notice is timely, pursuant to A.R.S. § 12-821.01.

## I.    Factual Basis for Claims

The factual context leading to the persecution of Ms. Norton goes back many years.

### A.    MCSO's Enforcement of Federal Immigration Laws

In approximately 2005, Arpaio and the MCSO began a highly publicized campaign to "crack down" on undocumented immigrants in Maricopa County. They formed a special unit dedicated to this task (the Human Smuggling Unit or "HSU") and pushed the passage of a new anti-human smuggling law. In March 2006, Arpaio and the MCSO began arresting undocumented immigrants for felonies under the new anti-human smuggling law for conspiring to smuggle themselves into the United States. The MCAO, alone among prosecuting agencies in the State, offered an interpretation of the law approving those arrests.

Arpaio and the MCSO obtained state funding to assist in their anti-immigration enforcement. In addition, through a 2007 agreement with the federal government, Arpaio and MCSO obtained federal funding for their anti-immigration campaign. Using these state and federal funds, MCSO conducted a number of "anti-immigration sweeps." During the anti-

---

[1] Amazingly, the County Attorney later stated in court filings that she didn't present the exculpatory evidence because doing so would "confuse the grand jurors".



July 21, 2014
Page 4

immigration sweeps, squads of deputy sheriffs and posse members descended upon a designated area, typically with a large Hispanic population, to round up undocumented immigrants.

In May 2008, in response to public outcry over the illegal tactics of Arpaio and the MCSO, then-Governor Napolitano issued an executive order that resulted in the MCSO losing $1.2 million in state funds for immigration enforcement.  On May 10, 2012, DOJ filed a Complaint alleging that MCSO and Sheriff Arpaio "have engaged and continue to engage in a pattern or practice of unlawful discriminatory police conduct directed at Latinos in Maricopa County."

In another lawsuit - *Melendres v. Arpaio et al.* - the plaintiffs alleged that Arpaio and MCSO had unlawfully instituted a pattern and practice of targeting Latino drivers and passengers in Maricopa County during traffic stops. On December 23, 2011 the District Court entered an Order prohibiting MCSO from detaining any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." A trial took place in that case before U.S. District Court Judge Murray Snow, during which deputies involved in the investigation of Mr. Frimmel, including now deceased and disgraced MCSO Det. Ramon Charley Armendariz, were found to be "not credible." In a later Order dated May 24, 2013, MCSO was found to have violated the injunction and the court ordered "monitoring" of MCSO for a pattern of misconduct, including widespread constitutional violations.

Rather than obey the Federal Court Injunction, MCSO and Arpaio engaged MCSO's "Criminal Employment Unit" to continue MCSO's anti-immigration campaign under the guise of enforcing identity-theft laws. Members of the Criminal Employment Unit, however, still identified themselves as members of the Human Smuggling Unit, even after the HSU was allegedly dissolved.  Det. Henderson is a member of both the "Human Smuggling Unit" and the "Criminal Employment Unit" of MCSO as was Det. Armendariz.

On March 24, 2014, Judge Snow chastised Sheriff Arpaio and his Chief Deputy Jerry Sheridan for flouting the Court's prior Orders. Judge Snow pointed to a video, recorded in October 2013, in which MCSO Chief Deputy Sheridan called Judge Snow's ruling "ludicrous" and "absurd," and referred to the order itself as "this crap." Arpaio followed Sheridan's statements by stating: "What the chief deputy said is what I've been saying."  The incendiary and disrespectful remarks by Arpaio and Sheridan were made during the time period between the July 2013 raid on Uncle Sam's and the January 2014 arrests of Mr. Frimmel and Ms. Norton and demonstrate the lawlessness rampant during the precise time they became targets of MCSO.

In May 2014, extremely troubling information came to light regarding Detective Armendariz.  Armendariz was the detective in charge of the July 2013 raid at Uncle Sam's



Peoria location and a member of the MCSO's "Human Smuggling Unit". Armendariz reportedly took his own life that month.  In the wake of Armendariz's death, investigators found not only heroin, methamphetamine, and marijuana at his home, but also hundreds of stolen driver's licenses, identifications, license plates, passports, airport security clearance cards, evidence bags, and wallets.   Further, the search of Armendariz's home revealed recordings of thousands of his traffic stops, which by one account "reportedly document misconduct on the part of [MCSO Det. Armendariz]."[2]

### B.  MCSO's Actions Involving Ms. Norton.

On July 17, 2013, MCSO, carrying three search warrants, raided the Phoenix and Peoria Uncle Sam's locations as well as Mr. Frimmel's home. During the raid, ten Uncle Sam's employees were arrested, although apparently only four were ever charged and convicted with identity theft.  The convictions were the result of plea agreements entered with MCAO for cooperation in its investigation of Mr. Frimmel and Ms. Norton.

During the raid, and again after the raid, Det. Henderson was informed that Mr. Frimmel was represented by counsel.

A few days after the raid, Mr. Frimmel was contacted by DOJ investigator Sarah Lopez, who sought Mr. Frimmel's assistance with DOJ's investigation of MCSO.  At the time Mr. Frimmel received this communication he, and his attorney, had been told by Det. Henderson that Mr. Frimmel was considered a victim in MCSO's investigation rather than a suspect or a person of interest.  MCSO's recent conduct in bringing criminal charges to harass and intimidate Mr. Frimmel demonstrate that MCSO's investigation was motivated by its concern that Mr. Frimmel might cooperate with the DOJ's investigation, a retaliatory act in violation of Mr. Frimmel's rights.

Between the July 2013 raid and January 2014, and despite knowing that Mr. Frimmel was represented by counsel, MCSO sought to gather evidence against Mr. Frimmel by having informants approach him, and by contacting Mr. Frimmel's current employees, in violation of Mr. Frimmel's civil rights.

On January 22, 2014, Mr. Frimmel and Ms. Norton were arrested on charges related to the purported unlawful acceptance of and/or trafficking in stolen identification provided by four undocumented workers at Uncle Sam's restaurants. The arrests were supported by knowingly

---

[2] Three of the four cooperating defendant witnesses in the criminal case against Mr. Frimmel and Ms. Norton were arrested at the Peoria location, which operation was run by Armendariz.



false and intentionally misleading probable cause statements provided by Det. Henderson, in violation of Mr. Frimmel's and Ms. Norton's rights. Det. Henderson did not obtain an arrest warrant. MCSO chose to engage in a public arrest complete with a media event rather than simply send a summons to Mr. Frimmel or his counsel.[3]

MCSO and Sheriff Arpaio created a media event surrounding the arrests of Mr. Frimmel and Ms. Norton, engaging in several television interviews, speaking with newspaper reporters and issuing press releases in which MCSO and Sheriff Arpaio repeatedly made defamatory statements regarding the Claimants. MCSO and Sheriff Arpaio additionally posted defamatory comments surrounding the raid on social media, including on Sheriff Arpaio's Facebook page. The defamatory statements included, among other things that Mr. Frimmel and Ms. Norton had committed criminal offenses, had knowingly hired undocumented workers, had assisted undocumented workers in obtaining false documents and had intentionally solicited undocumented workers to work at Uncle Sam's. These statements have caused damages to all of the Claimants.

### C.   MCSO's Investigation Demonstrated that Ms. Norton Committed no Crime, Yet Arrested Her and Engaged in a Media Campaign Regardless

#### 1. MCSO Arrested Ms. Norton on False Grounds

The basis for the probable cause arrest of Ms. Norton and Mr. Frimmel are set forth by Det. Henderson in a Probable Cause Statement.[4] The Probable Cause Statement is confusing, inherently contradictory, and made it impossible to determine what charged offense related to which assertion of fact. The statements were replete with assertions of fact that Henderson knew were false and were contradicted by his previous interviews of various witnesses, which were recorded. Those false or misleading statements included, but are not limited to the following:

- That Mr. Frimmel knowingly entered four fictitious or forged social security numbers into his computer and transmitted them to ADP.

---

[3] That MCSO and Arpaio chose a probable cause arrest when a summons would have sufficed, is additional evidence of the improper motives behind the arrest.

[4] There is in fact so little mentioned regarding Ms. Norton in any of the documents or witness interviews that the allegations against Mr. Frimmel have to be examined to understand the complete lack of any basis for the arrests at all.



- That five of the suspects arrested on July 17, 2013 came forward with information that Mr. Frimmel knowingly committed forgery or identity theft and/or conspiracy to commit forgery and identity theft.

- That both current and past employees stated that Mr. Frimmel knowingly hired employees that were using forged identities.

- That Henderson was contacted by four ex-employees with information consistent with information provided by the five employees.

- That one employee told him that Mr. Frimmel instructed the employee to forge the hiring date on another employee's W-4 to say he was hired in 2007, rather than 2010.

- That witnesses claimed that Mr. Frimmel was present during the hiring process and hired them without having to provide a valid identification or social security number.

- That the fact that some employees were working without food handler's cards was somehow relevant to the question of whether Mr. Frimmel knowingly hired workers based on stolen identities or forged documents.

- That "employees" advised that they signed and dated blank "applications" and tax forms, and that social security numbers were later provided and written in by the business.

- That Mr. Frimmel made comments that he didn't care about employees' immigration status and would call staff "illegals".

- That Ms. Norton made derogatory statements regarding Latino workers.

- That Ms. Norton directed that work applications be given to Latinos.

Relying on these skewed conclusions from his investigation, Ms. Norton was arrested by MCSO on January 22, 2014 and charged with various offenses. These charges were later replaced by a grand jury indictment.

These allegations, however, were diametrically opposed to the "Facts" that Det. Henderson learned in his investigation. In fact, no witness claimed to have been hired by Mr. Frimmel or Ms. Norton or that Mr. Frimmel or Ms. Norton were present during the hiring



July 21, 2014
Page 8

process. No witness claimed that they were not required to provide valid identification. Rather, several witnesses explained that lower level managers other than Mr. Frimmel or Ms. Norton did the hiring and obtained the proof of identity. Other witnesses, including long time managers reported that identification was required and that if they hired someone without it, they would be fired by Mr. Frimmel. No witness claimed to have signed a blank application.

In order to be guilty of accepting the identity of another, Ms. Norton had to "knowingly" accept false documents. There was no information provided to Det. Henderson to even suggest that Ms. Norton had any involvement in accepting identification documents from the employees no less that she knew the documents were false. Moreover, the law is that a prospective employer must accept whatever documents are provided, or be subject to liability for discrimination.

As stated above, the evidence was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging and arresting Mr. Norton no matter what.[5] Det. Henderson knew from his own investigation that Ms. Norton was not involved in the interview or application gathering process of prospective employees, that Mr. Frimmel required his managers to obtain proper identification documents, that the employees in question all provided facially valid documentation and that Mr. Frimmel entered the employee's information in his payroll company's web based system correctly and as required.

It is beyond dispute that the investigation and arrest were pre-determined and done for illegitimate purposes. And it is just as clear that the media campaign's purpose was to further intimidate Mr. Frimmel and promote Arpaio's political agenda.[6]

### 2. MCSO, Arpaio, Jones and Hegstrom Made False Statements to the Media Regarding the Evidence Gathered and Guilt of Ms. Norton.

On January 22, 2014, presumably under the direction of, and with the approval of Arpaio, MCSO issued a press release regarding Ms. Norton's arrest. (Attachment "A" hereto.) Among other false or misleading statements in the release is the following:

---

[5] The only alternative explanation, if one is even possible, is that the MCSO personnel involved were so poorly trained and poorly supervised that they didn't know any better and didn't understand the consequences of their own inappropriate actions. If that proves to be the case, an amended Notice of Claim will be served.

[6] It is of note that Arpaio once again claimed to be considering a run for Governor and did not remove his name from consideration until May 22, 2014 -- several months after the arrests and media campaign.



July 21, 2014
Page 9

- "Maricopa County Sheriff's detectives have questioned several witnesses who claimed to have first-hand knowledge that Norton and Frimmel colluded together to acquire false identification documents in order to provide those IDs to undocumented workers wishing to be employed at both restaurants."

This press release was picked up by all of the major newspapers and television stations in Arizona and the false comments contained therein were repeated in the following publications on January 22 and 23, 2014 and were attributed to MCSO, Arpaio, Jones and/or Hegstrom:

- 01/22/14 MCSO Press Release "Sheriff's Deputies Take Owner of Uncle Sam's Restaurants into Custody-Arrested for Trafficking Stolen IDs" http://www.mcso.org/MultiMedia/PressRelease/Uncle%20Sam's%20Owner%20Arrested.pdf

- 01/22/14 ABC 15 article "Uncle Sam's Restaurant Owner Bret Frimmel Arrested for Identity Theft, according to MCSO" http://www.abc15.com/news/region-west-valley/peoria/uncle-sams-restaurant-owner-bret-frimmel-arrested-for-identity-theft-according-to-mcso

- 01/22/14 Arizona Newszap article "Sheriff's Office arrests Uncle Sam's Owner" http://arizona.newszap.com/westvalley/129058-114/sheriffs-office-arrests-uncle-sams-owner-at-peoria-location

- 01/23/14 Arizona Daily Independent article "Uncle Sam's Owner Arrested for Identity Theft http://www.arizonadailyindependent.com/2014/01/23/uncle-sams-owner-arrested-for-identity-theft/

- 01/23/14 AZ Central article "Records: Info from Uncle Sam's Restaurant Workers Led to Owner's Peoria Arrest" http://www.azcentral.com/community/peoria/articles/20140123peoria-uncle-sams-owner-arrest-abrk.html

- 01/23/14 AZfamily.com article "Uncle Sam's Owner Appears in Court, Released on Own Recognizance" http://www.azfamily.com/news/Police-Uncle-Sams-owner-knowingly-hired-illegal-workers-forged-documents-241704801.html

- 01/23/14 AZfamily.com article "Uncle Sam's restaurant Owner Arrested for ID Theft" http://www.azfamily.com/news/Uncle-Sams-restaurant-owner-arrested-for-ID-theft-241533741.html



July 21, 2014
Page 10

- 01/23/14b My Fox Phoenix article "Uncle Sam's Owner Arrested for Alleged ID Trafficking"   http://www.myfoxphoenix.com/story/24529851/2014/01/23/uncle-sams-owner-arrested-for-alleged-id-trafficking

- 01/23/14 New Times Article "Joe Arpaio's Workplace Raid of Uncle Sam's Results in First Arrest of Business Owner" http://blogs.phoenixnewtimes.com/valleyfever/2014/01/joe_arpaio_immigration_r aid_uncle_sams_employer.php

- 01/23/14 KPHO, Channel 5 article "AZ Restaurant Owner Accused of Forging IDs for Employees"   http://www.kpho.com/story/24530789/az-restaurant-owner-accused-of-forging-ids-for-employees

- 01/23/14 Video from Channel 3 of coverage of Frimmel arrest http://www.youtube.com/watch?v=BbDEKExbvxs

Additionally, Arpaio appeared on a televised interview aired on local Phoenix TV station on January 22, 2014, and was reposted online at the following link: http://www.azfamily.com/news/10-arrested-in-Uncle-Sams-ID-theft-investigation-216084731.html, regarding the arrests at Uncle Sam's.  In the news report/video the restaurant is mentioned, video was shown of the July 17, 2014 raid Arpaio is shown making the following comment about Mr. Frimmel and Ms. Norton:

- "Also he [Mr. Frimmel] was knowingly hiring employees with fake social security numbers. We have witnesses in the restaurants that he made comments that he likes hiring illegal immigrants because they work hard and he can pay them less money."

This statement is false, and was published to further intimidate Frimmel and promote Arpaio's political agenda.

### 3.  MCSO Cannot Rely on the Grand Jury Indictment as a Defense

On February 7, 2014, Deputy County Attorney Jaimee Oliver sought and obtained indictments against Mr. Frimmel and Ms. Norton in their capacity as owner and manager of Uncle Sam's restaurants from a grand jury.  The charges alleged against both Mr. Frimmel and Ms. Norton in the indictments are two counts of conspiracy to commit taking the identity of another and four counts of taking the identity of another. The charges alleged against Mr. Frimmel alone are four counts of trafficking in the identity of another, one count of forgery, and



July 21, 2014
Page 11

two counts of taking the identity of another. No owner or manager in Arizona had ever been pursued on these identity-theft related charges in the past. The indictment was based entirely on the knowingly false and intentionally misleading testimony of MCSO Det. Henderson.

That a grand jury subsequently indicted Mr. Frimmel and Ms. Norton provides no defense in this case. Procuring an unconstitutional prosecution is unlawful regardless of whether the arrest was unlawful. If the sheriff acted maliciously or with reckless disregard for the rights of the arrested person the prosecutor's independent judgment does not provide the sheriff with immunity.

The grand jury presentation (like Henderson's prior probable cause statements) was utterly confusing and completely inaccurate. MCSO Det. Henderson was Oliver's single witness before the grand jury, and although Henderson had amassed a sizable collection of documents by the time the grand jury heard the case, the grand jury did not see a single document. Oliver and Henderson presented evidence they knew was false. Oliver did not properly instruct the grand jury on the applicable law (and did not provide copies of all of the relevant statutes she alleged were violated), failed to correct Henderson's repeated misstatements of fact and law, and withheld clearly exculpatory evidence – all with the singular purpose of ensuring that the grand jury returned an indictment against Mr. Frimmel and Ms. Norton so that the retaliatory intimidation scheme against them could go forward as planned.

Henderson, on behalf of MCSO, testified regarding information he learned in "free talks" with four witnesses who had been arrested in the July 17, 2013 raid: Fernando Gonzalez, Emidgio Munoz Gonzalez, Victor Vargas and Valentin Villanueva-Fernan. Henderson misled the grand jury regarding what these witness told him, just as he had misled the court in his probable cause statement. These include, but are not limited to the following:

- Henderson presented the materially false testimony to the grand jury that: "[Fenrando] Gonzales [sic] told me he was hired by Brett [sic] and that Brett [sic] made the decision to hire him". In fact, Gonzalez never stated that Mr. Frimmel hired him. Just the opposite: Gonzalez told both Oliver and Henderson that neither Mr. Frimmel nor Ms. Norton ever met with <u>any</u> applicants during the hiring process.

- Henderson testified that Fernando Gonzalez "stated that he did not sign any forms or present any identification at the time of hire." Neither he, nor Oliver instructed the grand jury that under the law Gonzalez was not required to present identification and work authorization documents until three days after hire.



- Henderson testified that Fernando Gonzalez was instructed by Ms. Norton "to give Latinos applications." Gonzalez, however, had merely stated that Ms. Norton required him to provide applications to prospective job applicants, without regard for race or national origin.  Moreover, Oliver did not clarify that if a business refuses to provide applications to "Latinos" that would be a violation of law.

- Neither Henderson nor Oliver conveyed to the grand jury that Fernando Gonzalez stated he had no idea what happened to documents submitted by applicants.

- While Henderson testified that Emidgio Munoz Gonzalez was hired at Uncle Sam's using a social security number that did not belong to him, neither Henderson nor Oliver disclosed that Munoz Gonzalez told them that he obtained the social security number he used 18 years ago, well before his time at Uncle Sam's, and that he possessed a driver's license issued by the Arizona Motor Vehicle Department since 1994. Rather, Henderson and Oliver concealed from the grand jury that Munoz Gonzalez presented both a social security card and driver's license to Uncle Sam's at hiring as was required by law.

- Henderson and Oliver concealed Munoz Gonzalez's testimony regarding management training, including that Mr. Frimmel instructed the managers to ask for a social security card and something with a picture on it, and that he was instructed by Mr. Frimmel to watch the person fill out the application and collect it from them when they were done.

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas told them he provided a social security card and a photo identification to Uncle Sam's "at the time of hiring."

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas admitted he acted on his own and without Defendants' knowledge when he obtained a forged social security card from an unknown person unrelated to Uncle Sam's.

- Henderson falsely testified to the grand jury that Mr. Frimmel hired Villanueva-Fernan.  In fact, Villanueva-Fernan stated that he was hired by an Uncle Sam's employee (not Mr. Frimmel or Ms. Norton) whose name he did not remember, and claimed no dealings with Mr. Frimmel beyond "just a few words."  Oliver was present during Villanueva-Fernan's free-talk, yet she did nothing to correct the false testimony to the grand jury.



July 21, 2014
Page 13

- Henderson falsely testified to the grand jury, that Villanueva-Fernan signed a "blank application."

- Neither Henderson nor Oliver disclosed to the grand jury that Villanueva-Fernan was convicted and/or found responsible by Arizona Courts for many civil and criminal offenses over the years he worked at Uncle Sam's, yet faced no immigration consequences from these activities.

Additionally, Oliver and Henderson withheld clearly exculpatory evidence from the grand jury and falsely testified regarding the law and other facts allegedly learned in the investigation, all in violation of Mr. Frimmel's rights. These include, but are not limited to, the following:

- Although Henderson falsely told the grand jury that his ongoing investigation showed Mr. Frimmel and Ms. Norton "knowingly" hired undocumented workers, he entirely concealed an interview with former manager Manuel Arredondo, who said the exact opposite. Arredondo told Henderson he was required to produce two forms of identification when he was hired at Uncle Sam's by an unknown Spanish speaking manager. Arredondo also admitted that he purchased a forged social security card prior to applying at Uncle Sam's, that Mr. Frimmel required employees to obtain a food handler's card, and that Arredondo never told Mr. Frimmel or Ms. Norton when he was unable to renew his own food handler's card.

- Despite having testified that another witness claimed to have heard Mr. Frimmel and Ms. Norton mistreating Latinos and making racial comments, Henderson did not disclose to the grand jury Arredondo's statement that during his 15 years as a kitchen staff member and manager, he never witnessed mistreatment or heard any racial comments.

- When asked by a grand juror whether Mr. Frimmel was "making the social security cards himself" and whether doing so was "part of the forgery," neither Oliver nor Henderson answered the questions. Rather than responding, Oliver falsely stated that "some of the employees just signed blank applications."

- Henderson testified that prospective employees would make up a social security number when applying and later obtain a card with the same number, misleading the grand jury to believe that Mr. Frimmel and Ms. Norton somehow knew that this was occurring.



July 21, 2014
Page 14

- Despite having testified that Mr. Frimmel forged documents in an attempt to misrepresent Munoz Gonzalez's hire date as having been in 2007, Henderson failed to inform the grand jury that he possessed an ADP Payroll document, provided by Mr. Frimmel during the July search of Mr. Frimmel's home, regarding the Uncle Sam's payroll that showed that Munoz Gonzalez's hire date was correctly reported as 2010.

- Henderson and Oliver concealed that commencing in 2007 – the same time that E-Verify was required in Arizona - Mr. Frimmel's payroll service, ADP, began charging Mr. Frimmel for its "New Hire Reporting Service," and that Mr. Frimmel believed that this included all legally required employment vetting services, including E-Verify. Without such information, the grand jury could not have understood why Mr. Frimmel believed the "New Hire Reporting Service" covered E-Verify once it became the law in Arizona. While Henderson did testify regarding Mr. Frimmel's initial ADP contract, which did not contain explicit E-Verify services language, Henderson and Oliver omitted that this contract was executed in 2006, before E-Verify was required, and thus E-Verify would not be specified as a part of any required employment vetting services.

- Henderson and Oliver provided false and misleading testimony regarding County issued "food handler's" cards. Henderson testified that Environmental Health in "approximately the year 2009" changed its "requirements to where people had to have a valid identification card – Arizona identification card to get a current – updated food handler's card," and that this restricted Uncle Sam's workers from obtaining food handler's cards, which expire after three years. However, Henderson and Oliver withheld from the grand jury the fact that all of the ex-employees convicted for possessing invalid documents had valid food handler's cards issued to them after February 2009.

- Henderson entirely concealed Mr. Frimmel's repeated and unequivocal statements once in custody that the allegations presented against him were false.

- Despite their knowledge to the contrary, neither Henderson nor Oliver advised the grand jury that shortly after the July 17, 2013 raids Mr. Frimmel had been contacted by DOJ regarding their on-going investigation into MCSO and that shortly after that contact, MCSO and MCAO turned their investigation to Mr. Frimmel and Ms. Norton.



July 21, 2014
Page 15

- Henderson testified that witness Sabrina Stark told him "the reason she left [Uncle Sam's] was because the owner, Brett [sic] Frimmel, treated his employees bad," Henderson withheld from grand jurors that Stark subsequently returned to work at Uncle Sam's at her request.

- Henderson repeated Stark's assertion "that every employee that Brett [sic] hires and puts in the kitchen is not legal" despite knowing this was false, given that MCSO did not arrest all kitchen employees on July 17, 2013 or thereafter.

- Henderson provided false testimony when he repeated Stark's false statement that Mr. Frimmel would "pay them whatever he wants."  In fact, Uncle Sam's paid its employees for all work performed in amounts often exceeding that required by law.  Henderson falsely repeated this testimony despite having no evidence to support this allegation, other than the uninformed and incorrect statement of witness Stark.[7]

- Henderson improperly implied it was criminal for Mr. Frimmel to tell witness Rodriguez to disregard what Rodriguez thought were forged identifications because Rodriguez was unqualified to make such an assessment and Mr. Frimmel would face significant liability for rejecting applicants based upon Rodriguez's suspicions.   Henderson and Oliver failed to inform the grand jury that Mr. Frimmel indeed could face significant civil liability for discrimination if he rejected employee applicants based upon Rodriquez's mere belief regarding the appearance of documents.

- The grand jury never learned that Rodriguez was strongly motivated to lie to harm Uncle Sam's.  While working at Uncle Sam's, Rodriguez had an extra-marital affair with witness Christina Hopkins, who subsequently made a sexual harassment complaint against Rodriguez.   Rodriguez quit Uncle Sam's and Hopkins later filed a paternity complaint against Rodriguez in Maricopa County Superior Court.

---

[7] Amazingly, in response to Mr. Frimmel's Motion to Remand, Oliver defended the presentation of knowingly false testimony from Sabrina Stark by arguing that since Henderson had prefaced his comments with "Sabrina Stark told me" the evidence was not being offered for the truth of the matter asserted! Claimants are still searching for the legal principle this explanation implicates.



July 21, 2014
Page 16

- When asked by a grand juror about whether "there should be some kind of photocopy of ID" made during the hiring process, Henderson ignored the question and misleadingly answered that "there was no photocopies done" at Uncle Sam's. Henderson and Oliver also misleadingly implied that there was something improper about Munoz Gonzalez being instructed not to make photocopies. This testimony is misleading, as there is no legal requirement to photocopy employee IDs. Further, when Oliver had the opportunity to correct this misstatement of law, she did not, instead vaguely and misleadingly stating "I don't know it is a requirement for the company to make a photocopy of the identification."

- Henderson misleadingly testified that his investigation began "[r]ight back in October of 2012 [when] I received an anonymous tip that referenced an Uncle Sam's restaurant. . . ." In fact, the anonymous tip was received on August 2, 2012, and the original complainants in this case were Said Ishak and Denee Porter Ishak, two married Uncle Sam's ex-employees and convicted criminals who had every reason to fabricate lies about Mr. Frimmel, Ms. Norton and Uncle Sam's. Mr. Frimmel fired Said Ishak after Mr. Frimmel reported to the Scottsdale Police Department that Ishak embezzled funds from Uncle Sam's, for which he was later convicted of felony theft. Said Ishak was arrested on August 2, 2012, the same day Porter Ishak placed her anonymous call. Denee Porter Ishak, also a convicted criminal, quit Uncle Sam's in January 2011 after Mr. Frimmel admonished her for poor work behavior. She subsequently lost her claim against Uncle Sam's for unemployment benefits. Despite the grand jurors' right to know the origin of this investigation, this information remained concealed.

Given all of the misrepresentations, omissions and fabrications, it is not surprising that MCAO was able to obtain an indictment despite the fact that Mr. Frimmel committed no crime.

### D.    Lisa and Bruce Norton are Just the Latest Victim of MCSO's Abusive Practices

All of the foregoing fits a pattern of abuse of power that has dominated Arpaio's reign of more than 20 years. Arpaio's bogus investigations have included:

- One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard, a democrat, left office.



July 21, 2014
Page 17

- One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were ultimately dismissed.

- An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees, certain Superior Court judges and the undersigned's law firm and partners. Supposedly, they all were part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

- A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.

- In retaliation for publishing articles critical of Arpaio and the MCSO, Phoenix New Times publishers Mike Lacey and Jim Larkin were arrested at their homes in the middle of the night for misdemeanor charges that were eventually dropped.

- Dan Pachoda, executive director of the Arizona chapter of the ACLU, was arrested by MCSO deputies for trespassing while he was leaving the scene of an immigration-related rally. Pachoda was acquitted after trial.

- Animal cruelty charges were brought against Chandler Police Sergeant Thomas Lovejoy after his canine partner died tragically. Lovejoy was also acquitted.

- There is currently a reported retaliatory probe by MCSO against U.S. District Court Judge Murray Snow: the judge who entered the order that Arpaio and his under-lings described as "ludicrous" and "absurd," and referred to as "this crap."

- As information comes to light from facts surrounding the death of Detective Armendariz, it is apparent that the initial confiscation of, and initial failure to return Mr. Frimmel's watch, jewelry and cash was part of ongoing practice of "shaking down" arrestees by MCSO.

## II.    Legal Claims

The facts demonstrate that MCSO had a wrongful motivation to pursue Ms. Norton and did so in violation of her constitutional and statutory rights. MCSO relied on an unreasonable



July 21, 2014
Page 18

interpretation of its own investigation and ignored its own evidence that no crime occurred, while going ahead with a very public arrest. MCSO selectively pursued Ms. Norton to elicit her help in intimidating Mr. Frimmel from exercising his constitutional right to cooperate with the DOJ investigation and to pursue a media campaign designed to intimidate and serve Sheriff Arpaio's political agenda. Ms. Norton was selectively prosecuted as similarly situated individuals have not been prosecuted in similar situations. *United States v. Armstrong*, 116 S.Ct. 1480 (1996).

The facts set forth above give rise to the claims against Maricopa County, the MCSO, Arpaio, Henderson, Jones and Hegstrom. These facts give rise to, or relate to, claims for negligence, gross negligence, defamation, false light invasion of privacy, intrusion upon seclusion, failure to train, negligent supervision, interference with business expectancy, violation of civil rights, including 42 U.S.C. § 1983, Free Speech, Law Enforcement Retaliatory Conduct, Abuse of Process, Abuse of Power, Equal Protection, Unconstitutional Policies, loss of consortium and Failure to Train, for actual, compensatory and/or punitive damages, attorneys' fees and costs, including the costs of defending the criminal charges when she prevails.

The Nortons may or will have other causes of action, or theories of recovery, also arising out of these and related facts and actions of Arpaio, Henderson, Jones and Hegstrom and potentially others; but those causes of action have not yet accrued. This Notice includes only claims known at this time and the Nortons will amend and/or supplement their claims if further information comes to light.

## III.   Damages and Settlement Offer

### A.   Description of Damages

Lisa Norton was born in Phoenix, Arizona. Bruce Norton was born in Northfolk, Virginia and moved to Arizona when he was 15. Lisa and Bruce met while Lisa was in high school (Bruce is one year older), dated for four years, and have been married for 32 years. They have two children and one two-and-a-half year old grandson. Their 23 year old son graduated from ASU with honors in military history and is currently stationed at Fort Benning, Georgia where he is on track to graduate from the Army Ranger program this summer. Their 29 year old daughter is a full time mother and student at ASU. Lisa and Bruce babysit and spend as much time as they can with their grandson. Lisa first started working at Uncle Sam's in 1980, and, but for a couple of years in the late 1990s, has worked at Uncle Sam's ever since. On January 10, 2014, just before the wrongful arrests, Lisa's mother passed away. As a result of her arrest, Lisa was not able to attend the events surrounding her mother's passing and has been seeing a counselor to help deal with the emotional trauma all of this has caused her. In addition



to the emotional distress, Lisa, who is a petite 53 year old woman, was physically threatened and intimidated by an MCSO detective at the time of her arrest.

The events set forth in this notice have caused Lisa and Bruce significant emotional distress and undue hardship all in furtherance of MCSO's and Sheriff Arpaio's on-going "anti-immigration" publicity seeking, fundraising, and wholly illegal campaign. Lisa is seeing both a medical doctor for the physical manifestations of the stress she is under and a therapist to deal with the extreme emotional distress she is under. She and Bruce have been completely unable to enjoy the time they should be spending with the children (a son is preparing to graduate from Army Ranger training) and grandchildren.

Notably, the actions of MCSO and its agents here demonstrate that they believe they can pursue anyone they want, without regard for the actual commission of a crime, simply to score political points. This fact will not be lost on jurors: any one of whom could be the next victim.

### B.    Amount for Which Claims Can Be Settled and Factual Basis Supporting That Amount

Lisa and Bruce's losses are truly immeasurable. Forced to defend against the unfounded charges, they have incurred attorneys' fees now exceeding $100,000. Uncle Sam's restaurant business has declined due to the damage done to Bret and Lisa's reputations, as well as the chilling effect caused by the wide-spread retaliation and intimidation tactics of Arpaio, the MCSO, and the MCAO. The loss of business value and good will is truly significant. As the business teeters near the brink, Lisa is at risk of losing her job, a place where she has worked for most of the last 34 years. It would be unlikely that she would be able to find comparable replacement employment.

Lisa and Bruce have suffered great distress as a result of the actions described in this letter, distress that has literally changed the way they live their lives. Most distressing to them, however, is the damage these actions have done to their families, friends and loved ones, damage they fear can never be reversed. Lisa has suffered from the stress this has caused her; a skin rash, loss of sleep, unbearable back pain, significant weight loss and raised blood pressure, to name but a few of the very real manifestations of harm. A jury will have no trouble finding that emotional distress and punitive damages are appropriate and should be awarded in the millions of dollars.

A jury will have no trouble finding that emotional distress are appropriate and should be awarded in the millions of dollars. Ms. Norton has suffered damage to her reputation, and to the extent she is dependent on the success of Uncle Sam's to assure her future earning capacity, she



July 21, 2014
Page 20

has everything she has worked for her entire adult life at stake.   Losses to future earnings are outlined in the damages analysis attached hereto as Exhibit "B".

Add to those amounts punitive damages and the Nortons will be entitled to a minimum of $10 million in damages for all of their losses.  See *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (suggesting a 4:1 ratio as a potential cap on punitive damage claims). While the symbolism of the choice of target was obvious and petty, the effect of MCSO's and Arpaio's taking out his feud with DOJ and Judge Snow on Ms. Norton is very real and very serious.  Although it is impossible to put a dollar amount on each of their items of damages, A.R.S. § 12-821.01 requires each of the claimants to state a specific amount for which they will settle their claims.  Accordingly:

Lisa and Bruce Norton, will settle all of their claims for $5,000,000.00.

This letter is intended to be a Notice of Claim under A.R.S. § 12-821.01. This notice contains sufficient facts for the County to understand the basis for its liability and the amount for which the claims may be settled. This notice also contains sufficient facts for MCSO, Arpaio, Henderson, Jones and Hegstrom to understand the basis for their liability and the amount for which the claims against them may be settled. This notice is given without the benefit of formal discovery and is subject to amendment or supplementation.  I ask you to put your carrier on notice of the claims made in this letter.

If, for any reason, you believe that this Notice of Claim or the Nortons' contemporaneous notice does not comply with the requirements of A.R.S. § 12-821.01, or if you desire additional facts or information, please contact the undersigned. Lisa and Bruce Norton reserve the right to amend and/or supplement this Notice of Claim.

We await your response pursuant to A.R.S. § 12-821.01.

Sincerely,

Leon Silver

LBS:hl
Enclosures

Copy to:  Lisa and Bruce Norton

48450406.2



*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** January 22, 2014        **CONTACT:** Lt. Brandon Jones (602) 525-6239

## SHERIFF'S DEPUTIES TAKE OWNER OF
## UNCLE SAM'S RESTAURANTS INTO CUSTODY
### *ARRESTED FOR TRAFFICKING STOLEN IDs*

**(Phoenix, AZ)** Maricopa County Sheriff Joe Arpaio today says his deputies just arrested Bret Frimmel, 40, owner of Uncle Sam's, a popular Valley restaurant, on four (4) counts trafficking the identity of another (a class 2 felony), four (4) counts identity theft, and two (2) counts forgery, class 4 felonies.  The arrest took place at around 12 noon today at the Uncle Sam's Peoria restaurant location.

Also arrested today was Frimmel's manager, Lisa Norton, 53, on two charges of trafficking the identity of another, three counts identity theft, and two counts forgery.  Norton was taken into custody by Sheriff's deputies this morning at the north Phoenix restaurant location.

The investigation into Uncle Sam's Restaurants was the 73rd workplace investigation so far conducted by the Sheriff's Criminal Employment Squad. Those 73 investigations have resulted in 762 employee arrests as well as three employer detainment on civil charges.

Today's arrests mark the first time Sheriff's deputies have taken into custody an owner/employer on criminal charges relating to identity theft for purposes of employing undocumented persons.

The Sheriff's Office investigation into Frimmel's two restaurants began in October 2012 after the office received a tip from a caller about the hiring of several individuals utilizing false identification documents to gain and maintain employment at the eating establishments.

On July 17, 2013, the Maricopa County Sheriff's Office conducted a workplace ID theft operation at Uncle Sam's two locations, one in Phoenix (3217 East Shea Blvd) and one in Peoria (18913 North 83 Ave).

The July operation resulted in 9 felony arrests related to identity theft and forgery, and all nine (9) were placed on ICE holds. A 10th suspect arrested was charged with auto theft after an outstanding warrant was discovered.

Maricopa County Sheriff's detectives have questioned several witnesses who claimed to have first-hand knowledge that Norton and Frimmel colluded together to acquire false identification documents in order to provide those IDs to undocumented workers wishing to be employed at both restaurants.

Arpaio says, "One look at what is occurring today where massive amounts of identification and financial information is being stolen and used for all kinds of criminal purposes, underscores the need for a continued effort by law enforcement to overcome the problem of identity theft." END

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2

# EXHIBIT B

*Attorney Client Privilege*
*DRAFT - For Client Review Only. Subject to Review Revision.*

## Exhibit A
Date of Incident: January 22, 2014
Preliminary Summary of Estimated Economic Damages

**Economic Damages**

| Claimant | | Preliminary Estimate of Economic Damages |
|---|---|---|
| Pishka, Inc. | | |
| Diminution in Business Value | $ | 2,203,641 |
| Lost Future Business Opportunity | | 802,135 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| Total (Rounded) | $ | 3,660,000 |
| | | |
| BRF Enterprises, LLC | | |
| Lost Profits | $ | 75,000 |
| Diminution in Value | | 1,054,852 |
| Total (Rounded) | $ | 1,130,000 |
| | | |
| Bret Frimmel | | |
| Loss of Earnings | $ | 1,745,943 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| Investment Opportunity Costs | | 637,683 |
| Total (Rounded) | $ | 3,030,000 |
| | | |
| Lisa Norton | | |
| Loss of Earnings (Pishka) | $ | 426,284 |
| Total (Rounded) | $ | 430,000 |
| | | |
| Grand Total | $ | 8,250,000 |

This analysis is preliminary in nature and subject to additional verification and analysis. These preliminary conclusions should not be disclosed or shared with third parties without our prior written authorization. Amounts do not include punitive damages, emotional distress, or hedonic losses. These calculations are preliminary and the ultimate quantification of economic damages may be different and the difference may be material.

Note:
It is our understanding based on discussions with Mr. Frimmel and our review of recent operating results that, as a result of the Arrest, the going concern premise of value may not be appropriate for Uncle Sam's and each of the two restaurant locations may be closed. Therefore our analysis assumes a diminution in the value of Uncle Sam's and a loss of economic benefits derived from Uncle Sam's for the other Claimants (i.e. salary, rent, etc.).

**EXHIBIT 13**

SERVED IN PERSON BY: JOE BEACOM
ACCEPTED FOR MCSO — KLT A9930 @ 1347 HRS
DB NOC P.S.
RECEIVED JUL 2 1 2014
2010 8258 W

Received 5 copies
1 for each respondent

KATA3615
7/23/14

# POLSINELLI

CityScape, One E. Washington St., Ste. 1200, Phoenix, AZ, 85004   602.650.2000

July 21, 2014

Leon B. Silver
(602) 650-2066
(602) 264-7033
lsilver@polsinelli.com

## <u>Notice of Claims Pursuant to A.R.S. § 12-821.01</u>

Fran McCarroll, Clerk of the Maricopa Board of Supervisors

Joseph M. Arpaio, Maricopa County Sheriff's Office

1. Joseph M. Arpaio   S0991

2. Joshua Henderson   S1458

3. Daniel Gandara   S1906

4. Christopher Hechavarria   S1851

Re:     **Notice of Claim of Lisa and Bruce Norton for, *inter alia*,
         Wrongful (Arrest)**

To the Addressees:

       Pursuant to A.R.S. § 12-821.01 this letter constitutes notice of the claims of Lisa and
Bruce Norton, against Maricopa County, the Maricopa County Sheriff's Office (MCSO), and its
individual employees, Sheriff Joseph M. Arpaio, Detective Joshua Henderson, Detective Daniel
Gandara, and Detective Christopher Hechavarria.

       These claims arise from specific harm to the Nortons that occurred during the course of
the MCSO's ongoing notorious, illegal and abusive attempts to enforce immigration laws in the
face of a Federal Court issued injunction prohibiting them from doing the same. MCSO has
openly demonstrated contempt for the Federal Court order, calling it "ludicrous" and "absurd,"
and referring to the order itself as "this crap."

Chicago   Dallas   Denver   Kansas City   Los Angeles   New York   Phoenix   St. Louis   Washington, DC   Wilmington


**POLSINELLI**

July 21, 2014
Page 2

In furtherance of its feud with the Federal Court, in July 2013, MCSO raided two restaurants that operate under the name "Uncle Sam's" purportedly to investigate alleged identity theft. The Uncle Sam's restaurants are owned and operated by Bret Frimmel through his companies, Pishka, Inc. (owner of the restaurants), and BRF Enterprises, LLC (owner of the real estate). Lisa Norton is a long time employee of Uncle Sam's and is the general manager.

During those raids, MCSO arrested nine undocumented immigrant workers under the pretext of identity theft charges. (A tenth employee was arrested on an outstanding auto theft warrant.) Only four of the arrested employees were charged with identity theft. The other five were released with no charges. These raids were conducted on the basis of false affidavits and testimony of MCSO Detective Henderson, who was the agent in charge of the investigation and raids.

Shortly after the raids, the U.S. Department of Justice ("DOJ") reached out to Mr. Frimmel to see if he would cooperate in its investigation of MCSO and Sheriff Arpaio. Mr. Frimmel has a first amendment right to speak to DOJ. However, in an attempt to intimidate Mr. Frimmel from exercising that right and cooperating with law enforcement, MCSO arrested Mr. Frimmel, on fabricated charges of accepting the identity of another, trafficking in fraudulent identity documents, forgery and conspiracy. And, in an attempt to further pressure Mr. Frimmel and obtain testimony against him, MCSO arrested Ms. Norton as well.

Subsequent to the arrests, the County Attorneys' office obtained grand jury indictments of Mr. Frimmel and Ms. Norton on 13 unfounded felony charges. The indictments were obtained solely based on the investigation and testimony of MCSO Detective Henderson. And as is standard for MCSO, Sheriff Arpaio engaged in a media campaign surrounding the arrests, defaming Ms. Norton with false allegations of illegal activity and proudly touting that MCSO was now going after employers just as it has always gone after undocumented workers.

Subsequent discovery revealed that the results of MCSO's investigation showed unequivocally that neither Mr. Frimmel nor Ms. Norton committed any crime, and no reasonable person would have pursued these charges. Rather, the evidence obtained in the investigation was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on bringing these charges no matter what. It can be logically concluded that Sheriff Arpaio saw this as an opportunity to both intimidate Mr. Frimmel and engage in a public relations ploy that served his political purposes. In either case, Ms. Norton's rights were violated.

Lisa and Bruce Norton's lives were then forever changed. They suffered, and continue to suffer emotional distress, reputational damage, and financial damage, including incurring over $100,000 in attorneys' fees as a result of the unfounded charges.



July 21, 2014
Page 3

The search warrants, arrest warrants, probable cause statements and grand jury proceeding teem with false and misleading testimony by MCSO, and in particular, Detective Henderson. The grand jury proceeding was further marred the Deputy County Attorney's decision to refrain from presenting clearly exculpatory evidence as required by law.[1]

Lisa and Bruce Norton submit this notice of claim for the claims set forth in detail below and summarized as the wrongful arrest, execution of search warrants, pursuit of criminal legal charges, personal injury, and violation of civil rights committed against them commencing on January 22, 2014.

This notice is timely, pursuant to A.R.S. § 12-821.01.

## I.    Factual Basis for Claims

The factual context leading to the unfounded arrests of Ms. Norton goes back many years.

### A.    MCSO's Enforcement of Federal Immigration Laws

In approximately 2005, Arpaio and the MCSO began a highly publicized campaign to "crack down" on undocumented immigrants in Maricopa County.  They formed a special unit dedicated to this task (the Human Smuggling Unit or "HSU") and pushed the passage of a new anti-human smuggling law.   In March 2006, Arpaio and the MCSO began arresting undocumented immigrants for felonies under the new anti-human smuggling law for conspiring to smuggle themselves into the United States.  The MCAO, alone among prosecuting agencies in the State, offered an interpretation of the law approving those arrests.

Arpaio and the MCSO obtained state funding to assist in their anti-immigration enforcement.  In addition, through a 2007 agreement with the federal government, Arpaio and MCSO obtained federal funding for their anti-immigration campaign.  Using these state and federal funds, MCSO conducted a number of "anti-immigration sweeps."   During the anti-immigration sweeps, squads of deputy sheriffs and posse members descended upon a designated area, typically with a large Hispanic population, to round up undocumented immigrants.

In May 2008, in response to public outcry over the illegal tactics of Arpaio and the MCSO, then-Governor Napolitano issued an executive order that resulted in the MCSO losing

---

[1] Amazingly, Ms. Oliver's later stated in court filings that she didn't present the exculpatory evidence because doing so would "confuse the grand jurors".

**POLSINELLI**

July 21, 2014
Page 4

$1.2 million in state funds for immigration enforcement.  On May 10, 2012, DOJ filed a Complaint alleging that MCSO and Sheriff Arpaio "have engaged and continue to engage in a pattern or practice of unlawful discriminatory police conduct directed at Latinos in Maricopa County."

In another lawsuit - *Melendres v. Arpaio et al.* - the plaintiffs alleged that Arpaio and MCSO had unlawfully instituted a pattern and practice of targeting Latino drivers and passengers in Maricopa County during traffic stops. On December 23, 2011 the District Court entered an Order prohibiting MCSO from detaining any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." A trial took place in that case before U.S. District Court Judge Murray Snow, during which deputies involved in the investigation of Mr. Frimmel, including now deceased and disgraced MCSO Det. Ramon Charley Armendariz, were found to be "not credible." In a later Order dated May 24, 2013, MCSO was found to have violated the injunction and the court ordered "monitoring" of MCSO for a pattern of misconduct, including widespread constitutional violations.

Rather than obey the Federal Court Injunction, MCSO and Arpaio engaged MCSO's "Criminal Employment Unit" to continue MCSO's anti-immigration campaign under the guise of enforcing identity-theft laws. Members of the Criminal Employment Unit, however, still identified themselves as members of the Human Smuggling Unit, even after the HSU was allegedly dissolved.  Detective Henderson is a member of both the "Human Smuggling Unit" and the "Criminal Employment Unit" of MCSO as was Det. Armendariz.

On March 24, 2014, Judge Snow chastised Sheriff Arpaio and his Chief Deputy Jerry Sheridan for flouting the Court's prior Order. Judge Snow pointed to a video, recorded in October 2013, in which MCSO Chief Deputy Sheridan called Judge Snow's ruling "ludicrous" and "absurd," and referred to the order itself as "this crap." Arpaio followed Sheridan's statements by stating: "What the chief deputy said is what I've been saying."   The incendiary and disrespectful remarks by Arpaio and Sheridan were made during the time period between the July 2013 raid on Uncle Sam's and the January 2014 arrests of Mr. Frimmel and Ms. Norton and demonstrate the lawlessness rampant during the precise time they became targets of MCSO.

In May 2014, extremely troubling information came to light regarding Detective Armendariz.  Armendariz was the detective in charge of the July 17, 2013 raid at Uncle Sam's Peoria location and a member of the MCSO's "Human Smuggling Unit". Armendariz reportedly took his own life that month.  In the wake of Armendariz's death, investigators found not only heroin, methamphetamine, and marijuana at his home, but also hundreds of stolen driver's licenses, identifications, license plates, passports, airport security clearance cards, evidence bags, and wallets.  Further, the search of Armendariz's home revealed recordings of thousands of his



July 21, 2014
Page 5

traffic stops, which by one account "reportedly document misconduct on the part of [MCSO Det. Armendariz]."[2]

### B.  MCSO's and MCAO's Actions Involving Claimants

On July 17, 2013, MCSO, carrying three search warrants, raided the Phoenix and Peoria Uncle Sam's locations as well as Mr. Frimmel's home. During the raid, ten Uncle Sam's employees were arrested, although apparently only four were ever charged and convicted with identity theft. The convictions were the result of plea agreements entered with MCAO for cooperation in its investigation of Mr. Frimmel and Ms. Norton.

A few days after the raid, Mr. Frimmel was contacted by DOJ investigator Sarah Lopez, who sought Mr. Frimmel's assistance with DOJ's investigation of MCSO. At the time Mr. Frimmel received this communication he, and his attorney, had been told by Det. Henderson that Mr. Frimmel was considered a victim in MCSO's investigation rather than a suspect or a person of interest. MCSO's recent conduct in bringing criminal charges to harass and intimidate Mr. Frimmel demonstrate that MCSO's investigation was motivated by its concern that Mr. Frimmel might cooperate with the DOJ's investigation, a retaliatory act in violation of Mr. Frimmel's rights.

On January 22, 2014, Ms. Norton, along with Mr. Frimmel, was arrested on charges related to the purported unlawful acceptance of and/or trafficking in stolen identification provided by four undocumented workers at Uncle Sam's restaurants. The arrests were supported by knowingly false and intentionally misleading probable cause statements provided by Det. Henderson, in violation of Mr. Frimmel's and Ms. Norton's rights. Henderson did not obtain an arrest warrant. MCSO chose to engage in a public arrest complete with a media event rather than simply send a summons to Mr. Frimmel or his counsel.[3]

At the time of her arrest, Ms. Norton, who is a petite, 53 year old woman, was accosted by an extremely large MCSO deputy who threatened her in an unnecessarily intimidating manner causing her extreme distress and apprehension of further harm.

---

[2] Three of the four cooperating defendant witnesses in the criminal case against Mr. Frimmel and Ms. Norton were arrested at the Peoria location, which operation was run by Armendariz.

[3] That MCSO and Arpaio chose a probable cause arrest when a summons would have sufficed, is additional evidence of the improper motives behind the arrest.



July 21, 2014
Page 6

Ms. Norton was released on her own recognizance.  However, upon her release, MCSO failed to return to Ms. Norton her purse, wallets and other personal items.  (These items were not returned until after counsel intervened and pressed MCSO.)

Subsequent to the arrests, MCSO obtained warrants permitting the search of, and extraction from Ms. Norton's cell phones. All of these affidavits consist of material misstatements that the affiants made knowingly, intentionally, or with reckless disregard for the truth, and included false statements that were necessary to the finding of probable cause.

## C.  Detective Henderson's Investigation Should have led to no Arrest or Charges

### 1.  MCSO Arrested Ms. Norton on False Grounds

The basis for the probable cause arrest of Ms. Norton is set forth by Det. Henderson in a Probable Cause Statement. The Probable Cause Statement is confusing, inherently contradictory, and made it impossible to determine what charged offense related to which assertion of fact.  The statements were replete with assertions of fact that Henderson knew were false and were contradicted by his previous interviews of various witnesses, which were recorded.  Those false or misleading statements included, but are not limited to the following:

- That Mr. Frimmel knowingly entered four fictitious or forged social security numbers into his computer and transmitted them to ADP.

- That five of the suspects arrested on July 17, 2013 came forward with information that Mr. Frimmel knowingly committed forgery or identity theft and or conspiracy to commit forgery and identity theft.

- That both current and past employees stated that Mr. Frimmel knowingly hired employees that were using forged identities.

- That Henderson was contacted by four ex-employees with information consistent with information provided by the five employees.

- That witnesses claimed that Mr. Frimmel was present during the hiring process and hired them without having to provide a valid identification or social security number.


POLSINELLI

July 21, 2014
Page 7

- That the fact that some employees were working without food handler's cards was somehow relevant to the question of whether Mr. Frimmel knowingly hired workers based on stolen identities or forged documents.

- That "employees" advised that they signed and dated blank "applications" and tax forms, and that social security numbers were later provided and written in by the business.

- That Mr. Frimmel made comments that he didn't care about employees' immigration status and would call staff "illegals".

- That Ms. Norton made derogatory statements regarding Latino workers.

- That Ms. Norton directed that work applications be given to Latinos.

Relying on these skewed conclusions from his investigation, Ms. Norton was arrested by MCSO on January 22, 2014 and charged with various offenses. These charges were later replaced by a grand jury indictment.

These allegations, however, were diametrically opposed to the "Facts" that Detective Henderson learned in his investigation. And those facts unequivocally demonstrate that there was no basis to arrest Ms. Norton at all. In fact, no witness claimed to have been hired by Ms. Norton or that Ms. Norton was present during the hiring process. No witness claimed that they were not required to provide valid identification. Rather, several witnesses explained that lower level managers other than Ms. Norton did the hiring and obtained the proof of identity. Other witnesses, including long time managers reported that identification was required and that if they hired someone without it, they would be fired by Mr. Frimmel. No witness claimed to have signed a blank application. Ms. Norton was accused merely of telling staff to give applications to anyone who asked for them.

In order to be guilty of accepting the identity of another, Ms. Norton had to "knowingly" accept false documents. There was no information provided to Detective Henderson to even suggest that Ms. Norton had any involvement in accepting identification documents from the employees no less that she knew the documents were false. Moreover, the law is that a prospective employer must accept whatever documents are provided, or be subject to liability for discrimination.

As stated above, the evidence was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging and arresting Mr. Norton no matter what. Henderson knew from his own investigation that Ms. Norton was not involved in the interview or



application gathering process of prospective employees, that Mr. Frimmel required his managers to obtain proper identification documents, that the employees in question all provided facially valid documentation and that Mr. Frimmel entered the employee's information in his payroll company's web based system correctly and as required.

It is beyond dispute that the investigation and arrest were pre-determined and done for illegitimate purposes. [4]

### 2. MCSO Falsely Obtained the Cell Phone Affidavits

Also on January 22, 2014, MCSO obtained a search warrant for Ms. Norton's cell phone records that were in the possession of "Cellco Partnership DBA Verizon Wireless." MCSO Detective Daniel Gandara provided false affidavits in support of these warrants in violation of Ms. Norton's rights. On January 22, 2014, MCSO obtained a search warrant that allowed them to search and extract information directly from the cellular phones belonging to Mr. Frimmel and Ms. Norton. The affidavit in support of that warrant was authored by MCSO Det. Christopher Hechavarria. All of these affidavits contained significant knowingly false and intentionally misleading statements, in violation of Ms. Norton's rights.

Detectives Gandara and Hechavarria misled the court as follows:

- Det. Hechavarria falsely stated that Defendants committed crimes on or about September 30, 2013, something not alleged anywhere else in the criminal case.

- Det. Gandara, falsely stated that Defendants committed crimes on or about October 1, 2013, something not alleged anywhere else in the criminal case.

- Det. Gandara falsely alleged that four cooperating witnesses in this case made "collaborating statements" that Defendants knowingly hired undocumented workers and conspired to commit identity theft and forgery, when the witnesses said no such thing

- Det. Gandara and Det. Hechavarria falsely alleged that four cooperating witnesses "were convicted of identity theft and forgery charges," and further concealed benefits the cooperators were provided by the State.

---

[4] The only alternative explanation, if one is even possible, is that the MCSO personnel involved were so poorly trained and poorly supervised that they didn't know any better and didn't understand the consequences of their own inappropriate actions. If that proves to be the case, an amended Notice of Claim will be served.


POLSINELLI

July 21, 2014
Page 9

- Det. Gandara and Det. Hechavarria omitted numerous statements that further render the cell phone affidavits erroneous.

- Det. Hechavarria made bizarre and improper statements regarding "illegal drugs" and "illegal drug trafficking" as being part of the criminal activity the claimants are charged with. This is wholly untrue and was clearly fabricated in order to obtain the warrant.

- Det. Hechavarria omitted the essential fact that there is nothing in the discovery, including in the free talks and grand jury transcripts, indicating cell phones or telephones were used to facilitate any of the alleged criminal activity.

- Det. Hechavarria fabricated a statement that Ms. Norton "owned" Uncle Sam's.

### 3. MCSO Cannot Rely on the Grand Jury Indictment as a Defense

On February 7, 2014, Deputy County Attorney Jaimee Oliver sought and obtained indictments against Mr. Frimmel and Ms. Norton in their capacity as owner and manager of Uncle Sam's restaurants from a grand jury. The charges alleged against both Mr. Frimmel and Ms. Norton in the indictments are two counts of conspiracy to commit taking the identity of another and four counts of taking the identity of another. The charges alleged against Mr. Frimmel alone are four counts of trafficking in the identity of another, one count of forgery, and two counts of taking the identity of another. No owner or manager in Arizona had ever been pursued on these identity-theft related charges in the past. The indictment was based entirely on the knowingly false and intentionally misleading testimony of MCSO detective Henderson.

That a grand jury subsequently indicted Mr. Frimmel and Ms. Norton provides no defense in this case. Procuring an unconstitutional prosecution is unlawful regardless of whether the arrest was unlawful. If the sheriff acted maliciously or with reckless disregard for the rights of the arrested person the prosecutors' independent judgment does not provide the sheriff with immunity.

The grand jury presentation (like Henderson's prior probable cause statements) was utterly confusing and completely inaccurate. MCSO detective Henderson was Oliver's single witness before the grand jury, and although Henderson had amassed a sizable collection of documents by the time the grand jury heard the case, the grand jury did not see a single document. Oliver and Henderson presented evidence they knew was false. Oliver did not properly instruct the grand jury on the applicable law (and did not provide copies of all of the relevant statutes she alleged were violated), failed to correct Henderson's repeated misstatements



of fact and law, and withheld clearly exculpatory evidence – all with the singular purpose of ensuring that the grand jury returned an indictment against Mr. Frimmel and Ms. Norton so that the retaliatory intimidation scheme against them could go forward as planned.

Det. Henderson, on behalf of MCSO, testified regarding information he learned in "free talks" with four witnesses who had been arrested in the July 17, 2013 raid: Fernando Gonzalez, Emidgio Munoz Gonzalez, Victor Vargas and Valentin Villanueva-Fernan. Henderson misled the grand jury regarding what these witness told him, just as he had misled the court in his probable cause statement. These include, but are not limited to the following:

- Henderson presented the materially false testimony to the grand jury that: "[Fenrando] Gonzales [sic] told me he was hired by Brett [sic] and that Brett [sic] made the decision to hire him". In fact, Gonzalez never stated that Mr. Frimmel hired him. Just the opposite:  Gonzalez told both Oliver and Henderson that neither Mr. Frimmel nor Ms. Norton ever met with <u>any</u> applicants during the hiring process.

- Henderson testified that Fernando Gonzalez "stated that he did not sign any forms or present any identification at the time of hire." Neither he, nor Oliver instructed the grand jury that under the law Gonzalez was not required to present identification and work authorization documents until three days after hire.

- Henderson testified that Fernando Gonzalez was instructed by Ms. Norton "to give Latinos applications." Gonzalez, however, had merely stated that Ms. Norton required him to provide applications to prospective job applicants, without regard for race or national origin.  Moreover, Oliver did not clarify that if a business refuses to provide applications to "Latinos" that would be a violation of law.

- Neither Henderson nor Oliver conveyed to the grand jury that Fernando Gonzalez stated he had no idea what happened to documents submitted by applicants.

- While Henderson testified that Emidgio Munoz Gonzalez was hired at Uncle Sam's using a social security number that did not belong to him, neither Henderson nor Oliver disclosed that Munoz Gonzalez told them that he obtained the social security number he used 18 years ago, well before his time at Uncle Sam's, and that he possessed a driver's license issued by the Arizona Motor Vehicle Department since 1994. Rather, Henderson and Oliver concealed from the grand jury that Munoz Gonzalez presented both a social security card and driver's license to Uncle Sam's at hiring as was required by law.



July 21, 2014
Page 11

- Henderson and Oliver concealed Munoz Gonzalez's testimony regarding management training, including that Mr. Frimmel instructed the managers to ask for a social security card and something with a picture on it, and that he was instructed by Mr. Frimmel to watch the person fill out the application and collect it from them when they were done.

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas told them he provided a social security card and a photo identification to Uncle Sam's "at the time of hiring."

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas admitted he acted on his own and without Defendants' knowledge when he obtained a forged social security card from an unknown person unrelated to Uncle Sam's.

- Henderson falsely testified to the grand jury that Mr. Frimmel hired Villanueva-Fernan.  In fact, Villanueva-Fernan stated that he was hired by an Uncle Sam's employee (not Mr. Frimmel or Ms. Norton) whose name he did not remember, and claimed no dealings with Mr. Frimmel beyond "just a few words."  Oliver was present during Villanueva-Fernan's free-talk, yet she did nothing to correct the false testimony to the grand jury.

- Henderson falsely testified to the grand jury, that Villanueva-Fernan signed a "blank application."

- Neither Henderson nor Oliver disclosed to the grand jury that Villanueva-Fernan was convicted and/or found responsible by Arizona Courts for many civil and criminal offenses over the years he worked at Uncle Sam's, yet faced no immigration consequences from these activities.

Additionally, Ms. Oliver and Det. Henderson withheld clearly exculpatory evidence from the grand jury and falsely testified regarding the law and other facts allegedly learned in the investigation, all in violation of Ms. Norton's rights.  These include, but are not limited to, the following:

- Although Henderson falsely told the grand jury that his ongoing investigation showed Mr. Frimmel and Ms. Norton "knowingly" hired undocumented workers, he entirely concealed an interview with former manager Manuel Arredondo, who said the exact opposite.  Arredondo told Henderson he was required to produce two forms of identification when he was hired at Uncle Sam's by an unknown



Spanish speaking manager. Arredondo also admitted that he purchased a forged social security card prior to applying at Uncle Sam's, that Mr. Frimmel required employees to obtain a food handler's card, and that Arredondo never told Mr. Frimmel or Ms. Norton when he was unable to renew his own food handler's card.

- Despite having testified that another witness claimed to have heard Mr. Frimmel and Ms. Norton mistreating Latinos and making racial comments, Henderson did not disclose to the grand jury Arredondo's statement that during his 15 years as a kitchen staff member and manager, he never witnessed mistreatment or heard any racial comments.

- When asked by a grand juror whether Mr. Frimmel was "making the social security cards himself" and whether doing so was "part of the forgery," neither Oliver nor Henderson answered the questions. Rather than responding, Oliver falsely stated that "some of the employees just signed blank applications."

- Henderson testified that prospective employees would make up a social security number when applying and later obtain a card with the same number, misleading the grand jury to believe that Mr. Frimmel and Ms. Norton somehow knew that this was occurring.

- Despite having testified that Mr. Frimmel forged documents in an attempt to misrepresent Munoz Gonzalez's hire date as having been in 2007, Henderson failed to inform the grand jury that he possessed an ADP Payroll document, provided by Mr. Frimmel during the July search of Mr. Frimmel's home, regarding the Uncle Sam's payroll that showed that Munoz Gonzalez's hire date was correctly reported as 2010.

- Henderson and Oliver concealed that commencing in 2007 – the same time that E-Verify was required in Arizona - Mr. Frimmel's payroll service, ADP, began charging Mr. Frimmel for its "New Hire Reporting Service," and that Mr. Frimmel believed that this included all legally required employment vetting services, including E-Verify. Without such information, the grand jury could not have understood why Mr. Frimmel believed the "New Hire Reporting Service" covered E-Verify once it became the law in Arizona. While Henderson did testify regarding Mr. Frimmel's initial ADP contract, which did not contain explicit E-Verify services language, Henderson and Oliver omitted that this contract was



executed in 2006, before E-Verify was required, and thus E-Verify would not be specified as a part of any required employment vetting services.

- Henderson and Oliver provided false and misleading testimony regarding County issued "food handler's" cards. Henderson testified that Environmental Health in "approximately the year 2009" changed its "requirements to where people had to have a valid identification card – Arizona identification card to get a current – updated food handler's card," and that this restricted Uncle Sam's workers from obtaining food handler's cards, which expire after three years. However, Henderson and Oliver withheld from the grand jury the fact that all of the ex-employees convicted for possessing invalid documents had valid food handler's cards issued to them after February 2009.

- Henderson entirely concealed Mr. Frimmel's repeated and unequivocal statements once in custody that the allegations presented against him were false.

- Despite their knowledge to the contrary, neither Henderson nor Oliver advised the grand jury that shortly after the July 17, 2013 raids Mr. Frimmel had been contacted by DOJ regarding their on-going investigation into MCSO and that shortly after that contact, MCSO and MCAO turned their investigation to Mr. Frimmel and Ms. Norton.

- Henderson testified that witness Sabrina Stark told him "the reason she left [Uncle Sam's] was because the owner, Brett [sic] Frimmel, treated his employees bad," Henderson withheld from grand jurors that Stark subsequently returned to work at Uncle Sam's at her request.

- Henderson repeated Stark's assertion "that every employee that Brett [sic] hires and puts in the kitchen is not legal" despite knowing this was false, given that MCSO did not arrest all kitchen employees on July 17, 2013 or thereafter.

- Henderson provided false testimony when he repeated Stark's false statement that Mr. Frimmel would "pay them whatever he wants." In fact, Uncle Sam's paid its employees for all work performed in amounts often exceeding that required by law. Henderson falsely repeated this testimony despite having no evidence to



July 21, 2014
Page 14

support this allegation, other than the uninformed and incorrect statement of witness Stark.[5]

- Henderson improperly implied it was criminal for Mr. Frimmel to tell witness Rodriguez to disregard what Rodriguez thought were forged identifications because Rodriguez was unqualified to make such an assessment and Mr. Frimmel would face significant liability for rejecting applicants based upon Rodriguez's suspicions.   Henderson and Oliver failed to inform the grand jury that Mr. Frimmel indeed could face significant civil liability for discrimination if he rejected employee applicants based upon Rodriquez's mere belief regarding the appearance of documents.

- The grand jury never learned that Rodriguez was strongly motivated to lie to harm Uncle Sam's.   While working at Uncle Sam's, Rodriguez had an extra-marital affair with witness Christina Hopkins, who subsequently made a sexual harassment complaint against Rodriguez.   Rodriguez quit Uncle Sam's and Hopkins later filed a paternity complaint against Rodriquez in Maricopa County Superior Court.

- When asked by a grand juror about whether "there should be some kind of photocopy of ID" made during the hiring process, Henderson ignored the question and misleadingly answered that "there was no photocopies done" at Uncle Sam's. Henderson and Oliver also misleadingly implied that there was something improper about Munoz Gonzalez being instructed not to make photocopies.   This testimony is misleading, as there is no legal requirement to photocopy employee IDs.   Further, when Oliver had the opportunity to correct this misstatement of law, she did not, instead vaguely and misleadingly stating "I don't know it is a requirement for the company to make a photocopy of the identification."

- Henderson misleadingly testified that his investigation began "[r]ight back in October of 2012 [when] I received an anonymous tip that referenced an Uncle Sam's restaurant. . . ."   In fact, the anonymous tip was received on August 2, 2012, and the original complainants in this case were Said Ishak and Denee Porter

---

[5] Amazingly, in response to Mr. Frimmel's Motion to Remand, Oliver defended the presentation of knowingly false testimony from Sabrina Stark by arguing that since Henderson had prefaced his comments with "Sabrina Stark told me" the evidence was not being offered for the truth of the matter asserted!  Claimants are still searching for the legal principle this explanation implicates.



July 21, 2014
Page 15

Ishak, two married Uncle Sam's ex-employees and convicted criminals who had every reason to fabricate lies about Mr. Frimmel, Ms. Norton and Uncle Sam's. Mr. Frimmel fired Said Ishak after Mr. Frimmel reported to the Scottsdale Police Department that Ishak embezzled funds from Uncle Sam's, for which he was later convicted of felony theft. Said Ishak was arrested on August 2, 2012, the same day Porter Ishak placed her anonymous call. Denee Porter Ishak, also a convicted criminal, quit Uncle Sam's in January 2011 after Mr. Frimmel admonished her for poor work behavior. She subsequently lost her claim against Uncle Sam's for unemployment benefits. Despite the grand jurors' right to know the origin of this investigation, this information remained concealed.

Given all of the misrepresentations, omissions and fabrications, it is not surprising that MCAO was able to obtain an indictment.[6]

### D.     Lisa and Bruce Norton are just the Latest Victims of MCSO/MCAO Abusive Practices

All of the foregoing fits a pattern of abuse of power that has dominated Arpaio's reign of more than 20 years. Arpaio's bogus investigations have included:

- One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard, a democrat, left office.

- One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were ultimately dismissed.

- An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees, certain Superior Court judges and the undersigned's law firm and partners. Supposedly, they all were part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

---

[6] In a demonstration of the coordination of County actors, while Mr. Frimmel and Ms. Norton were in court in a hearing on the criminal case on June 16, 2014, the Maricopa Board of Health engaged in a surprise inspection of the Uncle Sam's restaurant in Phoenix.   And in an unusual coincidence, the County Health Board was called to Uncle Sam's twice more - based on allegedly anonymous tips - over the next 10 days.


POLSINELLI

July 21, 2014
Page 16

- A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.

- In retaliation for publishing articles critical of Arpaio and the MCSO, Phoenix New Times publishers Mike Lacey and Jim Larkin were arrested at their homes in the middle of the night for misdemeanor charges that were eventually dropped.

- Dan Pachoda, executive director of the Arizona chapter of the ACLU, was arrested by MCSO deputies for trespassing while he was leaving the scene of an immigration-related rally. Pachoda was acquitted after trial.

- Animal cruelty charges were brought against Chandler Police Sergeant Thomas Lovejoy after his canine partner died tragically. Lovejoy was also acquitted.

- There is currently a reported retaliatory probe by MCSO against U.S. District Court Judge Murray Snow: the judge who entered the order that Arpaio and his under-lings described as "ludicrous" and "absurd," and referred to as "this crap."

- As information comes to light from facts surrounding the death of Detective Armendariz, it is apparent that the initial confiscation of, and initial failure to return Mr. Frimmel's watch, jewelry and cash was part of ongoing practice of "shaking down" arrestees by MCSO.

## II.    Legal Claims

The facts demonstrate that MCSO had a wrongful motivation to pursue Ms. Norton, and did so in violation of her constitutional and statutory rights. MCSO relied on an unreasonable interpretation of its own investigation and ignored its own evidence that no crime occurred, while going ahead with a very public arrest. MCSO wrongfully obtained search warrants for Ms. Norton's cell phone records. MCSO selectively pursued Ms. Norton in order to keep her from cooperating with the DOJ and to get her to help put pressure on Mr. Frimmel, to intimidate him from exercising his constitutional right to cooperate with the DOJ investigation. It also appears that Ms. Norton has been caught up in and victimized by the MCSO's racketeering activity including the black-market sale of automobiles and identity documents, and the theft of cash confiscated from immigrants stopped in MCSO's much publicized workplace and traffic raids. Although this time they were not able to get away with the petty theft of Ms. Norton's personal property upon her arrest, Ms. Norton was required to hire counsel to simply retrieve her personal



July 21, 2014
Page 17

belongings.  Ms. Norton was selectively prosecuted as similarly situated individuals have not been prosecuted in similar situations. *United States v. Armstrong,* 116 S.Ct. 1480 (1996).

A government official is immune unless (1) he violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation. *Ashcroft v. al Kidd,* 131 S.Ct. 2074, 2080 (2011).  Here the inquiry is (1) whether there was probable cause for arrest and (2) whether it was reasonably arguable that there was probable cause for the arrest. *Rosenbaum v. Washoe Cnty,* 654 F.3d 1001, 1006 (9th Cir. 2011).

The facts set forth above give rise to the following claims against Maricopa County, the MCSO, Arpaio, Henderson, Gandara, and Hechavarria:

- Negligence and Gross Negligence

- Failure to train/Failure to Supervise

- False or wrongful arrest

- Intentional Infliction of Emotional Distress

- Abuse of Process

- Tortious Interference with Contract and Business Relations

- Violations of Constitutional Rights

- Law Enforcement Retaliation

- Vindictive or selective prosecution under Arizona law and/or 42 U.S.C. § 1983

- Prima Facia Tort

- Violations of Rights Protected by the Arizona Constitution, including Article 2, Section 4 (Due Process), Article 2, Section 6 (Free Speech), Article 2, Section 8 (Right to Privacy), and Article 2, Section 13 (Civil Rights)

- Violations of 42 U.S.C. § 1983

- Loss of Consortium


POLSINELLI

July 21, 2014
Page 18

- Actual Damages

- Consequential Damages

- Punitive Damages

- Attorneys' Fees and Costs

This list includes only claims known at this time, and Claimants will supplement their claims as further information comes to light to support such claims.[7]

## III.   Damages and Settlement Offer

### A.   Description of Damages

Lisa Norton was born in Phoenix, Arizona.  Bruce Norton was born in Northfolk, Virginia and moved to Arizona when he was 15.  Lisa and Bruce met while Lisa was in high school (Bruce is one year older), dated for four years, and have been married for 32 years.  They have two children and one two-and-a-half year old grandson.  Their 23 year old son graduated from ASU with honors in military history and is currently stationed at Fort Benning, Georgia where he is on track to graduate from the Army Ranger program this summer.  Their 29 year old daughter is a full time mother and student at ASU. Lisa and Bruce babysit and spend as much time as they can with their grandson.  Lisa first started working at Uncle Sam's in 1980, and, but for a couple of years in the late 1990s, has worked at Uncle Sam's ever since.  On January 10, 2014, just before the wrongful arrests, Lisa's mother passed away.  As a result of her arrest, Lisa was not able to attend the events surrounding her mother's passing and has been seeing a counselor to help deal with the emotional trauma all of this has caused her.  In addition to the emotional distress, Lisa, who is a petite 53 year old woman, was physically threatened and intimidated by an MCSO detective at the time of her arrest.

The events set forth in this notice have caused Lisa and Bruce significant emotional distress and undue hardship all in furtherance of MCSO's and Sheriff Arpaio's on-going "anti-immigration" publicity seeking, fundraising, and wholly illegal campaign. Lisa is seeing both a medical doctor for the physical manifestations of the stress she is under and a therapist to deal with the extreme emotional distress she is under.   She and Bruce have been completely unable

---

[7] For example, if more information comes to light regarding the seemingly complete lack of training, direction or supervision of MCSO employees.



to enjoy the time they should be spending with the children (a son is preparing to graduate from Army Ranger training) and grandchildren.

Notably, the actions of MCSO and its agents here demonstrate that they believe they can pursue anyone they want, without regard for the actual commission of a crime, simply to score political points. This fact will not be lost on jurors: any one of whom could be the next victim.

**B.      Amount for Which Claims Can Be Settled and Factual Basis Supporting That Amount**

Lisa and Bruce's losses are truly immeasurable. Forced to defend against the unfounded charges, they have incurred attorneys' fees now exceeding $100,000. Uncle Sam's restaurant business has declined due to the damage done to Bret and Lisa's reputations, as well as the chilling effect caused by the wide-spread retaliation and intimidation tactics of Arpaio, the MCSO, and the MCAO. The loss of business value and good will is truly significant. As the business teeters near the brink, Lisa is at risk of losing her job, a place where she has worked for most of the last 34 years. It would be unlikely that she would be able to find comparable replacement employment.

Lisa and Bruce have suffered great distress as a result of the actions described in this letter, distress that has literally changed the way they live their lives. Most distressing to them, however, is the damage these actions have done to their families, friends and loved ones, damage they fear can never be reversed. Lisa has suffered from the stress this has caused her; a skin rash, loss of sleep, unbearable back pain, significant weight loss, and raised blood pressure, to name but a few of the very real manifestations of harm. A jury will have no trouble finding that emotional distress and punitive damages are appropriate and should be awarded in the millions of dollars.

A jury will have no trouble finding that emotional distress are appropriate and should be awarded in the millions of dollars. Ms. Norton has suffered damage to her reputation, and to the extent she is dependent on the success of Uncle Sam's to assure her future earning capacity, she has everything she has worked for her entire adult life at stake. Attachment "A" hereto contains a calculation of her lost earning capacity.

Add to those amounts punitive damages and the Nortons will be entitled to a minimum of $10 million in damages for all of their losses. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (suggesting a 4:1 ratio as a potential cap on punitive damage claims). While the symbolism of the choice of target was obvious and petty, the effect of MCSO's and Arpaio's taking out his feud with DOJ and Judge Snow on Ms. Norton is very real and very



July 21, 2014
Page 20

serious. Although it is impossible to put a dollar amount on each of their items of damages, A.R.S. § 12-821.01 requires each of the claimants to state a specific amount for which they will settle their claims. Accordingly:

Lisa and Bruce Norton, will settle all of their claims for $5,000,000.00.

Based on the information presented above and the evidence gathered so far, we believe these figures represent a fair compromise of the claims the Claimants have against the County, MCSO, Arpaio, Henderson, Gandara, and Hechavarria especially considering the egregious and intentional misconduct of the individual actors and the potential for an award of punitive damages and attorneys' fees in a suit under Arizona common law, private rights of action under the Arizona Constitution, and 42 U.S.C. § 1983. If any additional information is required to fully evaluate these claims, please let us know and we will provide it promptly.

I ask you to put your carrier on notice of the claims made in this letter. We await your response pursuant to A.R.S. § 12-821.01.

Sincerely,

Leon Silver

LBS;hl
Enclosures
Copy to:   Lisa and Bruce Norton

48449288.2

# EXHIBIT A

***Attorney Client Privilege***
***DRAFT - For Client Review Only. Subject to Review Revision.***

## Exhibit A

Date of Incident: January 22, 2014
Preliminary Summary of Estimated Economic Damages

**Economic Damages**

| Claimant | | Preliminary Estimate of Economic Damages |
|---|---|---|
| **Pishka, Inc.** | | |
| Diminution in Business Value | $ | 2,203,641 |
| Lost Future Business Opportunity | | 802,135 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| **Total (Rounded)** | $ | **3,660,000** |
| | | |
| **BRF Enterprises, LLC** | | |
| Lost Profits | $ | 75,000 |
| Diminution in Value | | 1,054,852 |
| **Total (Rounded)** | $ | **1,130,000** |
| | | |
| **Bret Frimmel** | | |
| Loss of Earnings | $ | 1,745,943 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| Investment Opportunity Costs | | 637,683 |
| **Total (Rounded)** | $ | **3,030,000** |
| | | |
| **Lisa Norton** | | |
| Loss of Earnings (Pishka) | $ | 426,284 |
| **Total (Rounded)** | $ | **430,000** |
| | | |
| **Grand Total** | $ | **8,250,000** |

This analysis is preliminary in nature and subject to additional verification and analysis. These preliminary conclusions should not be disclosed or shared with third parties without our prior written authorization. Amounts do not include punitive damages, emotional distress, or hedonic losses. These calculations are preliminary and the ultimate quantification of economic damages may be different and the difference may be material.

Note:

It is our understanding based on discussions with Mr. Frimmel and our review of recent operating results that, as a result of the Arrest, the going concern premise of value may not be appropriate for Uncle Sam's and each of the two restaurant locations may be closed. Therefore our analysis assumes a diminution in the value of Uncle Sam's and a loss of economic benefits derived from Uncle Sam's for the other Claimants (i.e. salary, rent, etc.).

**EXHIBIT 14**

# POLSINELLI

CityScape, One E. Washington St., Ste. 1200, Phoenix, AZ, 85004   602.650.2000

July 21, 2014

Leon B. Silver
(602) 650-2066
(602) 264-7033
lsilver@polsinelli.com

## Notice of Claims Pursuant to A.R.S. § 12-821.01

Fran McCarroll, Clerk of the Maricopa Board of Supervisors

Joseph M. Arpaio, Maricopa County Sheriff's Office

Joseph M. Arpaio

Joshua Henderson

Sean Locksa

Daniel Gandara

Christopher Hechavarria,

### Re: Notice of Claim of Bret Frimmel, Pishka, Inc., and BRF Enterprises, LLC for, inter alia, Wrongful Arrest

To the Addressees:

Pursuant to A.R.S. § 12-821.01, this letter constitutes notice of the claims of Bret Frimmel, Pishka, Inc., and BRF Enterprises, LLC, against Maricopa County, the Maricopa County Sheriff's Office (MCSO), and its individual employees, Sheriff Joseph M. Arpaio, Detective Joshua Henderson, Detective Sean Locksa, Detective Daniel Gandara and Detective Christopher Hechavarria.

These claims arise from specific harm that occurred during the course of the MCSO's ongoing notorious, illegal and abusive attempts to enforce immigration laws in the face of a Federal Court issued injunction prohibiting them from doing the same. MCSO has openly demonstrated contempt for the Federal Court order, calling the orders of that Court "ludicrous" and "absurd," and referring to the order itself as "this crap."

Chicago   Dallas   Denver   Kansas City   Los Angeles   New York   Phoenix   St. Louis   Washington, DC   Wilmington

45725485.5



July 21, 2014
Page 2

In furtherance of its feud with the Federal Court, in July 2013, MCSO raided two restaurants that operate under the name "Uncle Sam's" purportedly to investigate alleged identity theft.  The Uncle Sam's restaurants are owned and operated by Mr. Frimmel through his companies, Pishka, Inc. (owner of the restaurants), and BRF Enterprises, LLC (owner of the real estate and landlord to Uncle Sam's as well as other tenants).

During those raids, MCSO arrested nine undocumented immigrant workers under the pretext of identity theft charges. (A tenth employee was arrested on an outstanding auto theft warrant.) Only four of the arrested employees were charged with identity theft.  The other five were released with no charges. These raids were conducted on the basis of false affidavits and testimony of MCSO Detective Henderson, who was the agent in charge of the investigation and raids.

Shortly after the raids, the U.S. Department of Justice ("DOJ") reached out to Mr. Frimmel to see if he would cooperate in its investigation of MCSO and Sheriff Arpaio. Mr. Frimmel has a first amendment right to speak to DOJ.  However, in an attempt to intimidate Mr. Frimmel from exercising that right and cooperating with law enforcement, MCSO arrested Mr. Frimmel, and the general manager of the Uncle Sam's restaurants, Lisa Norton, on fabricated charges of accepting the identity of another, trafficking in fraudulent identity documents, forgery and conspiracy.

Subsequent to the arrests, the County Attorneys' office obtained grand jury indictments of Mr. Frimmel and Ms. Norton on 13 unfounded felony charges.  The indictments were obtained solely based on the investigation and testimony of MCSO Detective Henderson.  And as is standard for MCSO, Sheriff Arpaio engaged in a media campaign surrounding the arrests, defaming Mr. Frimmel with false allegations of illegal activity and proudly touting that MCSO was now going after employers just as it has always gone after undocumented workers.

The Uncle Sam's restaurants suffered, and continue to suffer substantial losses in lost customer revenue, incidental expenses including attorneys' fees, lost good will, reputational damage and lost value.  BRF Enterprises has also been significantly damaged by MCSO's ill-conceived and legally unsupported raids.

Subsequent discovery revealed that the results of MCSO's investigation showed unequivocally that neither Mr. Frimmel nor Ms. Norton committed any crime, and no reasonable person would have pursued these charges. Rather, the evidence obtained in the investigation was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging Mr. Frimmel no matter what.  It can be logically concluded that Sheriff Arpaio saw this as an opportunity to both intimidate Mr. Frimmel and engage in a public relations ploy that served his political purposes.  In either case, Mr. Frimmel's rights were violated.



July 21, 2014
Page 3

Mr. Frimmel's life was then forever changed. He suffered, and continues to suffer emotional distress, reputational damage, and financial damage, including incurring over $650,000.00 in attorneys' fees defending against the unfounded charges. The Uncle Sam's restaurants suffered, and continue to suffer substantial losses in lost customer revenue, good will, reputational damage and lost value. Mr. Frimmel's real estate company has also been significantly damaged by MCSO's ill-conceived and legally unsupported raids.

The search warrants, arrest, probable cause statements and grand jury proceeding teem with false and misleading testimony by MCSO and in particular, Detective Henderson. The grand jury proceeding was further marred by the Deputy County Attorney's decision to refrain from presenting clearly exculpatory evidence as required by law.[1]

Mr. Frimmel, Pishka, Inc., and BRF Enterprises, LLC submit this notice of claim for the claims set forth in detail below and summarized as the wrongful arrest, execution of search warrants, interference with business, violation of civil rights, and personal injury committed against him commencing on January 22, 2014.

This notice is timely, pursuant to A.R.S. § 12-821.01.

## I.      Factual Basis for Claims

The factual context leading to the unfounded arrests of Mr. Frimmel goes back many years.

### A.      MCSO's Enforcement of Federal Immigration Laws

In approximately 2005, Arpaio and the MCSO began a highly publicized campaign to "crack down" on undocumented immigrants in Maricopa County. They formed a special unit dedicated to this task (the Human Smuggling Unit or "HSU") and pushed the passage of a new anti-human smuggling law. In March 2006, Arpaio and the MCSO began arresting undocumented immigrants for felonies under the new anti-human smuggling law for conspiring to smuggle themselves into the United States. The MCAO, alone among prosecuting agencies in the State, offered an interpretation of the law approving those arrests.

Arpaio and the MCSO obtained state funding to assist in their anti-immigration enforcement. In addition, through a 2007 agreement with the federal government, Arpaio and

---

[1] Amazingly, the County Attorney later stated in court filings that she didn't present the exculpatory evidence because doing so would "confuse the grand jurors".



July 21, 2014
Page 4

MCSO obtained federal funding for their anti-immigration campaign. Using these state and federal funds, MCSO conducted a number of "anti-immigration sweeps." During the anti-immigration sweeps, squads of deputy sheriffs and posse members descended upon a designated area, typically with a large Hispanic population, to round up undocumented immigrants.

In May 2008, in response to public outcry over the illegal tactics of Arpaio and the MCSO, then-Governor Napolitano issued an executive order that resulted in the MCSO losing $1.2 million in state funds for immigration enforcement. On May 10, 2012, DOJ filed a Complaint alleging that MCSO and Sheriff Arpaio "have engaged and continue to engage in a pattern or practice of unlawful discriminatory police conduct directed at Latinos in Maricopa County."

In another lawsuit - *Melendres v. Arapio et al.* - the plaintiffs alleged that Arpaio and MCSO had unlawfully instituted a pattern and practice of targeting Latino drivers and passengers in Maricopa County during traffic stops. On December 23, 2011 the District Court entered an Order prohibiting MCSO from detaining any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." A trial took place in that case before U.S. District Court Judge Murray Snow, during which deputies involved in the investigation of Mr. Frimmel, including now deceased and disgraced MCSO Det. Ramon Charley Armendariz, were found to be "not credible." In a later Order dated May 24, 2013, MCSO was found to have violated the injunction and the court ordered "monitoring" of MCSO for a pattern of misconduct, including widespread constitutional violations.

Rather than obey the Federal Court Injunction, MCSO and Arpaio engaged MCSO's "Criminal Employment Unit" to continue MCSO's anti-immigration campaign under the guise of enforcing identity-theft laws. Members of the Criminal Employment Unit, however, still identified themselves as members of the Human Smuggling Unit, even after the HSU was allegedly dissolved. Detective Henderson is a member of both the "Human Smuggling Unit" and the "Criminal Employment Unit" of MCSO as was Det. Armendariz.

On March 24, 2014, Judge Snow chastised Sheriff Arpaio and his Chief Deputy Jerry Sheridan for flouting the Court's prior Orders. Judge Snow pointed to a video, recorded in October 2013, in which MCSO Chief Deputy Sheridan called Judge Snow's ruling "ludicrous" and "absurd," and referred to the order itself as "this crap." Arpaio followed Sheridan's statements by stating: "What the chief deputy said is what I've been saying." The incendiary and disrespectful remarks by Arpaio and Sheridan were made during the time period between the July 2013 raid on Uncle Sam's and the January 2014 arrests of Mr. Frimmel and Ms. Norton and demonstrate the lawlessness rampant during the precise time they became targets of MCSO.



July 21, 2014
Page 5

In May 2014, extremely troubling information came to light regarding Detective Armendariz. Armendariz was the detective in charge of the July 2013 raid at Uncle Sam's Peoria location and a member of the MCSO's "Human Smuggling Unit".[2]   Armendariz reportedly took his own life that month.  In the wake of Armendariz's death, investigators found not only heroin, methamphetamine, and marijuana at his home, but also hundreds of stolen driver's licenses, identifications, license plates, passports, airport security clearance cards, evidence bags, and wallets.   Further, the search of Armendariz's home revealed recordings of thousands of his traffic stops, which by one account "reportedly document misconduct on the part of [MCSO Det. Armendariz]."[3]

**B.  MCSO's Actions Involving Mr. Frimmel.**

On July 17, 2013, MCSO, carrying three search warrants, raided the Phoenix and Peoria Uncle Sam's locations as well as Mr. Frimmel's home. During the raid, ten Uncle Sam's employees were arrested, although apparently only four were ever charged and convicted with identity theft.   The convictions were the result of plea agreements entered with MCAO for cooperation in its investigation of Mr. Frimmel and Ms. Norton.

During the raid, and again after the raid, Det. Henderson was informed that Mr. Frimmel was represented by counsel.

A few days after the raid, Mr. Frimmel was contacted by DOJ investigator Sarah Lopez, who sought Mr. Frimmel's assistance with DOJ's investigation of MCSO.  At the time Mr. Frimmel received this communication he, and his attorney, had been told by Henderson that Mr. Frimmel was considered a victim in MCSO's investigation rather than a suspect or a person of interest.   MCSO's recent conduct in bringing criminal charges to harass and intimidate Mr. Frimmel demonstrate that MCSO's investigation was motivated by its concern that Mr. Frimmel might cooperate with the DOJ's investigation, a retaliatory act in violation of Mr. Frimmel's rights.

Between the July 2013 raid and January 2014, and despite knowing that Mr. Frimmel was represented by counsel, MCSO sought to gather evidence against Mr. Frimmel by having

---

[2] Three of the four cooperating defendant witnesses in the criminal case against Mr. Frimmel and Ms. Norton were arrested at the Peoria location, which operation was run by Armendariz.

[3] Shortly after the Armandariz information came to light, Arpaio removed his name from consideration as a candidate for Governor of Arizona.   However, his political purposes for the arrest had long before been served.



informants approach him, and by contacting Mr. Frimmel's current employees, in violation of Mr. Frimmel's civil rights.

On January 22, 2014, Mr. Frimmel (and Ms. Norton) was arrested on charges related to the purported unlawful acceptance of and/or trafficking in stolen identification provided by four undocumented workers at Uncle Sam's restaurants. The arrests were supported by knowingly false and intentionally misleading probable cause statements provided by Det. Henderson, in violation of Mr. Frimmel's and Ms. Norton's rights. Det. Henderson did not obtain an arrest warrant. MCSO chose to engage in a public arrest complete with a media event rather than simply send a summons to Mr. Frimmel or his counsel.[4]

At the time of his arrest, Mr. Frimmel was handcuffed by Henderson in such an aggressive manner as to cause significant physical injury to his right hand, leaving his entire hand numb and without feeling for several months. Additionally, despite knowing that Mr. Frimmel was represented by counsel, and despite Mr. Frimmel's repeated requests for counsel to be present, Henderson interrogated Mr. Frimmel after his arrest without counsel present, in violation of Mr. Frimmel's rights.

Mr. Frimmel and Ms. Norton were both released on their own recognizance. However, upon his release, MCSO did not return to Mr. Frimmel his Rolex watch, his gold necklace, his gold bracelet, or the $4,000 in cash they had removed from him on his arrest. (These items were not returned until after counsel intervened and pressed MCSO.)

Subsequent to the arrests, MCSO obtained warrants permitting the search of, and extraction from Mr. Frimmel's cell phone. The affidavits in support of these searches consist of material misstatements that the affiants made knowingly, intentionally, or with reckless disregard for the truth, and included false statements that were necessary to the finding of probable cause.

## C.   Detective Henderson's Investigation Should have led to no Arrest or Charges

### 1. MCSO Arrested Mr. Frimmel on False Grounds

The basis for the probable cause arrest of Mr. Frimmel is set forth by Det. Henderson in a Probable Cause Statement. The Probable Cause Statement is confusing, inherently contradictory, and made it impossible to determine what charged offense related to which assertion of fact. The

---

[4] That MCSO and Arpaio chose a probable cause arrest when a summons would have sufficed, is additional evidence of the improper motives behind the arrest.



July 21, 2014
Page 7

statements were replete with assertions of fact that Henderson knew were false and were contradicted by his previous interviews of various witnesses, which were recorded.  Those false or misleading statements included, but are not limited to the following:

- That Mr. Frimmel knowingly entered four fictitious or forged social security numbers into his computer and transmitted them to ADP.

- That five of the suspects arrested on July 17, 2013 came forward with information that Mr. Frimmel knowingly committed forgery or identity theft and/or conspiracy to commit forgery and identity theft.

- That both current and past employees stated that Mr. Frimmel knowingly hired employees that were using forged identities.

- That Henderson was contacted by four ex-employees with information consistent with information provided by the five employees.

- That one employee told him that Mr. Frimmel instructed the employee to forge the hiring date on another employee's W-4 to say he was hired in 2007, rather than 2010.

- That witnesses claimed that Mr. Frimmel was present during the hiring process and hired them without having to provide a valid identification or social security number.

- That the fact that some employees were working without food handler's cards was somehow relevant to the question of whether Mr. Frimmel knowingly hired workers based on stolen identities or forged documents.

- That "employees" advised that they signed and dated blank "applications" and tax forms, and that social security numbers were later provided and written in by the business.

- That Mr. Frimmel made comments that he didn't care about employees' immigration status and would call staff "illegals".

- That Ms. Norton made derogatory statements regarding Latino workers.

- That Ms. Norton directed that work applications be given to Latinos.



July 21, 2014
Page 8

Relying on these skewed conclusions from his investigation, Mr. Frimmel was arrested by MCSO on January 22, 2014 and charged with various offenses. These charges were later replaced by a grand jury indictment.

These allegations, however, were diametrically opposed to the "Facts" that Detective Henderson learned in his investigation. In fact, no witness claimed to have been hired by Mr. Frimmel or Ms. Norton or that Mr. Frimmel or Ms. Norton were present during the hiring process. No witness claimed that they were not required to provide valid identification. Rather, several witnesses explained that lower level managers other than Mr. Frimmel or Ms. Norton did the hiring and obtained the proof of identity. Other witnesses, including long time managers reported that identification was required and that if they hired someone without it, they would be fired by Mr. Frimmel. No witness claimed to have signed a blank application.

In order to be guilty of accepting the identity of another, Mr. Frimmel had to "knowingly" accept false documents. There was no information provided to Det. Henderson to even suggest that Mr. Frimmel had any involvement in accepting identification documents from the employees no less that he knew the documents were false. Moreover, the law is that a prospective employer must accept whatever documents are provided, or be subject to liability for discrimination. Moreover, there was not a single witness who claimed Ms. Norton accepted any document, no less false ones.

In order to be guilty of trafficking in the identity of another Mr. Frimmel had to "knowingly" transmit the information without the consent of the person. Without any indication that Mr. Frimmel knew that the employees were providing identification documents that were not their own, it is not possible for Mr. Frimmel to have transmitted them to anyone. (The charge is based on Mr. Frimmel transmitting the information contained in the documents by entering them in his payroll service's web-based system.)

And as regards the alleged forgery, no one claimed that Mr. Frimmel wrote anything on the employee's application or had anything to do with the employee (or the manager) filling out the application. Det. Henderson appears to have simply made that allegation up. And, more importantly, Det. Henderson had in his possession as part of his investigation the payroll records of that very employee that demonstrated that Mr. Frimmel entered the correct hire date, regardless of what the employee's application says on it.

As stated above, the evidence was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging and arresting Mr. Frimmel no matter what. Det. Henderson knew from his own investigation that Mr. Frimmel was not involved in the interview or application gathering process of prospective employees, that Mr. Frimmel required his managers to obtain proper identification documents, that the employees in question all provided



July 21, 2014
Page 9

facially valid documentation and that Mr. Frimmel entered the employee's information in his payroll company's web based system correctly and as required.

It is beyond dispute that the investigation and arrest were pre-determined and done for illegitimate purposes.[5]

## 2. MCSO Falsely Obtained the Cell Phone Affidavits

Also on January 22, 2014, MCSO obtained a search warrant for Ms. Norton's cell phone records that were in the possession of "Cellco Partnership DBA Verizon Wireless." On February 4, 2014 MCSO obtained a search warrant from Mr. Frimmel's cell phone records in the possession of "Cellco Partnership DBA Verizon Wireless."   MCSO Detective Sean Locksa and Daniel Gandara provided false affidavits in support of these warrants in violation of Mr. Frimmel's and Ms. Norton's rights. On January 22, 2014, MCSO obtained a search warrant that allowed them to search and extract information directly from the cellular phones belonging to Mr. Frimmel and Ms. Norton.  The affidavit in support of that warrant was authored by MCSO Det. Christopher Hechavarria.  All of these affidavits contained significant knowingly false and intentionally misleading statements, in violation of Mr. Frimmel and Ms. Norton's rights.

Detectives Locksa, Gandara and Hechavarria misled the court as follows:

- Det. Locksa falsely stated how MCSO identified Mr. Frimmel as the user/subscriber of the cell phone.

- Det. Hechavarria falsely stated that Defendants committed crimes on or about September 30, 2013, something not alleged anywhere else in the criminal case.

- Det. Locksa and Det. Gandara falsely stated that Defendants committed crimes on or about October 1, 2013, something not alleged anywhere else in the criminal case.

- Det. Locksa and Det. Gandara falsely alleged that four cooperating witnesses in this case made "collaborating statements" that Defendants knowingly hired undocumented workers and conspired to commit identity theft and forgery, when the witnesses said no such thing

---

[5] The only alternative explanation, if one is even possible, is that the MCSO personnel involved were so poorly trained and poorly supervised that they didn't know any better and didn't understand the consequences of their own inappropriate actions.  If that proves to be the case, an amended Notice of Claim will be served.



July 21, 2014
Page 10

- Det. Locksa, Det. Gandara and Det. Hechavarria falsely alleged that four cooperating witnesses "were convicted of identity theft and forgery charges," and further concealed benefits the cooperators were provided by the State.

- Det. Locksa, MCSO Det. Gandara and Det. Hechavarria omitted numerous statements that further render the cell phone affidavits erroneous.

- Det. Hechavarria made bizarre and improper statements regarding "illegal drugs" and "illegal drug trafficking" as being part of the criminal activity the claimants are charged with. This is wholly untrue and was clearly fabricated in order to obtain the warrant.

- Det. Hechavarria omitted the essential fact that there is nothing in the discovery, including in the free talks and grand jury transcripts, indicating cell phones or telephones were used to facilitate any of the alleged criminal activity.

- Det. Hechavarria fabricated a statement that Ms. Norton "owned" Uncle Sam's.

**3. MCSO Cannot Rely on the Grand Jury Indictment as a Defense**

On February 7, 2014, Deputy County Attorney Jaimee Oliver sought and obtained indictments against Mr. Frimmel and Ms. Norton in their capacity as owner and manager of Uncle Sam's restaurants from a grand jury. The charges alleged against both Mr. Frimmel and Ms. Norton in the indictments are two counts of conspiracy to commit taking the identity of another and four counts of taking the identity of another. The charges alleged against Mr. Frimmel alone are four counts of trafficking in the identity of another, one count of forgery, and two counts of taking the identity of another. No owner or manager in Arizona had ever been pursued on these identity-theft related charges in the past. The indictment was based entirely on the knowingly false and intentionally misleading testimony of MCSO detective Henderson.

That a grand jury subsequently indicted Mr. Frimmel and Ms. Norton provides no defense in this case. Procuring an unconstitutional prosecution is unlawful regardless of whether the arrest was unlawful. If the sheriff acted maliciously or with reckless disregard for the rights of the arrested person the prosecutor's independent judgment does not provide the sheriff with immunity.

The grand jury presentation (like Henderson's prior probable cause statements) was utterly confusing and completely inaccurate. MCSO detective Henderson was Oliver's single witness before the grand jury, and although Henderson had amassed a sizable collection of



July 21, 2014
Page 11

documents by the time the grand jury heard the case, the grand jury did not see a single document. Oliver and Henderson presented evidence they knew was false. Oliver did not properly instruct the grand jury on the applicable law (and did not provide copies of all of the relevant statutes she alleged were violated), failed to correct Det. Henderson's repeated misstatements of fact and law, and withheld clearly exculpatory evidence – all with the singular purpose of ensuring that the grand jury returned an indictment against Mr. Frimmel and Ms. Norton so that the retaliatory intimidation scheme against them could go forward as planned.

Det. Henderson, on behalf of MCSO, testified regarding information he learned in "free talks" with four witnesses who had been arrested in the July 17, 2013 raid: Fernando Gonzalez, Emidgio Munoz Gonzalez, Victor Vargas and Valentin Villanueva-Fernan. Det. Henderson misled the grand jury regarding what these witness told him, just as he had misled the court in his probable cause statement. These include, but are not limited to the following:

- Henderson presented the materially false testimony to the grand jury that: "[Fenrando] Gonzales [sic] told me he was hired by Brett [sic] and that Brett [sic] made the decision to hire him". In fact, Gonzalez never stated that Mr. Frimmel hired him. Just the opposite: Gonzalez told both Oliver and Henderson that neither Mr. Frimmel nor Ms. Norton ever met with <u>any</u> applicants during the hiring process.

- Henderson testified that Fernando Gonzalez "stated that he did not sign any forms or present any identification at the time of hire." Neither he, nor Oliver instructed the grand jury that under the law Gonzalez was not required to present identification and work authorization documents until three days after hire.

- Henderson testified that Fernando Gonzalez was instructed by Ms. Norton "to give Latinos applications." Gonzalez, however, had merely stated that Ms. Norton required him to provide applications to prospective job applicants, without regard for race or national origin. Moreover, Oliver did not clarify that if a business refuses to provide applications to "Latinos" that would be a violation of law.

- Neither Henderson nor Oliver conveyed to the grand jury that Fernando Gonzalez stated he had no idea what happened to documents submitted by applicants.

- While Henderson testified that Emidgio Munoz Gonzalez was hired at Uncle Sam's using a social security number that did not belong to him, neither Henderson nor Oliver disclosed that Munoz Gonzalez told them that he obtained the social security number he used 18 years ago, well before his time at Uncle



Sam's, and that he possessed a driver's license issued by the Arizona Motor Vehicle Department since 1994. Rather, Henderson and Oliver concealed from the grand jury that Munoz Gonzalez presented both a social security card and driver's license to Uncle Sam's at hiring as was required by law.

- Henderson and Oliver concealed Munoz Gonzalez's testimony regarding management training, including that Mr. Frimmel instructed the managers to ask for a social security card and something with a picture on it, and that he was instructed by Mr. Frimmel to watch the person fill out the application and collect it from them when they were done.

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas told them he provided a social security card and a photo identification to Uncle Sam's "at the time of hiring."

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas admitted he acted on his own and without Defendants' knowledge when he obtained a forged social security card from an unknown person unrelated to Uncle Sam's.

- Henderson falsely testified to the grand jury that Mr. Frimmel hired Villanueva-Fernan. In fact, Villanueva-Fernan stated that he was hired by an Uncle Sam's employee (not Mr. Frimmel or Ms. Norton) whose name he did not remember, and claimed no dealings with Mr. Frimmel beyond "just a few words." Oliver was present during Villanueva-Fernan's free-talk, yet she did nothing to correct the false testimony to the grand jury.

- Henderson falsely testified to the grand jury, that Villanueva-Fernan signed a "blank application."

- Neither Henderson nor Oliver disclosed to the grand jury that Villanueva-Fernan was convicted and/or found responsible by Arizona Courts for many civil and criminal offenses over the years he worked at Uncle Sam's, yet faced no immigration consequences from these activities.

Additionally, Oliver and Henderson withheld clearly exculpatory evidence from the grand jury and falsely testified regarding the law and other facts allegedly learned in the investigation, all in violation of Mr. Frimmel's rights. These include, but are not limited to, the following:



July 21, 2014
Page 13

- Although Henderson falsely told the grand jury that his ongoing investigation showed Mr. Frimmel and Ms. Norton "knowingly" hired undocumented workers, he entirely concealed an interview with former manager Manuel Arredondo, who said the exact opposite. Arredondo told Henderson he was required to produce two forms of identification when he was hired at Uncle Sam's by an unknown Spanish speaking manager. Arredondo also admitted that he purchased a forged social security card prior to applying at Uncle Sam's, that Mr. Frimmel required employees to obtain a food handler's card, and that Arredondo never told Mr. Frimmel or Ms. Norton when he was unable to renew his own food handler's card.

- Despite having testified that another witness claimed to have heard Mr. Frimmel and Ms. Norton mistreating Latinos and making racial comments, Henderson did not disclose to the grand jury Arredondo's statement that during his 15 years as a kitchen staff member and manager, he never witnessed mistreatment or heard any racial comments.

- When asked by a grand juror whether Mr. Frimmel was "making the social security cards himself" and whether doing so was "part of the forgery," neither Oliver nor Henderson answered the questions. Rather than responding, Oliver falsely stated that "some of the employees just signed blank applications."

- Henderson testified that prospective employees would make up a social security number when applying and later obtain a card with the same number, misleading the grand jury to believe that Mr. Frimmel and Ms. Norton somehow knew that this was occurring.

- Despite having testified that Mr. Frimmel forged documents in an attempt to misrepresent Munoz Gonzalez's hire date as having been in 2007, Henderson failed to inform the grand jury that he possessed an ADP Payroll document, provided by Mr. Frimmel during the July search of Mr. Frimmel's home, regarding the Uncle Sam's payroll that showed that Munoz Gonzalez's hire date was correctly reported as 2010.

- Henderson and Oliver concealed that commencing in 2007 – the same time that E-Verify was required in Arizona - Mr. Frimmel's payroll service, ADP, began charging Mr. Frimmel for its "New Hire Reporting Service," and that Mr. Frimmel believed that this included all legally required employment vetting services, including E-Verify. Without such information, the grand jury could not



July 21, 2014
Page 14

have understood why Mr. Frimmel believed the "New Hire Reporting Service" covered E-Verify once it became the law in Arizona.  While Henderson did testify regarding Mr. Frimmel's initial ADP contract, which did not contain explicit E-Verify services language, Henderson and Oliver omitted that this contract was executed in 2006, before E-Verify was required, and thus E-Verify would not be specified as a part of any required employment vetting services.

- Henderson and Oliver provided false and misleading testimony regarding County issued "food handler's" cards.  Henderson testified that Environmental Health in "approximately the year 2009" changed its "requirements to where people had to have a valid identification card -- Arizona identification card to get a current – updated food handler's card," and that this restricted Uncle Sam's workers from obtaining food handler's cards, which expire after three years.  However, Henderson and Oliver withheld from the grand jury the fact that all of the ex-employees convicted for possessing invalid documents had valid food handler's cards issued to them after February 2009.

- Henderson entirely concealed Mr. Frimmel's repeated and unequivocal statements once in custody that the allegations presented against him were false.

- Despite their knowledge to the contrary, neither Henderson nor Oliver advised the grand jury that shortly after the July 17, 2013 raids Mr. Frimmel had been contacted by DOJ regarding their on-going investigation into MCSO and that shortly after that contact, MCSO and MCAO turned their investigation to Mr. Frimmel and Ms. Norton.

- Henderson testified that witness Sabrina Stark told him "the reason she left [Uncle Sam's] was because the owner, Brett [sic] Frimmel, treated his employees bad," Henderson withheld from grand jurors that Stark subsequently returned to work at Uncle Sam's at her request.

- Henderson repeated Stark's assertion "that every employee that Brett [sic] hires and puts in the kitchen is not legal" despite knowing this was false, given that MCSO did not arrest all kitchen employees on July 17, 2013 or thereafter.

- Henderson provided false testimony when he repeated Stark's false statement that Mr. Frimmel would "pay them whatever he wants."  In fact, Uncle Sam's paid its employees for all work performed in amounts often exceeding that required by law.  Henderson falsely repeated this testimony despite having no evidence to



July 21, 2014
Page 15

support this allegation, other than the uninformed and incorrect statement of witness Stark.[6]

- Henderson improperly implied it was criminal for Mr. Frimmel to tell witness Rodriguez to disregard what Rodriguez thought were forged identifications because Rodriguez was unqualified to make such an assessment and Mr. Frimmel would face significant liability for rejecting applicants based upon Rodriguez's suspicions.   Henderson and Oliver failed to inform the grand jury that Mr. Frimmel indeed could face significant civil liability for discrimination if he rejected employee applicants based upon Rodriquez's mere belief regarding the appearance of documents.

- The grand jury never learned that Rodriguez was strongly motivated to lie to harm Uncle Sam's.  While working at Uncle Sam's, Rodriguez had an extra-marital affair with witness Christina Hopkins, who subsequently made a sexual harassment complaint against Rodriguez.   Rodriguez quit Uncle Sam's and Hopkins later filed a paternity complaint against Rodriquez in Maricopa County Superior Court.

- When asked by a grand juror about whether "there should be some kind of photocopy of ID" made during the hiring process, Henderson ignored the question and misleadingly answered that "there was no photocopies done" at Uncle Sam's. Henderson and Oliver also misleadingly implied that there was something improper about Munoz Gonzalez being instructed not to make photocopies.  This testimony is misleading, as there is no legal requirement to photocopy employee IDs.  Further, when Oliver had the opportunity to correct this misstatement of law, she did not, instead vaguely and misleadingly stating "I don't know it is a requirement for the company to make a photocopy of the identification."

- Henderson misleadingly testified that his investigation began "[r]ight back in October of 2012 [when] I received an anonymous tip that referenced an Uncle Sam's restaurant. . . ."   In fact, the anonymous tip was received on August 2, 2012, and the original complainants in this case were Said Ishak and Denee Porter

---

[6] Amazingly, in response to Mr. Frimmel's Motion to Remand, Oliver defended the presentation of knowingly false testimony from Sabrina Stark by arguing that since Henderson had prefaced his comments with "Sabrina Stark told me" the evidence was not being offered for the truth of the matter asserted!  Claimants are still searching for the legal principle this explanation implicates.



July 21, 2014
Page 16

Ishak, two married Uncle Sam's ex-employees and convicted criminals who had every reason to fabricate lies about Mr. Frimmel, Ms. Norton and Uncle Sam's. Mr. Frimmel fired Said Ishak after Mr. Frimmel reported to the Scottsdale Police Department that Ishak embezzled funds from Uncle Sam's, for which he was later convicted of felony theft. Said Ishak was arrested on August 2, 2012, the same day Porter Ishak placed her anonymous call. Denee Porter Ishak, also a convicted criminal, quit Uncle Sam's in January 2011 after Mr. Frimmel admonished her for poor work behavior. She subsequently lost her claim against Uncle Sam's for unemployment benefits. Despite the grand jurors' right to know the origin of this investigation, this information remained concealed.

Given all of the misrepresentations, omissions and fabrications, it is not surprising that MCAO was able to obtain an indictment.

### D.   Mr. Frimmel is Just the Latest Victim of MCSO/MCAO's Abusive Practices[7]

All of the foregoing fits a pattern of abuse of power that has dominated Arpaio's reign of more than 20 years. Arpaio's bogus investigations have included:

- One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard, a democrat, left office.

- One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were ultimately dismissed.

- An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees, certain Superior Court judges and the undersigned's law firm and partners. Supposedly, they all were

---

[7] In a demonstration of the coordination of County actors, and the vindictiveness of the MCSO, while Mr. Frimmel and Ms. Norton were in a court hearing in the criminal case on June 16, 2014, the Maricopa County Board of Health engaged in a surprise inspection of the Uncle Sam's restaurant in Phoenix. While an occasional inspection is not unusual (Uncle Sam's experiences them 3 or 4 times a year), the County Board of Health was coincidentally called to Uncle Sam's four more times – based on "anonymous" tips – over the next four weeks.



July 21, 2014
Page 17

part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

- A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.

- In retaliation for publishing articles critical of Arpaio and the MCSO, Phoenix New Times publishers Mike Lacey and Jim Larkin were arrested at their homes in the middle of the night for misdemeanor charges that were eventually dropped.

- Dan Pachoda, executive director of the Arizona chapter of the ACLU, was arrested by MCSO deputies for trespassing while he was leaving the scene of an immigration-related rally. Pachoda was acquitted after trial.

- Animal cruelty charges were brought against Chandler Police Sergeant Thomas Lovejoy after his canine partner died tragically. Lovejoy was also acquitted.

- There is currently a reported retaliatory probe by MCSO against U.S. District Court Judge Murray Snow: the judge who entered the order that Arpaio and his under-lings described as "ludicrous" and "absurd," and referred to as "this crap."

- As information comes to light from facts surrounding the death of Detective Armendariz, it is apparent that the initial confiscation of, and initial failure to return Mr. Frimmel's watch, jewelry and cash was part of ongoing practice of "shaking down" arrestees by MCSO.

## II.    Legal Claims

The facts demonstrate that MCSO had a wrongful motivation to pursue Mr. Frimmel and did so in violation of his constitutional and statutory rights. MCSO relied on an unreasonable interpretation of its own investigation and ignored its own evidence that no crime occurred, while going ahead with a very public arrest. MCSO wrongfully obtained search warrants for Mr. Frimmel's cell phone records, and wrongfully interrogated and sought to obtain information from Mr. Frimmel without counsel present. Additionally, MCSO selectively pursued Mr. Frimmel to intimidate him from exercising his constitutional right to cooperate with the DOJ investigation. Finally, it appears that Mr. Frimmel has been caught up in and victimized by the MCSO's racketeering activity including the black-market sale of automobiles and identity



July 21, 2014
Page 18

documents, and the theft of cash confiscated from immigrants stopped in MCSO's much publicized workplace and traffic raids.   Although this time they were not able to get away with the petty theft of Mr. Frimmel's personal property upon his arrest, Mr. Frimmel was required to hire and pay for counsel to simply retrieve his personal belongings.  Mr. Frimmel was selectively prosecuted as similarly situated individuals have not been prosecuted in similar situations. *United States v. Armstrong*, 116 S.Ct. 1480 (1996).

A government official is immune unless (1) he violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation. *Ashcroft v. al Kidd*, 131 S.Ct. 2074, 2080 (2011).  Here the inquiry is (1) whether there was probable cause for arrest and (2) whether it was reasonably arguable that there was probable cause for the arrest.  *Rosenbaum v. Washoe Cnty,* 654 F.3d 1001, 1006 (9th Cir. 2011).

The facts set forth above give rise to the following claims against Maricopa County, the MCSO, Arpaio, Henderson, Locksa, and Hechavarria:

- Negligence and Gross Negligence

- Failure to train/failure to supervise

- False or wrongful arrest

- Intentional Infliction of Emotional Distress

- Abuse of Process

- Tortious Interference with Contract and Business Relations

- Violations of Constitutional Rights including first, fifth and fourteenth amendment rights per 42 U.S.C. § 1983

- Law Enforcement Retaliation

- Vindictive or selective prosecution under Arizona law and/or 42 U.S.C. § 1983

- Prima Facia Tort

- Violations of Rights Protected by the Arizona Constitution, including Article 2, Section 4 (Due Process), Article 2, Section 6 (Free Speech), Article 2, Section 8 (Right to Privacy), and Article 2, Section 13 (Civil Rights)



July 21, 2014
Page 19

- Actual Damages

- Consequential Damages

- Punitive Damages

- Attorneys' Fees and Costs

This list includes only claims known at this time, and Claimants will supplement these claims as further information comes to light.[8]

## III.  Damages and Settlement Offer

### A.  Description of Damages

Bret Frimmel has lived in Arizona since he was four years old. Bret's father opened the first Uncle Sam's restaurant in 1980 when Bret was six. Bret essentially grew up in the restaurant and first started working at Uncle Sam's when he was fifteen. Bret took over the operations when he turned eighteen. Bret's father passed away in 2000. Bret is the sole owner of the companies that own and operate Uncle Sam's. Bret has two sons, ages 18 and 12, and a four year old daughter. Bret has been deprived of the opportunity to spend significant time with his children; rather, he has spent all of his time dealing with the criminal charges against him while trying to keep the restaurants running. He has had to cut out everything in his life other than attention to those two things. In addition, at the time of his arrest, Mr. Frimmel was handcuffed in a negligent manner by Det. Henderson which caused an acute compression of his right thoracic outlet region, with weakness in the right median-innervated thenar muscles, for which he needed medical treatment. If this case makes it to a jury, Bret is likely to receive substantial compensatory and punitive damage awards.

Bret is the principal of Pishka, Inc. The false publicity surrounding the raids has caused an enormous loss of business and good will. At the time of these events, Bret was in discussions regarding taking the Uncle Sam's brand to a national platform by either franchising or expansion. In addition, Pishka has lost its existing commercial liability insurance and has had to replace it with more expensive coverage. Pishka, Inc.'s damages include:

---

[8] For example, if more information comes to light regarding the sudden dramatic increase in "anonymous" tips to the County Department of Health regarding Uncle Sam's or the seemingly complete lack of training, direction or supervision of MCSO employees.



July 21, 2014
Page 20

- Lost profits from the existing business
- Diminution in value of the existing business
- Lost future business opportunities
- Incidental out-of-pocket expenses

Bret is also the principal of BRF Enterprises, LLC, the owner of the real estate upon which both restaurants sit.  As a direct result of the false publicity, BRF has also suffered damage to the value of its properties and has recently been informed that its $6 million credit line will not be renewed by its lender, thereby causing him to liquidate other income generating assets and cash to pay the obligation.

Notably, the actions of MCSO and its agents demonstrate that they believe they can pursue anyone they want, without regard for the actual commission of a crime, simply to score political points.  This fact will not be lost on jurors: any one of whom could be the next victim.

### B.   Amount for Which Claims Can Be Settled and Factual Basis Supporting That Amount

Mr. Frimmel's losses are truly immeasurable.  Forced to defend against the unfounded charges, he has incurred attorneys' fees now exceeding $650,000.  Uncle Sam's restaurant business has declined due to the damage done to Bret's reputation, as well as the chilling effect caused by the wide-spread retaliation and intimidation tactics of Arpaio, the MCSO, and the MCAO.  The loss of business value and good will is truly significant.   Uncle Sam's has long been a sponsor of little league teams and active part of its community.

Attached to this notice as Attachment "A" is an outline of the various elements of Claimants' compensatory damages.  In addition to those items set forth in the Attachment, a jury will have no trouble finding that emotional distress is appropriate and should be awarded in the millions of dollars.  Additionally, Mr. Frimmel is entitled to damages for his hand injury.  Add to those amounts punitive damages and Mr. Frimmel will be entitled to a minimum of $40 million in damages for all of his losses.  See *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003) (suggesting a 4:1 ratio as a potential cap on punitive damage claims).

While the symbolism of the choice of target was obvious and petty, the effect of MCSO's and Arpaio's taking out his feud with DOJ and Judge Snow on Mr. Frimmel is very real, very serious and outrageous.  A.R.S. § 12-821.01 requires each of the claimants to state a specific amount for which they will settle their claims.  Accordingly, Mr. Frimmel, Pishka and BRF, will settle all of their claims for $10,000,000.00.  This is a reasonable demand in light of past jury verdicts in Arizona for claims and damages. For example, in *Devore v. Southwest Airlines,* 2006



July 21, 2014
Page 21

WL 4546313 (Ariz. 2006), the jury awarded the plaintiff $4.5 million for false arrest and emotional distress.

Based on the information presented above and the evidence gathered so far, we believe these figures represent a fair compromise of the claims the Claimants have against the County, MCSO, Arpaio, Henderson, Locksa, Gandara and Hechavarria, especially considering the egregious and intentional misconduct of the individual actors and the potential for an award of punitive damages and attorneys' fees in a suit under Arizona common law, private rights of action under the Arizona Constitution, and 42 U.S.C. § 1983. If any additional information is required to fully evaluate these claims, please let us know and we will provide it promptly.

I ask you to put your carrier on notice of the claims made in this letter. We await your response pursuant to A.R.S. § 12-821.01.

Sincerely,

Leon Silver

LBS;hl
Enclosures

Copy to:  Mr. Bret Frimmel

# EXHIBIT A

*Attorney Client Privilege*
*DRAFT - For Client Review Only. Subject to Review Revision.*

## Exhibit A
Date of Incident: January 22, 2014
Preliminary Summary of Estimated Economic Damages

**Economic Damages**

| Claimant | | Preliminary Estimate of Economic Damages |
|---|---|---|
| **Pishka, Inc.** | | |
| Diminution in Business Value | $ | 2,203,641 |
| Lost Future Business Opportunity | | 802,135 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| **Total (Rounded)** | $ | 3,660,000 |
| | | |
| **BRF Enterprises, LLC** | | |
| Lost Profits | $ | 75,000 |
| Diminution in Value | | 1,054,852 |
| **Total (Rounded)** | $ | 1,130,000 |
| | | |
| **Bret Frimmel** | | |
| Loss of Earnings | $ | 1,745,943 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| Investment Opportunity Costs | | 637,683 |
| **Total (Rounded)** | $ | 3,030,000 |
| | | |
| **Lisa Norton** | | |
| Loss of Earnings (Pishka) | $ | 426,284 |
| **Total (Rounded)** | $ | 430,000 |
| | | |
| **Grand Total** | $ | 8,250,000 |

This analysis is preliminary in nature and subject to additional verification and analysis. These preliminary conclusions should not be disclosed or shared with third parties without our prior written authorization. Amounts do not include punitive damages, emotional distress, or hedonic losses. These calculations are preliminary and the ultimate quantification of economic damages may be different and the difference may be material.

Note:
It is our understanding based on discussions with Mr. Frimmel and our review of recent operating results that, as a result of the Arrest, the going concern premise of value may not be appropriate for Uncle Sam's and each of the two restaurant locations may be closed. Therefore our analysis assumes a diminution in the value of Uncle Sam's and a loss of economic benefits derived from Uncle Sam's for the other Claimants (i.e. salary, rent, etc.).

**EXHIBIT 15**

*[Handwritten annotations: "SERVED IN PERSON BY JOE BEACOM @ 1347 HOURS", "DB - KLT AF930 NOC P.S RECEIVED JUL 21 2014 2010 $260", "Received Scopes, 1 for each", "KAB X3615 7/23/14"]*



CityScape, One E. Washington St., Ste. 1200, Phoenix, AZ, 85004   602.650.2000

July 21, 2014

Leon B. Silver
(602) 650-2066
(602) 264-7033
lsilver@polsinelli.com

## Notice of Claims Pursuant to A.R.S. § 12-821.01

Fran McCarroll, Clerk of the Maricopa Board of Supervisors

1   Joseph M. Arpaio, Maricopa County Sheriff's Office

2   Joseph M. Arpaio   *J0991*

3   Joshua Henderson   *J1458*

4   Brandon Jones   *A7823*

5   Christopher Hegstrom   *B1798*

Re:   **Notice of Claim of Bret Frimmel, Pishka, Inc., and BRF Enterprises, LLC for,** *inter alia,* **Defamation**

To the Addressees:

Pursuant to A.R.S. § 12-821.01 this letter constitutes notice of the claims of Bret Frimmel, Pishka, Inc., and BRF Enterprises, LLC, against Maricopa County, the Maricopa County Sheriff's Office (MCSO), and its individual employees, Sheriff Joseph M. Arpaio, Detective Joshua Henderson, Brandon Jones and Christopher Hegstrom.

These claims arise from specific harm that occurred during the course of the MCSO's ongoing notorious, illegal and abusive attempts to enforce immigration laws in the face of a Federal Court issued injunction prohibiting them from doing the same. MCSO has openly demonstrated contempt for the Federal Court order, calling the orders of that Court "ludicrous" and "absurd," and referring to the order itself as "this crap."

Chicago   Dallas   Denver   Kansas City   Los Angeles   New York   Phoenix   St. Louis   Washington, DC   Wilmington

48450286.2



July 21, 2014
Page 2

In furtherance of its feud with the Federal Court, in July 2013, MCSO raided two restaurants that operate under the name "Uncle Sam's" purportedly to investigate alleged identity theft. The Uncle Sam's restaurants are owned and operated by Mr. Frimmel through his companies, Pishka, Inc. (owner of the restaurants), and BRF Enterprises, LLC (owner of the real estate and landlord to Uncle Sam's as well as other tenants).

During those raids, MCSO arrested nine undocumented immigrant workers under the pretext of identity theft charges. (A tenth employee was arrested on an outstanding auto theft warrant.) Only four of the arrested employees were charged with identity theft. The other five were released with no charges. These raids were conducted on the basis of false affidavits and testimony of MCSO Detective Henderson, who was the agent in charge of the investigation and raids.

Shortly after the raids, the U.S. Department of Justice ("DOJ") reached out to Mr. Frimmel to see if he would cooperate in its investigation of MCSO and Sheriff Arpaio. Mr. Frimmel has a first amendment right to speak to DOJ. However, in an attempt to intimidate Mr. Frimmel from exercising that right and cooperating with law enforcement, MCSO arrested Mr. Frimmel, and the general manager of the Uncle Sam's restaurants, Lisa Norton, on fabricated charges of accepting the identity of another, trafficking in fraudulent identity documents, forgery and conspiracy.

Subsequent to the arrests, the County Attorneys' office obtained grand jury indictments of Mr. Frimmel and Ms. Norton on 13 unfounded felony charges. The indictments were obtained solely based on the flawed investigation and false testimony of MCSO Detective Henderson. And as is standard for MCSO, Sheriff Arpaio engaged in a media campaign surrounding the arrests, defaming Mr. Frimmel with false allegations of illegal activity and proudly touting that MCSO was now going after employers just as it has always gone after undocumented workers.

The Uncle Sam's restaurants suffered, and continue to suffer substantial losses in lost customer revenue, incidental expenses including attorneys' fees, lost good will, reputational damage and lost value. BRF Enterprises has also been significantly damaged by MCSO's ill-conceived and legally unsupported raids.

Subsequent discovery revealed that the results of MCSO's investigation showed unequivocally that neither Mr. Frimmel nor Ms. Norton committed any crime, and no reasonable person would have pursued these charges. Rather, the evidence obtained in the investigation was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging Mr. Frimmel no matter what. It can be logically concluded that Sheriff Arpaio saw this as an



July 21, 2014
Page 3

opportunity to both intimidate Mr. Frimmel and engage in a public relations ploy that served his political purposes. In either case, Mr. Frimmel's rights were violated.

Mr. Frimmel's life was then forever changed. He suffered, and continues to suffer emotional distress, reputational damage, and financial damage, including incurring over $650,000.00 in attorneys' fees defending against the unfounded charges. The Uncle Sam's restaurants suffered, and continue to suffer substantial losses in lost customer revenue, good will, reputational damage and lost value. Mr. Frimmel's real estate company has also been significantly damaged by MCSO's ill-conceived and legally unsupported raids.

The search warrants, arrest, probable cause statements and grand jury proceeding teem with false and misleading testimony by MCSO and in particular, Detective Henderson. The grand jury proceeding was further marred by the Deputy County Attorney's decision to refrain from presenting clearly exculpatory evidence as required by law.[1]

Mr. Frimmel, Pishka, Inc., and BRF Enterprises, LLC submit this notice of claim for the claims set forth in detail below and summarized as the defamation, false light invasion of privacy, intrusion upon seclusion, negligent supervision, interference with business expectancy, violation of civil rights, including 42 U.S.C. § 1983, Free Speech, Law Enforcement Retaliatory Conduct, Abuse of Process, Abuse of Power, Equal Protection, Unconstitutional Policies, and Failure to Train, committed against him commencing on January 22, 2014.

This notice is timely, pursuant to A.R.S. § 12-821.01.

## I.     Factual Basis for Claims

The factual context leading to the persecution of Mr. Frimmel goes back many years.

### A.     MCSO's Enforcement of Federal Immigration Laws

In approximately 2005, Arpaio and the MCSO began a highly publicized campaign to "crack down" on undocumented immigrants in Maricopa County. They formed a special unit dedicated to this task (the Human Smuggling Unit or "HSU") and pushed the passage of a new anti-human smuggling law. In March 2006, Arpaio and the MCSO began arresting undocumented immigrants for felonies under the new anti-human smuggling law for conspiring

---

[1] Amazingly, the County Attorney later stated in court filings that she didn't present the exculpatory evidence because doing so would "confuse the grand jurors".



July 21, 2014
Page 4

to smuggle themselves into the United States. The MCAO, alone among prosecuting agencies in the State, offered an interpretation of the law approving those arrests.

Arpaio and the MCSO obtained state funding to assist in their anti-immigration enforcement. In addition, through a 2007 agreement with the federal government, Arpaio and MCSO obtained federal funding for their anti-immigration campaign. Using these state and federal funds, MCSO conducted a number of "anti-immigration sweeps." During the anti-immigration sweeps, squads of deputy sheriffs and posse members descended upon a designated area, typically with a large Hispanic population, to round up undocumented immigrants.

In May 2008, in response to public outcry over the illegal tactics of Arpaio and the MCSO, then-Governor Napolitano issued an executive order that resulted in the MCSO losing $1.2 million in state funds for immigration enforcement. On May 10, 2012, DOJ filed a Complaint alleging that MCSO and Sheriff Arpaio "have engaged and continue to engage in a pattern or practice of unlawful discriminatory police conduct directed at Latinos in Maricopa County."

In another lawsuit - *Melendres v. Arpaio et al.* - the plaintiffs alleged that Arpaio and MCSO had unlawfully instituted a pattern and practice of targeting Latino drivers and passengers in Maricopa County during traffic stops. On December 23, 2011 the District Court entered an Order prohibiting MCSO from detaining any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." A trial took place in that case before U.S. District Court Judge Murray Snow, during which deputies involved in the investigation of Mr. Frimmel, including now deceased and disgraced MCSO Det. Ramon Charley Armendariz, were found to be "not credible." In a later Order dated May 24, 2013, MCSO was found to have violated the injunction and the court ordered "monitoring" of MCSO for a pattern of misconduct, including widespread constitutional violations.

Rather than obey the Federal Court Injunction, MCSO and Arpaio engaged MCSO's "Criminal Employment Unit" to continue MCSO's anti-immigration campaign under the guise of enforcing identity-theft laws. Members of the Criminal Employment Unit, however, still identified themselves as members of the Human Smuggling Unit, even after the HSU was allegedly dissolved. Detective Henderson is a member of both the "Human Smuggling Unit" and the "Criminal Employment Unit" of MCSO as was Det. Armendariz.

On March 24, 2014, Judge Snow chastised Sheriff Arpaio and his Chief Deputy Jerry Sheridan for flouting the Court's prior Orders. Judge Snow pointed to a video, recorded in October 2013, in which MCSO Chief Deputy Sheridan called Judge Snow's ruling "ludicrous" and "absurd," and referred to the order itself as "this crap." Arpaio followed Sheridan's



July 21, 2014
Page 5

statements by stating: "What the chief deputy said is what I've been saying." The incendiary and disrespectful remarks by Arpaio and Sheridan were made during the time period between the July 2013 raid on Uncle Sam's and the January 2014 arrests of Mr. Frimmel and Ms. Norton and demonstrate the lawlessness rampant during the precise time they became targets of MCSO.

In May 2014, extremely troubling information came to light regarding Detective Armendariz. Armendariz was the detective in charge of the July 2013 raid at Uncle Sam's Peoria location and a member of the MCSO's "Human Smuggling Unit". Armendariz reportedly took his own life that month. In the wake of Armendariz's death, investigators found not only heroin, methamphetamine, and marijuana at his home, but also hundreds of stolen driver's licenses, identifications, license plates, passports, airport security clearance cards, evidence bags, and wallets. Further, the search of Armendariz's home revealed recordings of thousands of his traffic stops, which by one account "reportedly document misconduct on the part of [MCSO Det. Armendariz]."[2]

### B. MCSO's Actions Involving Mr. Frimmel.

On July 17, 2013, MCSO, carrying three search warrants, raided the Phoenix and Peoria Uncle Sam's locations as well as Mr. Frimmel's home. During the raid, ten Uncle Sam's employees were arrested, although apparently only four were ever charged and convicted with identity theft. The convictions were the result of plea agreements entered with MCAO for cooperation in its investigation of Mr. Frimmel and Ms. Norton.

During the raid, and again after the raid, Det. Henderson was informed that Mr. Frimmel was represented by counsel.

A few days after the raid, Mr. Frimmel was contacted by DOJ investigator Sarah Lopez, who sought Mr. Frimmel's assistance with DOJ's investigation of MCSO. At the time Mr. Frimmel received this communication he, and his attorney, had been told by Det. Henderson that Mr. Frimmel was considered a victim in MCSO's investigation rather than a suspect or a person of interest. MCSO's recent conduct in bringing criminal charges to harass and intimidate Mr. Frimmel demonstrate that MCSO's investigation was motivated by its concern that Mr. Frimmel might cooperate with the DOJ's investigation, a retaliatory act in violation of Mr. Frimmel's rights.

---

[2] Three of the four cooperating defendant witnesses in the criminal case against Mr. Frimmel and Ms. Norton were arrested at the Peoria location, which operation was run by Armendariz.



July 21, 2014
Page 6

Between the July 2013 raid and January 2014, and despite knowing that Mr. Frimmel was represented by counsel, MCSO sought to gather evidence against Mr. Frimmel by having informants approach him, and by contacting Mr. Frimmel's current employees, in violation of Mr. Frimmel's civil rights.

On January 22, 2014, Mr. Frimmel (and Ms. Norton) was arrested on charges related to the purported unlawful acceptance of and/or trafficking in stolen identification provided by four undocumented workers at Uncle Sam's restaurants. The arrests were supported by knowingly false and intentionally misleading probable cause statements provided by Det. Henderson, in violation of Mr. Frimmel's and Ms. Norton's rights. Det. Henderson did not obtain an arrest warrant. MCSO chose to engage in a public arrest complete with a media event rather than simply send a summons to Mr. Frimmel or his counsel.[3]

MCSO and Sheriff Arpaio created a media event surrounding the arrests of Mr. Frimmel and Ms. Norton, engaging in several television interviews, speaking with newspaper reporters and issuing press releases in which MCSO and Sheriff Arpaio repeatedly made defamatory statements regarding the Claimants. MCSO and Sheriff Arpaio additionally posted defamatory comments surrounding the raid on social media, including on Sheriff Arpaio's Facebook page. The defamatory statements included, among other things that Mr. Frimmel and Ms. Norton had committed criminal offenses, had knowingly hired undocumented workers, had assisted undocumented workers in obtaining false documents and had intentionally solicited undocumented workers to work at Uncle Sam's. These statements have caused damages to all of the Claimants.

### C.   MCSO's Investigation Demonstrated that Mr. Frimmel Committed no Crime, Yet Arrested him and Engaged in a Media Campaign Regardless

#### 1. MCSO Arrested Mr. Frimmel on False Grounds

The basis for the probable cause arrest of Mr. Frimmel is set forth by Det. Henderson in a Probable Cause Statement. The Probable Cause Statement is confusing, inherently contradictory, and made it impossible to determine what charged offense related to which assertion of fact. The statements were replete with assertions of fact that Henderson knew were false and were contradicted by his previous interviews of various witnesses, which were recorded. Those false or misleading statements included, but are not limited to the following:

---

[3] That MCSO and Arpaio chose a probable cause arrest when a summons would have sufficed, is additional evidence of the improper motives behind the arrest.



July 21, 2014
Page 7

- That Mr. Frimmel knowingly entered four fictitious or forged social security numbers into his computer and transmitted them to ADP.

- That five of the suspects arrested on July 17, 2013 came forward with information that Mr. Frimmel knowingly committed forgery or identity theft and/or conspiracy to commit forgery and identity theft.

- That both current and past employees stated that Mr. Frimmel knowingly hired employees that were using forged identities.

- That Henderson was contacted by four ex-employees with information consistent with information provided by the five employees.

- That one employee told him that Mr. Frimmel instructed the employee to forge the hiring date on another employee's W-4 to say he was hired in 2007, rather than 2010.

- That witnesses claimed that Mr. Frimmel was present during the hiring process and hired them without having to provide a valid identification or social security number.

- That the fact that some employees were working without food handler's cards was somehow relevant to the question of whether Mr. Frimmel knowingly hired workers based on stolen identities or forged documents.

- That "employees" advised that they signed and dated blank "applications" and tax forms, and that social security numbers were later provided and written in by the business.

- That Mr. Frimmel made comments that he didn't care about employees' immigration status and would call staff "illegals".

- That Ms. Norton made derogatory statements regarding Latino workers.

- That Ms. Norton directed that work applications be given to Latinos.

Relying on these skewed conclusions from his investigation, Mr. Frimmel was arrested by MCSO on January 22, 2014 and charged with various offenses. These charges were later replaced by a grand jury indictment.



July 21, 2014
Page 8

These allegations, however, were diametrically opposed to the "Facts" that Detective Henderson learned in his investigation. In fact, no witness claimed to have been hired by Mr. Frimmel or Ms. Norton or that Mr. Frimmel or Ms. Norton were present during the hiring process. No witness claimed that they were not required to provide valid identification. Rather, several witnesses explained that lower level managers other than Mr. Frimmel or Ms. Norton did the hiring and obtained the proof of identity. Other witnesses, including long time managers, reported that identification was required and that if they hired someone without it, they would be fired by Mr. Frimmel. No witness claimed to have signed a blank application.

In order to be guilty of accepting the identity of another, Mr. Frimmel had to "knowingly" accept false documents. There was no information provided to Det. Henderson to even suggest that Mr. Frimmel had any involvement in accepting identification documents from the employees no less that he knew the documents were false. Moreover, the law is that a prospective employer must accept whatever documents are provided, or be subject to liability for discrimination. Moreover, there was not a single witness who claimed Ms. Norton accepted any document, no less false ones.

In order to be guilty of trafficking in the identity of another Mr. Frimmel had to "knowingly" transmit the information without the consent of the person. Without any indication that Mr. Frimmel knew that the employees were providing identification documents that were not their own, it is not possible for Mr. Frimmel to have transmitted them to anyone. (The charge is based on Mr. Frimmel transmitting the information contained in the documents by entering them in his payroll service's web-based system.)

And as regards the alleged forgery, no one claimed that Mr. Frimmel wrote anything on the employee's application or had anything to do with the employee (or the manager) filling out the application. Det. Henderson appears to have simply made that allegation up. And, more importantly, Det. Henderson had in his possession as part of his investigation the payroll records of that very employee that demonstrated that Mr. Frimmel entered the correct hire date, regardless of what the employee's application says on it.

As stated above, the evidence was so exculpatory that it is apparent that someone in the Sheriff's Office was intent on charging and arresting Mr. Frimmel no matter what. [4] Det. Henderson knew from his own investigation that Mr. Frimmel was not involved in the interview

---

[4] The only alternative explanation, if one is even possible, is that the MCSO personnel involved were so poorly trained and poorly supervised that they didn't know any better and didn't understand the consequences of their own inappropriate actions. If that proves to be the case, an amended Notice of Claim will be served.



July 21, 2014
Page 9

or application gathering process of prospective employees, that Mr. Frimmel required his managers to obtain proper identification documents, that the employees in question all provided facially valid documentation and that Mr. Frimmel entered the employee's information in his payroll company's web based system correctly and as required.

It is beyond dispute that the investigation and arrest were pre-determined and done for illegitimate purposes. And it is just as clear that the media campaign's purpose was to further intimidate Mr. Frimmel and promote Arpaio's political agenda.[5]

### 2.   MCSO, Arpaio, Jones and Hegstrom Made False Statements to the Media Regarding the Evidence Gathered and Guilt of Mr. Frimmel

On January 22, 2014, presumably under the direction of, and with the approval of Arpaio, MCSO issued a press release regarding Mr. Frimmel's arrest. (Attachment "A" hereto.) Among other false or misleading statements in the release is the following:

- "Maricopa County Sheriff's detectives have questioned several witnesses who claimed to have first-hand knowledge that Norton and Frimmel colluded together to acquire false identification documents in order to provide those IDs to undocumented workers wishing to be employed at both restaurants."

This press release was picked up by all of the major newspapers and television stations in Arizona and the false comments contained therein were repeated in the following publications on January 22, and 23, 2014 and were attributed to MCSO, Arpaio, Jones and/or Hegstrom:

This press release was picked up by all of the major newspapers and television stations in Arizona and in several national publications. The false comments contained therein were repeated in the following publications on January 22 and 23, 2014 and were attributed to MCSO, Arpaio, Jones and/or Hegstrom:

- 01/22/14 MCSO Press Release "Sheriff's Deputies Take Owner of Uncle Sam's Restaurants into Custody-Arrested for Trafficking Stolen IDs" http://www.mcso.org/MultiMedia/PressRelease/Uncle%20Sam's%20Owner%20Arrested.pdf

---

[5] It is of note that Arpaio once again claimed to be considering a run for Governor and did not remove his name from consideration until May 22, 2014 – several months after the arrests and media campaign.



July 21, 2014
Page 10

- 01/22/14 ABC 15 article "Uncle Sam's Restaurant Owner Bret Frimmel Arrested for Identity Theft, according to MCSO"  http://www.abc15.com/news/region-west-valley/peoria/uncle-sams-restaurant-owner-bret-frimmel-arrested-for-identity-theft-according-to-mcso

- 01/22/14 Arizona Newszap article "Sheriff's Office arrests Uncle Sam's Owner"  http://arizona.newszap.com/westvalley/129058-114/sheriffs-office-arrests-uncle-sams-owner-at-peoria-location

- 01/23/14  Arizona Daily Independent article "Uncle Sam's Owner Arrested for Identity Theft  http://www.arizonadailyindependent.com/2014/01/23/uncle-sams-owner-arrested-for-identity-theft/

- 01/23/14 AZ Central article "Records: Info from Uncle Sam's Restaurant Workers Led to Owner's Peoria Arrest"  http://www.azcentral.com/community/peoria/articles/20140123peoria-uncle-sams-owner-arrest-abrk.html

- 01/23/14 AZfamily.com article "Uncle Sam's Owner Appears in Court, Released on Own Recognizance"  http://www.azfamily.com/news/Police-Uncle-Sams-owner-knowingly-hired-illegal-workers-forged-documents-241704801.html

- 01/23/14 AZfamily.com article "Uncle Sam's restaurant Owner Arrested for ID Theft"  http://www.azfamily.com/news/Uncle-Sams-restaurant-owner-arrested-for-ID-theft-241533741.html

- 01/23/14b My Fox Phoenix article "Uncle Sam's Owner Arrested for Alleged ID Trafficking"  http://www.myfoxphoenix.com/story/24529851/2014/01/23/uncle-sams-owner-arrested-for-alleged-id-trafficking

- 01/23/14 New Times Article "Joe Arpaio's Workplace Raid of Uncle Sam's Results in First Arrest of Business Owner"  http://blogs.phoenixnewtimes.com/valleyfever/2014/01/joe_arpaio_immigration_raid_uncle_sams_employer.php

- 01/23/14 KPHO, Channel 5 article "AZ Restaurant Owner Accused of Forging IDs for Employees"  http://www.kpho.com/story/24530789/az-restaurant-owner-accused-of-forging-ids-for-employees



July 21, 2014
Page 11

- 01/23/14 Video from Channel 3 of coverage of Frimmel arrest
  http://www.youtube.com/watch?v=BbDEKExbvxs

Additionally, Arpaio appeared on a televised interview aired on local Phoenix TV station on January 22, 2014, and was reposted online at the following link: http://www.azfamily.com/news/10-arrested-in-Uncle-Sams-ID-theft-investigation-216084731.html, regarding the arrests at Uncle Sam's. In the news report/video the restaurant is mentioned, video was shown of the July 17, 2014 raid Arpaio is shown making the following comment about Mr. Frimmel and Ms. Norton:

- "Also he [Mr. Frimmel] was knowingly hiring employees with fake social security numbers. We have witnesses in the restaurants that he made comments that he likes hiring illegal immigrants because they work hard and he can pay them less money."

This statement is false, and was published to further intimidate Frimmel and promote Arpaio's political agenda.

### 3. MCSO Cannot Rely on the Grand Jury Indictment as a Defense

On February 7, 2014, Deputy County Attorney Jaimee Oliver sought and obtained indictments against Mr. Frimmel and Ms. Norton in their capacity as owner and manager of Uncle Sam's restaurants from a grand jury. The charges alleged against both Mr. Frimmel and Ms. Norton in the indictments are two counts of conspiracy to commit taking the identity of another and four counts of taking the identity of another. The charges alleged against Mr. Frimmel alone are four counts of trafficking in the identity of another, one count of forgery, and two counts of taking the identity of another. No owner or manager in Arizona had ever been pursued on these identity-theft related charges in the past. The indictment was based entirely on the knowingly false and intentionally misleading testimony of MCSO Det. Henderson.

That a grand jury subsequently indicted Mr. Frimmel and Ms. Norton provides no defense in this case. Procuring an unconstitutional prosecution is unlawful regardless of whether the arrest was unlawful. If the sheriff acted maliciously or with reckless disregard for the rights of the arrested person the prosecutor's independent judgment does not provide the sheriff with immunity.

The grand jury presentation (like Henderson's prior probable cause statements) was utterly confusing and completely inaccurate. MCSO detective Henderson was Oliver's single witness before the grand jury, and although Henderson had amassed a sizable collection of documents by the time the grand jury heard the case, the grand jury did not see a single



July 21, 2014
Page 12

document.  Oliver and Henderson presented evidence they knew was false. Oliver did not properly instruct the grand jury on the applicable law (and did not provide copies of all of the relevant statutes she alleged were violated), failed to correct Henderson's repeated misstatements of fact and law, and withheld clearly exculpatory evidence – all with the singular purpose of ensuring that the grand jury returned an indictment against Mr. Frimmel and Ms. Norton so that the retaliatory intimidation scheme against them could go forward as planned.

Det. Henderson, on behalf of MCSO, testified regarding information he learned in "free talks" with four witnesses who had been arrested in the July 17, 2013 raid:  Fernando Gonzales, Emidgio Munoz Gonzalez, Victor Vargas and Valentin Villanueva-Fernan.  Henderson misled the grand jury regarding what these witness told him, just as he had misled the court in his probable cause statement. These include, but are not limited to the following:

- Henderson presented the materially false testimony to the grand jury that: "[Fenrando] Gonzales [sic] told me he was hired by Brett [sic] and that Brett [sic] made the decision to hire him". In fact, Gonzalez never stated that Mr. Frimmel hired him. Just the opposite:  Gonzalez told both Oliver and Henderson that neither Mr. Frimmel nor Ms. Norton ever met with any applicants during the hiring process.

- Henderson testified that Fernando Gonzalez "stated that he did not sign any forms or present any identification at the time of hire." Neither he, nor Oliver instructed the grand jury that under the law Gonzalez was not required to present identification and work authorization documents until three days after hire.

- Henderson testified that Fernando Gonzalez was instructed by Ms. Norton "to give Latinos applications." Gonzalez, however, had merely stated that Ms. Norton required him to provide applications to prospective job applicants, without regard for race or national origin.  Moreover, Oliver did not clarify that if a business refuses to provide applications to "Latinos" that would be a violation of law.

- Neither Henderson nor Oliver conveyed to the grand jury that Fernando Gonzalez stated he had no idea what happened to documents submitted by applicants.

- While Henderson testified that Emidgio Munoz Gonzalez was hired at Uncle Sam's using a social security number that did not belong to him, neither Henderson nor Oliver disclosed that Munoz Gonzalez told them that he obtained the social security number he used 18 years ago, well before his time at Uncle Sam's, and that he possessed a driver's license issued by the Arizona Motor



July 21, 2014
Page 13

Vehicle Department since 1994. Rather, Henderson and Oliver concealed from the grand jury that Munoz Gonzalez presented both a social security card and driver's license to Uncle Sam's at hiring as was required by law.

- Henderson and Oliver concealed Munoz Gonzalez's testimony regarding management training, including that Mr. Frimmel instructed the managers to ask for a social security card and something with a picture on it, and that he was instructed by Mr. Frimmel to watch the person fill out the application and collect it from them when they were done.

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas told them he provided a social security card and a photo identification to Uncle Sam's "at the time of hiring."

- Neither Henderson nor Oliver disclosed to the grand jury that Vargas admitted he acted on his own and without Defendants' knowledge when he obtained a forged social security card from an unknown person unrelated to Uncle Sam's.

- Henderson falsely testified to the grand jury that Mr. Frimmel hired Villanueva-Fernan. In fact, Villanueva-Fernan stated that he was hired by an Uncle Sam's employee (not Mr. Frimmel or Ms. Norton) whose name he did not remember, and claimed no dealings with Mr. Frimmel beyond "just a few words." Oliver was present during Villanueva-Fernan's free-talk, yet she did nothing to correct the false testimony to the grand jury.

- Henderson falsely testified to the grand jury, that Villanueva-Fernan signed a "blank application."

- Neither Henderson nor Oliver disclosed to the grand jury that Villanueva-Fernan was convicted and/or found responsible by Arizona Courts for many civil and criminal offenses over the years he worked at Uncle Sam's, yet faced no immigration consequences from these activities.

Additionally, Oliver and Henderson withheld clearly exculpatory evidence from the grand jury and falsely testified regarding the law and other facts allegedly learned in the investigation, all in violation of Mr. Frimmel's rights. These include, but are not limited to, the following:



- Although Henderson falsely told the grand jury that his ongoing investigation showed Mr. Frimmel and Ms. Norton "knowingly" hired undocumented workers, he entirely concealed an interview with former manager Manuel Arredondo, who said the exact opposite. Arredondo told Henderson he was required to produce two forms of identification when he was hired at Uncle Sam's by an unknown Spanish speaking manager. Arredondo also admitted that he purchased a forged social security card prior to applying at Uncle Sam's, that Mr. Frimmel required employees to obtain a food handler's card, and that Arredondo never told Mr. Frimmel or Ms. Norton when he was unable to renew his own food handler's card.

- Despite having testified that another witness claimed to have heard Mr. Frimmel and Ms. Norton mistreating Latinos and making racial comments, Henderson did not disclose to the grand jury Arredondo's statement that during his 15 years as a kitchen staff member and manager, he never witnessed mistreatment or heard any racial comments.

- When asked by a grand juror whether Mr. Frimmel was "making the social security cards himself" and whether doing so was "part of the forgery," neither Oliver nor Henderson answered the questions. Rather than responding, Oliver falsely stated that "some of the employees just signed blank applications."

- Henderson testified that prospective employees would make up a social security number when applying and later obtain a card with the same number, misleading the grand jury to believe that Mr. Frimmel and Ms. Norton somehow knew that this was occurring.

- Despite having testified that Mr. Frimmel forged documents in an attempt to misrepresent Munoz Gonzalez's hire date as having been in 2007, Henderson failed to inform the grand jury that he possessed an ADP Payroll document, provided by Mr. Frimmel during the July search of Mr. Frimmel's home, regarding the Uncle Sam's payroll that showed that Munoz Gonzalez's hire date was correctly reported as 2010.

- Henderson and Oliver concealed that commencing in 2007 – the same time that E-Verify was required in Arizona - Mr. Frimmel's payroll service, ADP, began charging Mr. Frimmel for its "New Hire Reporting Service," and that Mr. Frimmel believed that this included all legally required employment vetting services, including E-Verify. Without such information, the grand jury could not



July 21, 2014
Page 15

have understood why Mr. Frimmel believed the "New Hire Reporting Service" covered E-Verify once it became the law in Arizona. While Henderson did testify regarding Mr. Frimmel's initial ADP contract, which did not contain explicit E-Verify services language, Henderson and Oliver omitted that this contract was executed in 2006, before E-Verify was required, and thus E-Verify would not be specified as a part of any required employment vetting services.

- Henderson and Oliver provided false and misleading testimony regarding County issued "food handler's" cards. Henderson testified that Environmental Health in "approximately the year 2009" changed its "requirements to where people had to have a valid identification card – Arizona identification card to get a current – updated food handler's card," and that this restricted Uncle Sam's workers from obtaining food handler's cards, which expire after three years. However, Henderson and Oliver withheld from the grand jury the fact that all of the ex-employees convicted for possessing invalid documents had valid food handler's cards issued to them after February 2009.

- Henderson entirely concealed Mr. Frimmel's repeated and unequivocal statements once in custody that the allegations presented against him were false.

- Despite their knowledge to the contrary, neither Henderson nor Oliver advised the grand jury that shortly after the July 17, 2013 raids Mr. Frimmel had been contacted by DOJ regarding their on-going investigation into MCSO and that shortly after that contact, MCSO and MCAO turned their investigation to Mr. Frimmel and Ms. Norton.

- Henderson testified that witness Sabrina Stark told him "the reason she left [Uncle Sam's] was because the owner, Brett [sic] Frimmel, treated his employees bad," Henderson withheld from grand jurors that Stark subsequently returned to work at Uncle Sam's at her request.

- Henderson repeated Stark's assertion "that every employee that Brett [sic] hires and puts in the kitchen is not legal" despite knowing this was false, given that MCSO did not arrest all kitchen employees on July 17, 2013 or thereafter.

- Henderson provided false testimony when he repeated Stark's false statement that Mr. Frimmel would "pay them whatever he wants." In fact, Uncle Sam's paid its employees for all work performed in amounts often exceeding that required by law. Henderson falsely repeated this testimony despite having no evidence to



July 21, 2014
Page 16

support this allegation, other than the uninformed and incorrect statement of witness Stark.[6]

- Henderson improperly implied it was criminal for Mr. Frimmel to tell witness Rodriguez to disregard what Rodriguez thought were forged identifications because Rodriguez was unqualified to make such an assessment and Mr. Frimmel would face significant liability for rejecting applicants based upon Rodriguez's suspicions. Henderson and Oliver failed to inform the grand jury that Mr. Frimmel indeed could face significant civil liability for discrimination if he rejected employee applicants based upon Rodriguez's mere belief regarding the appearance of documents.

- The grand jury never learned that Rodriguez was strongly motivated to lie to harm Uncle Sam's. While working at Uncle Sam's, Rodriguez had an extra-marital affair with witness Christina Hopkins, who subsequently made a sexual harassment complaint against Rodriguez. Rodriguez quit Uncle Sam's and Hopkins later filed a paternity complaint against Rodriguez in Maricopa County Superior Court.

- When asked by a grand juror about whether "there should be some kind of photocopy of ID" made during the hiring process, Henderson ignored the question and misleadingly answered that "there was no photocopies done" at Uncle Sam's. Henderson and Oliver also misleadingly implied that there was something improper about Munoz Gonzalez being instructed not to make photocopies. This testimony is misleading, as there is no legal requirement to photocopy employee IDs. Further, when Oliver had the opportunity to correct this misstatement of law, she did not, instead vaguely and misleadingly stating "I don't know it is a requirement for the company to make a photocopy of the identification."

- Henderson misleadingly testified that his investigation began "[r]ight back in October of 2012 [when] I received an anonymous tip that referenced an Uncle Sam's restaurant. . . ." In fact, the anonymous tip was received on August 2, 2012, and the original complainants in this case were Said Ishak and Denee Porter

---

[6] Amazingly, in response to Mr. Frimmel's Motion to Remand, Oliver defended the presentation of knowingly false testimony from Sabrina Stark by arguing that since Henderson had prefaced his comments with "Sabrina Stark told me" the evidence was not being offered for the truth of the matter asserted! Claimants are still searching for the legal principle this explanation implicates.



Ishak, two married Uncle Sam's ex-employees and convicted criminals who had every reason to fabricate lies about Mr. Frimmel, Ms. Norton and Uncle Sam's. Mr. Frimmel fired Said Ishak after Mr. Frimmel reported to the Scottsdale Police Department that Ishak embezzled funds from Uncle Sam's, for which he was later convicted of felony theft. Said Ishak was arrested on August 2, 2012, the same day Porter Ishak placed her anonymous call. Denee Porter Ishak, also a convicted criminal, quit Uncle Sam's in January 2011 after Mr. Frimmel admonished her for poor work behavior. She subsequently lost her claim against Uncle Sam's for unemployment benefits. Despite the grand jurors' right to know the origin of this investigation, this information remained concealed.

Given all of the misrepresentations, omissions and fabrications, it is not surprising that MCAO was able to obtain an indictment despite the fact that Mr. Frimmel committed no crime.

**D.     Mr. Frimmel is Just the Latest Victim of MCSO's Abusive Practices**

All of the foregoing fits a pattern of abuse of power that has dominated Arpaio's reign of more than 20 years. Arpaio's bogus investigations have included:

- One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard, a democrat, left office.

- One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were ultimately dismissed.

- An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees, certain Superior Court judges and the undersigned's law firm and partners. Supposedly, they all were part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

- A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.



July 21, 2014
Page 18

- In retaliation for publishing articles critical of Arpaio and the MCSO, Phoenix New Times publishers Mike Lacey and Jim Larkin were arrested at their homes in the middle of the night for misdemeanor charges that were eventually dropped.

- Dan Pachoda, executive director of the Arizona chapter of the ACLU, was arrested by MCSO deputies for trespassing while he was leaving the scene of an immigration-related rally.  Pachoda was acquitted after trial.

- Animal cruelty charges were brought against Chandler Police Sergeant Thomas Lovejoy after his canine partner died tragically.  Lovejoy was also acquitted.

- There is currently a reported retaliatory probe by MCSO against U.S. District Court Judge Murray Snow: the judge who entered the order that Arpaio and his under-lings described as "ludicrous" and "absurd," and referred to as "this crap."

- As information comes to light from facts surrounding the death of Detective Armendariz, it is apparent that the initial confiscation of, and initial failure to return Mr. Frimmel's watch, jewelry and cash was part of ongoing practice of "shaking down" arrestees by MCSO.

## II.   Legal Claims

The facts demonstrate that MCSO had a wrongful motivation to pursue Mr. Frimmel and did so in violation of his constitutional and statutory rights.  MCSO relied on an unreasonable interpretation of its own investigation and ignored its own evidence that no crime occurred, while going ahead with a very public arrest.  MCSO selectively pursued Mr. Frimmel to intimidate him from exercising his constitutional right to cooperate with the DOJ investigation and used Mr. Frimmel and his restaurant to pursue a media campaign designed to intimidate him and serve Sheriff Arpaio's political agenda.  Mr. Frimmel was selectively prosecuted as similarly situated individuals have not been prosecuted in similar situations. *United States v. Armstrong*, 116 S.Ct. 1480 (1996).

The facts set forth above give rise to the claims against Maricopa County, the MCSO, Arpaio, Henderson, Jones and Hegstrom.  These facts give rise to, or relate to, claims by Mr. Frimmel for negligence, gross negligence, defamation, false light invasion of privacy, intrusion upon seclusion, failure to train, negligent supervision, interference with business expectancy, violation of civil rights, including 42 U.S.C. § 1983, Free Speech, Law Enforcement Retaliatory Conduct, Abuse of Process, Abuse of Power, Equal Protection, Unconstitutional Policies, and



July 21, 2014
Page 19

Failure to Train, for actual and/or punitive damages, attorneys' fees and costs, including the costs of defending the criminal charges if he prevails.

Mr. Frimmel may or will have other causes of action, or theories of recovery, also arising out of these and related facts and actions of Arpaio, Henderson, Jones and Hegstrom and potentially others; but those causes of action have not yet accrued.

This Notice includes only claims known at this time and Mr. Frimmel will amend and/or supplement his claims if further information comes to light.[7]

### III.     Damages and Settlement Offer

#### A.     Description of Damages

Bret Frimmel has lived in Arizona since he was four years old. Bret's father opened the first Uncle Sam's restaurant in 1980 when Bret was six. Bret essentially grew up in the restaurant and first started working at Uncle Sam's when he was fifteen. Bret took over the operations when he turned eighteen. Bret's father passed away in 2000. Bret is the sole owner of the companies that own and operate Uncle Sam's. Bret has two sons, ages 18 and 12, and a four year old daughter. Bret has been deprived of the opportunity to spend significant time with his children; rather, he has spent all of his time dealing with the criminal charges against him while trying to keep the restaurants running. He has had to cut out everything in his life other than attention to those two things. In addition, at the time of his arrest, Mr. Frimmel was handcuffed in a negligent manner by Det. Henderson which caused an acute compression of his right thoracic outlet region, with weakness in the right median-innervated thenar muscles, for which he needed medical treatment. If this case makes it to a jury, Bret is likely to receive substantial compensatory and punitive damage awards.

Bret is the principal of Pishka, Inc. The false publicity surrounding the raids has caused an enormous loss of business and good will. At the time of these events, Bret was in discussions regarding taking the Uncle Sam's brand to a national platform by either franchising or expansion. In addition, Pishka has lost its existing commercial liability insurance and has had to replace it with more expensive coverage. Pishka, Inc.'s damages include:

- Lost profits from the existing business
- Diminution in value of the existing business

---

[7] And in particular when more information comes to light regarding the sudden dramatic increase in "anonymous" tips to the County Department of Health regarding Uncle Sam's.


POLSINELLI

July 21, 2014
Page 20

- Lost future business opportunities
- Incidental out-of-pocket expenses

Bret is also the principal of BRF Enterprises, LLC, the owner of the real estate upon which both restaurants sit. As a direct result of the false publicity, BRF has also suffered damage to the value of its properties and has recently been informed that its $6 million credit line will not be renewed by its lender, thereby causing him to liquidate other income generating assets and cash to pay the obligation.

Bret has had emotional stress arising out of the arrest and he has suffered from Arpaio's steady stream of unfounded accusations of criminal conduct. Bret faced the humiliation and degradation of being arrested in public without a warrant and without probable cause and having his initial appearance posted online, while MCSO and Arpaio made a media event out of their legally unjustified actions. Bret cannot avoid the repeated television reports, newspaper articles and internet postings. Bret is subjected to endless unfounded criticism in blogs or postings on internet websites.

The events have caused Bret humiliation, emotional distress, and health issues. Bret has suffered from loss of sleep and emotional anguish. Bret has incurred approximately $650,000 in legal fees as a result of these actions. Bret's reputation, brand and goodwill have been forever tarnished, putting an end to his plans to expand his brand nationally.

These actions have damaged Bret's employment and earning opportunities. And he has been damaged by the numerous and widespread release of information, false information in many cases, to the press. While damages for these intangible harms are not subject to precise calculation, we are confident that when a jury hears the facts of these claims and considers the character and reputation of Bret, the years he spent building a successful and popular restaurant under a widely known brand, the jury will award substantial general and punitive damages.

Notably, the actions of MCSO and MCAO and their agents here demonstrate that both entities believe they can pursue anyone they want, without regard for the actual commission of a crime, simply to score political points. This fact will not be lost on jurors: any one of whom could be the next victim.



July 21, 2014
Page 21

### B.   Amount for Which Claims Can Be Settled and Factual Basis Supporting That Amount

Mr. Frimmel's losses are truly immeasurable. Forced to defend against the unfounded charges, he has incurred attorneys' fees now exceeding $650,000. Uncle Sam's restaurant business has declined due to the damage done to Bret's reputation, as well as the chilling effect caused by the wide-spread retaliation and intimidation tactics of Arpaio, the MCSO, and the MCAO. The loss of business value and good will is truly significant.

Attached to this notice as Attachment "B" is an outline of the various elements of Claimants' compensatory damages. In addition to those items set forth in the Attachment, a jury will have no trouble finding that emotional distress is appropriate and should be awarded in the millions of dollars. Additionally, Mr. Frimmel is entitled to damages for his hand injury. Add to those amounts punitive damages and Mr. Frimmel will be entitled to a minimum of $40 million in damages for all of his losses. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (suggesting a 4:1 ratio as a potential cap on punitive damage claims).

While the symbolism of the choice of target was obvious and petty, the effect of MCSO's and Arpaio's taking out his feud with DOJ and Judge Snow on Mr. Frimmel is very real and very serious. Although it is impossible to put a dollar amount on each of their items of damages, A.R.S. § 12-821.01 requires each of the claimants to state a specific amount for which they will settle their claims. Accordingly, Mr. Frimmel will settle all of his claims for $10,000,000.00. This is a reasonable demand in light of past jury verdicts in Arizona for claims and damages. For example, in *Devore v. Southwest Airlines*, 2006 WL 4546313 (Ariz. 2006), the jury awarded the plaintiff $4.5 million for false arrest and emotional distress.

Based on the information presented above and the evidence gathered so far, we believe these figures represent a fair compromise of the claims the Claimants have against the County, MCSO, Arpaio, Henderson, Jones and Hegstrom, especially considering the egregious and intentional misconduct of the individual actors and the potential for an award of punitive damages and attorneys' fees in a suit under Arizona common law, private rights of action under the Arizona Constitution, and 42 U.S.C. § 1983. If any additional information is required to fully evaluate these claims, please let us know and we will provide it promptly.

This letter is intended as a Notice of Claim under A.R.S. § 12-821.01. This notice contains sufficient facts for the County to understand the basis for its liability and the amount for which the claims may be settled. This notice also contains sufficient facts for MCSO, Arpaio, Henderson, Jones and Hegstrom to understand the basis for their liability and the amount for which the claims against them may be settled. This notice is given without the benefit of formal

48450286.2



July 21, 2014
Page 22

discovery and is subject to amendment or supplementation.  I ask you to put your carrier on notice of the claims made in this letter.

If, for any reason, you believe that this Notice of Claim or Mr. Frimmel's contemporaneous notice does not comply with the requirements of A.R.S. § 12-821.01, or if you desire additional facts or information, please contact the undersigned. Mr. Frimmel reserves the right to amend and/or supplement this Notice of Claim.

We await your response pursuant to A.R.S. § 12-821.01.

Sincerely,

Leon Silver

LBS:hl
Enclosures

Copy to:  Mr. Bret Frimmel

# EXHIBIT A

*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** January 22, 2014          **CONTACT:** Lt. Brandon Jones (602) 525-6239

## SHERIFF'S DEPUTIES TAKE OWNER OF
## UNCLE SAM'S RESTAURANTS INTO CUSTODY
## *ARRESTED FOR TRAFFICKING STOLEN IDs*

**(Phoenix, AZ)** Maricopa County Sheriff Joe Arpaio today says his deputies just arrested Bret Frimmel, 40, owner of Uncle Sam's, a popular valley restaurant, on four (4)counts trafficking the Identity of another (a class 2 felony), four (4) counts identity theft, and two (2) counts forgery, class 4 felonies. The arrest took place at around 12 noon today at the Uncle Sam's Peoria restaurant location.

Also arrested today was Frimmel's manager, Lisa Norton, 53, on two charges of trafficking the identity of another, three counts identity theft and two counts forgery. Norton was taken into custody by Sheriff's deputies this morning at the north Phoenix restaurant location.

The investigation into Uncle Sam's Restaurants was the 73rd workplace investigation so far conducted by the Sheriff's Criminal Employment Squad. Those 73 investigations have resulted in 762 employee arrests as well as three employer's detainment on civil charges.

Today's arrests mark the first time Sheriff's deputies have taken into custody an owner/employer on criminal charges relating to identity theft for purposes of employing undocumented persons.

The Sheriff's Office investigation into Frimmel's two restaurants began in October 2012 after the office received a tip from a caller about the hiring of several individuals utilizing false identification documents to gain and maintain employment at the eating establishments.

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

On July 17, 2013, the Maricopa County Sheriff's Office conducted a workplace ID theft operation at Uncle Sam's two locations, one in Phoenix (3217 East Shea Blvd) and one in Peoria (18913 North 83 Ave).

The July operation resulted in 9 felony arrests related to identity theft and forgery and all nine (9) were placed on ICE holds. A 10th suspect arrested was charged with auto theft after an outstanding warrant was discovered.

Maricopa County Sheriff's detectives have questioned several witnesses who claimed to have first-hand knowledge that Norton and Frimmel colluded together to acquire false identification documents in order to provide those IDs to undocumented workers wishing to be employed at both restaurants.

Arpaio says, "One look at what is occurring today where massive amounts of identification and financial information is being stolen and used for all kinds of criminal purposes, underscores the need for a continued effort by law enforcement to overcome the problem of identity theft." END

###

100 West Washington, Suite 1900, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax: (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2

# EXHIBIT B

*Attorney Client Privilege*
*DRAFT - For Client Review Only. Subject to Review Revision.*

## Exhibit A

Date of Incident: January 22, 2014
Preliminary Summary of Estimated Economic Damages

**Economic Damages**

| Claimant | | Preliminary Estimate of Economic Damages |
|---|---|---|
| **Pishka, Inc.** | | |
| Diminution in Business Value | $ | 2,203,641 |
| Lost Future Business Opportunity | | 802,135 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| **Total (Rounded)** | $ | 3,660,000 |
| | | |
| **BRF Enterprises, LLC** | | |
| Lost Profits | $ | 75,000 |
| Diminution in Value | | 1,054,852 |
| **Total (Rounded)** | $ | 1,130,000 |
| | | |
| **Bret Frimmel** | | |
| Loss of Earnings | $ | 1,745,943 |
| Incidental Out-of-Pocket Expenses | | 650,000 |
| Investment Opportunity Costs | | 637,683 |
| **Total (Rounded)** | $ | 3,030,000 |
| | | |
| **Lisa Norton** | | |
| Loss of Earnings (Pishka) | $ | 426,284 |
| **Total (Rounded)** | $ | 430,000 |
| | | |
| **Grand Total** | $ | 8,250,000 |

This analysis is preliminary in nature and subject to additional verification and analysis. These preliminary conclusions should not be disclosed or shared with third parties without our prior written authorization. Amounts do not include punitive damages, emotional distress, or hedonic losses. These calculations are preliminary and the ultimate quantification of economic damages may be different and the difference may be material.

**Note:**
It is our understanding based on discussions with Mr. Frimmel and our review of recent operating results that, as a result of the Arrest, the going concern premise of value may not be appropriate for Uncle Sam's and each of the two restaurant locations may be closed. Therefore our analysis assumes a diminution in the value of Uncle Sam's and a loss of economic benefits derived from Uncle Sam's for the other Claimants (i.e. salary, rent, etc.).

**EXHIBIT 16**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


BRET FRIMMEL; PISHKA, INC.;        )
and BRF ENTERPRISES, LLC;          )
LISA AND WILLIAM BRUCE             )
NORTON, wife and husband,          )
                                   )
          Plaintiffs,              ) No. 2-15-cv-00087-SPL
                                   )
                                   )
               vs.                 )
                                   )
                                   )
JOSEPH M. AND AVA ARPAIO,          )
et al.,                            )
                                   )
                                   )
          Defendants.              )
_____)


VIDEO DEPOSITION OF DMITRIUS WHELAN-GONZALES

Phoenix, Arizona
July 26, 2016
9:34 a.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 2415 E. Camelback Road
Certified Realtime Reporter     Suite 700
Certified LiveNote Reporter     Phoenix, AZ 85016
AZ CR No.  #50574               (480) 429-7573
carrie@carriereporting.com

(COPY)

Page 51

1   Q.    Did the Sheriff ask to see any of the

2   transcripts of testimony that you obtained?

3   A.    No.

4   Q.    Did you hear anybody relate the substance of any

5   testimony to the Sheriff?

6   A.    Some of the high points might have been

7   discussed.

8   Q.    Can you recall any of those high points?

9   A.    The fact that we had discussed the case file,

10  and the county attorney was intimately involved with the

11  case and that we had met with the county attorney, gone

12  over the charges they had, roundtabled it as well, and

13  came back with the determination of how we should proceed,

14  whether it's by grand jury indictment or by probable cause

15  arrest, but they decided that the charges were solid, so

16  they didn't care either way.

17        Some of the statements that we had gathered from

18  the witnesses about the racist comments, kind of

19  bigot -- some of the inflammatory comments that Frimmel

20  had made towards his staff were discussed.  I think we

21  also spoke about that there was a parallel -- or an

22  investigation also going on on the civil side where

23  Mr. Frimmel was maybe facing approximately a

24  half-million-dollar civil fine for I-9s being improperly

25  filled out.  And then the explanation that the I-9s

Page 52

1   wouldn't be able to be used in our case based off case law

2   but that he would likely have issues with the federal

3   government, ICE, reference his I-9s financially on that

4   case.

5       Q.    Was there discussion with the Sheriff about

6   arresting Mrs. Norton prior to that arrest?

7       A.    Yes.

8       Q.    What was discussed in that context?

9       A.    That during our meeting with the county

10  attorney, we had discussed charges on both Frimmel and

11  Norton and had a list of charges that we intended to

12  arrest and charge them with.

13      Q.    In the course of working up the investigation

14  prior to the arrest of Mr. Frimmel and Mrs. Norton, did --

15  are you aware if any of the deputies in your office,

16  including yourself, sent e-mails to each other discussing

17  the case?

18              MS. IAFRATE:   Form.

19              THE WITNESS:   Nothing comes to mind about

20  e-mail correspondence between us of any importance.

21  BY MR. JACOB:

22      Q.    Are you aware of e-mails discussing the

23  substance of the case going between the CEU deputies

24  including yourself and people at the county attorney's

25  office?

1      A.     Not in Western Union.

2      Q.     Do you know whether Mr. Frimmel was put into

3  handcuffs when he was arrested?

4      A.     Yes.

5      Q.     Do you know why?

6      A.     Yes.

7      Q.     Why?

8      A.     Per our policy, we handcuff people, restrain

9  them, and place them in the cars for transport.  So it's

10  nothing special that he was handcuffed.

11      Q.     Do you handcuff everybody that you arrest for

12  any reason?

13                MS. IAFRATE:  Form.

14                THE WITNESS:  What's your definition of

15  "arrest"?

16  BY MR. JACOB:

17      Q.     What's your definition?

18      A.     Maybe I'll give you a hypothetical.  If I pull

19  you over for suspended license, that's a criminal charge,

20  and I'm going to issue a citation which is a criminal

21  citation.  Technically, I've arrested you.  You might not

22  know that because I haven't put handcuffs on you and told

23  you you can't leave, but that's a criminal charge.  You've

24  been arrested.

25                If I find a bank robber, we can all assume that

1    that guy is going to be arrested and transported and

2    charged.

3            So if your question is, does everyone who gets

4    arrested get handcuffed, my answer would be no.  If your

5    question is, everyone who gets arrested for whatever the

6    charge is and transported, would they be restrained, my

7    answer is yes.

8       Q.    With handcuffs?

9       A.    Or possibly leg shackles as well.  Or belly

10   belt.

11      Q.    Is that something that other police forces do?

12      A.    I think you'd have to ask them.

13      Q.    This is Exhibit 15.  We've had that before.

14            Have you ever seen this letter before?

15      A.    Yes.

16      Q.    Can you explain to me what it is?

17      A.    I believe this is a letter that was requested

18   for John Penner, the attorney, to generate to us to try to

19   figure out where the listed information -- I'm sorry, the

20   listed items, the cash, and the watch, where they were

21   located.

22      Q.    Did you see this letter around the time it was

23   received by Detective -- then-Detective Henderson?

24            MS. IAFRATE:  Form.

25            THE WITNESS:  It's been a while ago.  But

Page 135

1   STATE OF ARIZONA    )
                        ) ss.
2   COUNTY OF MARICOPA )

3

4        BE IT KNOWN that the foregoing proceedings were
    taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
5   in and for the County of Maricopa, State of Arizona; that
    the witness before testifying was duly sworn to testify to
6   the whole truth; that the questions propounded to the
    witness and the answers of the witness thereto were taken
7   down by me in shorthand and thereafter reduced to
    typewriting under my direction; that the witness will read
8   and sign said deposition; that the foregoing pages are a
    true and correct transcript of all proceedings had, all
9   done to the best of my skill and ability.
         I FURTHER CERTIFY that I am in no way related to
10  any of the parties hereto, nor am I in any way interested
    in the outcome hereof.
11       I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206(J)(1)(g)(1)
12  and (2).

13

    Michaela Herman Davis                        50574
14  _____      _____
    Certified Reporter                      CR Number
15

16  _____      _____
    Certified Reporter                        Date
17  (Signature)

18

         I CERTIFY that this Registered Reporting Firm has
19  complied with the ethical obligations set forth in
    ACJA 7-206(J)(1)(g)(1) and (2).
20

21  Carrie Reporting, LLC                      R1064
    _____      _____
22  Registered Reporting Firm               RRF Number

23

24  _____      _____
    Registered Reporting Firm                 Date
    (Signature)
25

**EXHIBIT 17**

## DECLARATION OF SERGEANT DANIEL GANDARA

I, Daniel Gandara, declare the following under penalty of perjury:

1.     I am employed by the Maricopa County Sheriff's Office ("MCSO") as a sworn sergeant in District Two.

2.     I began work with MCSO in March 2007 as a Detention Officer Recruit. Approximately one year later, I entered the MCSO Academy as a Deputy Sheriff Recruit.

3.     After graduating from the Academy I was promoted to Deputy and assigned to District Patrol, District Three.

4.     I was later asked to transfer to the Human Smuggling Unit (HSU); I was assigned to the HSU for three and one half years.

5.     On or about January 22, 2014, Sergeant Glenn Powe and Sergeant Whelan-Gonzalez asked me to assist the Criminal Employment Unit (CEU) by completing a search warrant for telephone records regarding a CEU investigation.

6.     To complete the search warrant documentation, I obtained information from the case agents working the investigation, Detectives Darren Frei and Josh Henderson. (Search Warrant attached as Exhibit A).

7.     I obtained the probable cause statement for the search warrant affidavit from Detectives Darren Frei and Josh Henderson.

8.      I also indicated on the search warrant that the information sought

was to go to Detective Frei.  (Exhibit A at Bates number 000064).

9.      I did not investigate Uncle Sam's restaurant, Bret Frimmel, or Lisa

Norton.

10.     The only information I had regarding the investigation came to me

from Detectives Frei and Henderson.

        **DATED** this 20th day of January, 2016.

                                        Sgt. D. Gandara - S19Φb
                                        Sergeant Daniel Gandara

**EXHIBIT A**

MICHAEL K. JEANES, CLERK
BY J. Spelgatti DEP.
FILED

14 JAN 28 PM 1: 02

# MARICOPA COUNTY SUPERIOR COURT JURISDICTION
## SPECIAL WARRANT

*1721*

## ISSUANCE of Special Warrant at (Initial Appearance Court)

| SPECIAL WARRANT NUMBER: | SW 2014- 000714 |
|---|---|

| AFFIANT NAME: *Gandara* | BADGE NUMBER: *1906* |
|---|---|
| AGENCY: *MCSO* | |

### INDICATE TYPE OF ISSUANCE (ISW)

| | |
|---|---|
| | WALK-IN |
| ✓ | FAX/ELECTRONIC |

### CAPTION:

| | |
|---|---|
| ✗ | IN RE THE MATTER OF SEARCH WARRANT (951) |
| | IN RE THE MATTER OF PEN REGISTER (952) [60 days] |
| | IN RE THE MATTER OF TRAP AND TRACE (953) [60 days] |
| | IN RE THE MATTER OF HANDWRITING EXEMPLAR (954) |
| | IN RE THE MATTER OF SEIZURE WARRANT (956) |
| | IN RE THE MATTER OF ORDER TO OBTAIN PHYSICAL EVIDENCE OR PHYSICAL CHARACTERISTICS (955) |
| | IN RE THE MATTER OF GLOBAL POSITIONING SYSTEM (957) |
| ✗ | IN RE THE MATTER OF *Telecommunication Records* |

### ORDERED BY THE COURT:

| | |
|---|---|
| ✗ | SEAL ALL SEARCH WARRANT DOCUMENTS PER REQUEST OF OFFICER/STATE AS ORDERED BY THE COURT. |
| | SEAL ALL ISSUANCE DOCUMENTS PURSUANT TO A.R.S. 13-3918. |

IT IS FURTHER ORDERED THAT ALL WORKSHEETS IN THIS CASE ARE **NOT** TO BE
SEALED UNLESS SPECIFICALLY ORDERED BY THE COURT.

| 1-22-14 | 1729 | *Maria Brandon* |
|---|---|---|
| DATE | TIME | JUDGE OR JUDGE PRO TEM |

Please forward these documents immediately to the following address:
Clerk of Superior Court, Special Warrant Desk 201 W. Jefferson, 1st Floor (602) 506-7754
ISS/Issuance Worksheet Form LRD 12-01-2010

HONORABLE MARIA BRANDON
MARICOPA COUNTY SUPERIOR COURT

GR000061

MICHAEL K. JEANES CLERK
·BY *J. Spelgatti* DEP
FILED

14 JAN 28 PM 1: 02

### AFFIDAVIT FOR SEARCH WARRANT

**MARICOPA COUNTY SHERIFF'S OFFICE**
County of Maricopa, State of Arizona

Warrant Number: CW2014000714

Your Affiant, Detective D. Gandara, S1906, a sworn Deputy Sheriff for the County of Maricopa, State of Arizona, being first duly sworn, upon oath, deposes and says:

I spoke to both case agents, Detective Darren Frei, S1570 and Detective Josh Henderson, S1458. Both Detectives told me the following facts establishing probable cause regarding the pending criminal case against Lisa Anne Norton. The Detectives told me;

That on or about the 1st day of October, 2013 within the County of Maricopa, State of Arizona, the crime(s) of Trafficking, Forgery, Identity Theft, ARS 13-2010; ARS 13-2002 and ARS 13-2008 was/were committed by Lisa Anne Norton in the following manner:

This search warrant is respectfully requested to obtain Lisa Anne Norton's cell phone records for her Verizon cell phone number of **602-326-6314.** A search warrant for identity theft and forgery was executed at a local business managed and/or operated by Lisa Anne Norton on or about 07-17-2013. During the execution of this warrant, 4 out of the 9 employees(s) were convicted of identity theft and forgery charges. A free talk involving the 4 employees was established with detectives and all 4 made collaborating statements identifying Lisa Anne Norton had knowingly hired undocumented workers and conspired with other employees to continue employing employees using fictitious or forged identification.

Detectives want to establish a pattern of contact between Lisa Anne Norton and various other employees that worked for her, and to retain records of any calls that may have been deleted. It will also aid in uncovering other possible known or unknown suspect information. Additionally, her cell phone information will aide in identifying the person(s) assisting and/or making forged documents for Lisa Anne Norton. MCSO Detectives also believe this cell phone information will aid in identifying other unknown suspect(s) aiding Lisa Anne Norton in this conspiracy of identity theft and forgery. This information will assist in the prosecution of Lisa Anne Norton for charges of Trafficking, Forgery, and Identity Theft.

That you affiant has probable cause to believe and he/she does believe that there is now in the possession of **Cellco Partnership DBA Verizon Wireless** which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley

4 | P a g e

GR000062

Road Bedminster, New Jersey 07921

Pertaining to the mobile telephone number of:    **602-326-6314**

*Which property or things were:*

Constitutes evidence tending to show that a public offense has been committed or tending to show that, suspect Lisa Anne Norton has committed a public offense, such offense being, Trafficking, Forgery, Identity Theft, ARS 13-2010; ARS 13-2002 and ARS 13-2008 which occurred on or about the 1st day of October, 2013.

That within the County of Maricopa, State of Arizona, there is now being concealed certain property or things described as:

Subscriber information for the number 602-326-6314 including name, date of birth, mailing address, alternate phone number, and other numbers on the same account.

Subscriber's social security number, email addresses, IP addresses, types of service utilized, length of services, including start date, means and source of payment, including credit card and bank account numbers as well as payment amounts

Any and all subscriber "Notes and Footnotes" associated with the account to include where the device was purchased, any number changes, where payments were made and by what method of payment was used.

All communication for the wireless number 602-326-6314 to include: Incoming & Outgoing calls, SMS & MMS message activity, SMS & MMS content, Internet activity to include IP session activity / Web Browsing Info, for the time period of **August 01, 2013 to January 22, 2014.** Include all tower locations and azimuth for the sectors accessed during the communications for all Element's accessed. Also indicate if the tower was Lucent or Nortel and provide a three sector layout, as well as possible maximum ranges.

Any and all device information to include make and model of the device associated to this cellular number.

The Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), and Mobile Identification Number (MIN) that this carrier has captured or has on file.

The Media Access Control (MAC) address associated with the subscriber's cellular device(s).

5 | P a g e

GR000063

Additionally RTT (Round Trip Time) for the cellular phone number of 602-326-6314 for the time period of August 01, 2013 to January 22, 2014.

Lastly, provide a detailed definitions page, which identifies all information in the records.

**Please provide this information to Detective Darren Frei, S1570, email: d_frei@mcso.maricopa.gov, in digital format on a compact disc in Excel, PDF or TXT format / or via email. If records are sent via an email can you please include a certification of authenticity for the records provided.**

That the following facts establish probable cause for believing that grounds for the issuance of a search warrant for the aforementioned persons, places, and items of property exist:

## PROBABLE CAUSE STATEMENT:

This search warrant is respectfully requested to obtain Lisa Anne Norton's cell phone records for her Verizon cell phone number of 602-326-6314. A search warrant for identity theft and forgery was executed at a local business operated and/or managed by Lisa Anne Norton on or about 07-17-2013. During the execution of this warrant, 4 out of the 9 employees(s) were convicted of identity theft and forgery charges. A free talk involving the 4 employees was established with detectives and all 4 made collaborating statements identifying Lisa Anne Norton had knowingly hired undocumented workers and conspired with other employees to continue employing employees using fictitious or forged identification.

Detectives want to establish a pattern of contact between Lisa Anne Norton and various other employees that worked for her, and to retain records of any calls that may have been deleted. It will also aid in uncovering other possible known or unknown suspect information. Additionally, her cell phone information will aide in identifying the person(s) assisting and/or making forged documents for Lisa Anne Norton. MCSO Detectives also believe this cell phone information will aid in identifying other unknown suspect(s) aiding Lisa in this conspiracy of identity theft and forgery. This information will assist in the prosecution of Lisa Anne Norton for charges of Conspiracy, Forgery, and Identity Theft.

Your Affiant, Detective D. Gandara, S1906, is a sworn Deputy Sheriff for the County of Maricopa, State of Arizona and has been so for a period of 7 years. Your Affiant is currently assigned to the Maricopa County Sheriff's Office, Special Investigations Division, Where he has served as a Detective for a period of about 3 ½ years. Your Affiant has received training and has experience with the investigation of violent crimes against people and other related felony crimes. Your Affiant's training and experience lead him to believe and he does believe that persons, who engage in crimes

6 | P a g e

GR000064

such as Lisa Anne Norton, believe law enforcement cannot track and trace cellular devices. The items of evidence listed within this affidavit will aid in the identification and prosecution the person responsible for the commission of the aforementioned crime(s).

Wherefore your Affiant prays that a search warrant be issued, commanding that a search of the aforementioned places described herein, for the property and items described herein.

Your affiant, Detective D. Gandara, S1906 a certified peace officer in the State of Arizona of the Maricopa County Sheriff Office, being duly sworn, upon oath, deposes and says that:

The provider is an electronic communication service company as defined in 18 USC § 2510(15) and is doing business in Arizona.

Pursuant to 18 USC §§ 2703(c)(1)(B), 2703(c), and 2703(d), this court may order a provider of an electronic communication service doing business in Arizona to disclose the records listed above to an officer who has established reasonable grounds to believe said records are relevant and material to an ongoing criminal investigation.

Per 18 USC § 2703(d), I certify that records that are likely to be obtained pursuant to this Order/Search Warrant are relevant to an ongoing criminal investigation being conducted by the above law enforcement agency.

It is ordered, pursuant to 18 USC § 2705(b) and A.R.S. § 13-3016 this order and the application be sealed until otherwise ordered by the court, and that *Cellco Partnership DBA Verizon Wireless* which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley Road Bedminster, New Jersey 07921 shall not disclose the existence of this order or the existence of the investigation to the listed subscriber, or to any person, unless or until otherwise ordered by the court.

Applicant's affidavit has established grounds for a non-disclosure order pursuant to 18 USC § 2705(b). Grounds for nondisclosure are based on the following:

☒Jeopardize an investigation                    ☐Danger to life or safety
☒Flight from prosecution                          ☒Evidence destruction or tampering
☒Intimidation of potential witnesses

GR000065

Your Affiant further says that all property and things seized during the execution of this search warrant will be retained in the custody of the Maricopa County Sheriff's Office and only disposed of in accordance to state law, A.R.S. 13-3920.

David Gandara-1906

Detective D. Gandara, S1906
MCSO / SID

Subscribed and sworn to, before me this 22nd day of Jan , 2014

Honorable Judge / Commissioner
Maricopa County Superior Court

HONORABLE MARIA BRANDON
MARICOPA COUNTY SUPERIOR COURT

8 | P a g e

# MARICOPA COUNTY SUPERIOR COURT JURISDICTION
## SPECIAL WARRANT

## RETURN of Special Warrant at (Initial Appearance Court)

| SPECIAL WARRANT NUMBER | SW 2014- 000714 |
|---|---|

| TYPE OF ORDER | |
|---|---|
| X | RETURN (RSW) |
| | EXTENSION (EXT) |
| | ORDER (ORD) |

| ORDERED BY THE COURT | |
|---|---|
| X | SEAL ALL SEARCH WARRANT DOCUMENTS (including all issuance and all return documents plus all subsequent SW pleadings filed in this number) per request of Officer/State and as Ordered by the Court.  NOTE: The original SW warrant is excluded and shall be unsealed, unless noted below.<br><br>_X_    The original SW Warrant shall REMAIN SEALED. |
| | IT IS ORDERED UNSEALING [Previously Sealed Search Warrant documents are now to be unsealed] ALL SEARCH WARRANT DOCUMENTS IN THIS CASE. |
| | PURSUANT TO A.R.S. 13-3918, IT IS ORDERED UNSEALING ALL SEARCH WARRANT DOCUMENTS (including all issuance and return documents plus all subsequent SW pleadings filed in this number) unless previously ordered sealed. |

IT IS FURTHER ORDERED THAT ALL MINUTE ENTRIES/WORKSHEETS IN THIS CASE ARE NOT TO BE SEALED UNLESS SPECIFICALLY ORDERED BY THE COURT.

| 1-23-14 | 08:25  Hours | _signature_ |
|---|---|---|
| DATE | TIME | JUDGE OR JUDGE PRO TEM |

Please forward these documents immediately to the following address:
Clerk of Superior Court, Special Warrant Desk
175 W. Madison St., RCC/EDC 4th Floor; Telephone: (602) 506-7754
Return Worksheet Form LRD 12/06/12

HONORABLE LISA M. ROBERTS
MARICOPA COUNTY SUPERIOR COURT

GR000067



WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Jaimee Oliver
Deputy County Attorney
Bar Id #: 028839
301 West Jefferson, 5th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8484
Mcaomjc1@mcao.Maricopa.Gov
MCAO Firm #: 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, )<br>)<br>        Plaintiff, )<br>)<br>vs. )<br>)<br>COUNTY OF MARICOPA )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | SW2014-000714<br><br>STATE'S EX PARTE APPLICATON TO<br>UNSEALING  SEARCH WARRANT<br>AFFIDAVIT<br>(Assigned to the  Honorable<br>Teresa Sanders) |

The State applies for an order unsealing the search warrant affidavit designated as Search

Warrant SW2014-000714

The investigation which resulted in the execution of this search warrant has concluded.

Therefore, there is no longer a need to keep this Search Warrant affidavit under seal.

The state requests that Search Warrant SW2014-000714 be unsealed.

Submitted March __20__, 2014.

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY: /s/ _____
     /s/ Jaimee Oliver
     Deputy County Attorney

GR000068

4/9/14 FILED 4:00pm
MICHAEL K. JEANES, Clerk

By _A. Schmidt_
A. Schmidt, Deputy

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Jaimee Oliver
Deputy County Attorney
Bar Id #: 028839
301 West Jefferson, 5th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8484
Mcaomjc1@mcao.Maricopa.Gov
MCAO Firm #: 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> COUNTY OF MARICOPA ) <br> ) <br> ) <br> ) <br> ) <br> ) | SW2014-000714 <br><br> ORDER UNSEALING SEARCH WARRANTS <br><br> (Assigned to the Honorable Teresa Sanders) |

Application have been made by the State, the Court finds that there is a good cause for the

search warrant affidavit in Search Warrant SW2014-000714 to be unsealed.

IT IS HERBY ORDERED that the search warrant affidavit designed as Search Warrant

SW2014-000714 shall be unsealed and that disclosure is permitted.

_Teresa Sanders_
The Honorable Teresa Sanders
Judge of the Superior Court

4-7-14
Date

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

4|10|14    800am

SW2014000714                                      04/09/2014

HONORABLE TERESA SANDERS

CLERK OF THE COURT
A. Schmidt
Deputy

IN RE:  SW2014-000714                 JAIMEE OLIVER

D & C MATERIALS-CSC

MINUTE ENTRY

The Court has received and reviewed the State's Ex Parte Application to Unsealing Search Warrant Affidavit.  Good cause appearing,

IT IS ORDERED unsealing the search warrant affidavit in this matter.

All in accordance with the formal written order signed by the Court on April 7, 2014 and filed by the clerk April 9, 2014.

FILED:  Order Re: State's Ex Parte Application to Unsealing Search Warrant Affidavit.

GR000070

**EXHIBIT 18**

## DECLARATION OF DEPUTY SEAN LOCKSA

I, Sean Locksa, declare the following under penalty of perjury:

1.      I am employed by the Maricopa County Sheriff's Office ("MCSO") as a sworn Deputy Sheriff in Special Investigations Division.

2.      I began work with MCSO on August 16, 1999, as a Deputy Sheriff Trainee.

3.      After completing a nine-year assignment with a Federal Task Force, I was assigned to the Intelligence Division.

4.      On November 25, 2013, I was transferred to the Special Investigation Division, Criminal Employment Unit (CEU).

5.      At that time, my supervisor was Sergeant Dmitrius Whelan.

6.      On or about January 17, 2014, my supervisor, Sergeant Whelan asked me to assist Detective Henderson by completing documentation to obtain a search warrant for telephone records in an investigation he was working. (Search warrant attached as Exhibit A).

7.      I obtained the information for the probable cause statement from case agent, Detective Josh Henderson.

8.      At the time, I assisted Detective Henderson with the search warrant, I had been in the unit for approximately a month and a half.

9.      I did not investigate Uncle Sam's restaurant, Bret Frimmel, or Lisa

Norton.  My involvement was only to assist in the case and to complete

search warrant documentation.

DATED this 19th day of January, 2017.

S/3/2

Deputy Sheriff Sean Locksa

**EXHIBIT A**



Exhibit E

*Walk in*

MARICOPA COUNTY SUPERIOR COURT JURISDICTION
SPECIAL WARRANT

## ISSUANCE of Special Warrant at (Initial Appearance Court)

| SPECIAL WARRANT NUMBER: | SW 2014- 001136 |
|---|---|

| AFFIANT NAME: | Locke | BADGE NUMBER: 1312 |
|---|---|---|
| AGENCY: | MCSO | |

### INDICATE TYPE OF ISSUANCE (ISW)

| X | WALK-IN |
|---|---|
| X | FAX/ELECTRONIC |

12 56

| CAPTION: |
|---|
| IN RE THE MATTER OF SEARCH WARRANT (951) |
| IN RE THE MATTER OF PEN REGISTER (952) [60 days] |
| IN RE THE MATTER OF TRAP AND TRACE (953) [60 days] |
| IN RE THE MATTER OF HANDWRITING EXEMPLAR (954) |
| IN RE THE MATTER OF SEIZURE WARRANT (956) |
| IN RE THE MATTER OF ORDER TO OBTAIN PHYSICAL EVIDENCE OR PHYSICAL CHARACTERISTICS (955) |
| IN RE THE MATTER OF GLOBAL POSITIONING SYSTEM (957) |
| IN RE THE MATTER OF |

| ORDERED BY THE COURT: |
|---|
| SEAL ALL SEARCH WARRANT DOCUMENTS PER REQUEST OF OFFICER/STATE AS ORDERED BY THE COURT. |
| X SEAL ALL ISSUANCE DOCUMENTS PURSUANT TO A.R.S. 13-3918. |

IT IS FURTHER ORDERED THAT ALL WORKSHEETS IN THIS CASE ARE **NOT** TO BE
SEALED UNLESS SPECIFICALLY ORDERED BY THE COURT.

| 2/4/2014 | 1307 | |
|---|---|---|
| DATE | TIME | JUDGE OR JUDGE PRO TEM |

Please forward these documents immediately to the following address:
Clerk of Superior Court, Special Warrant Desk 201 W. Jefferson, 1ˢᵗ Floor (602) 506-7754
ISS/Issuance Worksheet Form LRD 12-01-2010

MICHAEL K. JEANES, CLERK
BY ___ DEP
FILED
14 FEB -6 AM 9:34

GR000071

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED
14 FEB -6  AM 9: 34

*AFFIDAVIT FOR SEARCH WARRANT*

### MARICOPA COUNTY SHERIFF'S OFFICE
### County of Maricopa, State of Arizona

Warrant Number: __SW 2014 001136__

Your Affiant, Detective S. Locksa S1312, a sworn Deputy Sheriff for the County of Maricopa, State of Arizona, being first duly sworn, upon oath, deposes and says:

I spoke to case agent, Detective Josh Henderson S1458, who told me the following facts establishing probable cause regarding the pending criminal case against Bret Frimmel. Detective Henderson told me:

That on or about the 1st day of October, 2013 within the County of Maricopa, State of Arizona, the crime(s) of Conspiracy, Trafficking, Forgery, Identity Theft, ARS13-1003, ARS-13-2010, ARS13-2002, ARS13-2008 was/were committed by Bret Frimmel in the following manner:

This search warrant is respectfully requested to obtain Bret Frimmel's cell phone records for his Verizon cell phone number of **602-628-9606**. Law Enforcement database checks conducted on telephone number **602-628-9606** identified Frimmel to this phone number. Further, a call to the phone number, which went to voicemail, identifies Frimmel by name. A search warrant for identity theft and forgery was executed at a local business owned by Bret Frimmel on July 7th, 2013. During the execution of this warrant, 4 out of the 9 employees(s) were convicted of identity theft and forgery charges. A free talk involving the 4 employees was established with detectives and all 4 made collaborating statements identifying Bret Frimmel had knowingly hired undocumented workers and conspired with other employees to continue employing employees using fictitious or forged identification.

Detectives want to establish a pattern of contact between Bret Frimmel and various other employees that worked for him, and to retain records of any calls that may have been deleted. It will also aid in uncovering other possible known or unknown suspect information. Additionally, it may identify the person making forged documents for Bret Frimmel and unknown suspect(s) aiding Frimmel in this conspiracy. This information will assist in the prosecution of Bret Frimmel for charges of Conspiracy, Forgery, and Identity Theft

That you affiant has probable cause to believe and he/she does believe that there is now in the possession of **Cellco Partnership DBA Verizon Wireless** which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley Road Bedminster, New Jersey 07921

4 | P a g e

GR000072

Pertaining to the mobile telephone number of: **602-628-9606**

Which property or things were:

> Constitutes evidence tending to show that a public offense has been committed or tending to show that, suspect Bret Frimmel has committed a public offense, such offense being, Conspiracy, Trafficking, Forgery, Identity Theft, ARS13-1003, ARS-13-2010, ARS13-2002, ARS13-2008, which occurred on or about the 1st day of October, 2013.

That within the County of Maricopa, State of Arizona, there is now being concealed certain property or things described as:

> Subscriber information for the number **602-628-9606** including name, date of birth, mailing address, alternate phone number, and other numbers on the same account.

> Subscriber's social security number, email addresses, IP addresses, types of service utilized, length of services, including start date, means and source of payment, including credit card and bank account numbers as well as payment amounts

> Any and all subscriber "Notes and Footnotes" associated with the account to include where the device was purchased, any number changes, where payments were made and by what method of payment was used.

> All communication for the wireless number **602-628-9606**, to include: Incoming & Outgoing calls, SMS & MMS message activity, SMS & MMS content, Internet activity to include IP session activity / Web Browsing Info, for the time period of **August 01, 2013 to January 22, 2014**. Include all tower locations and azimuth for the sectors accessed during the communications for all Element's accessed. Also indicate if the tower was Lucent or Nortel and provide a three sector layout, as well as possible maximum ranges.

> Any and all device information to include make and model of the device associated to this cellular number.

> The Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), and Mobile Identification Number (MIN) that this carrier has captured or has on file.

> The Media Access Control (MAC) address associated with the subscriber's cellular device(s).

> Additionally RTT (Round Trip Time) for the cellular phone number of **602-628-9606** for the time period of **August 01, 2013 to January 22, 2014.**

GR000073

Lastly, provide a detailed definitions page, which identifies all information in the records.

**Please provide this information to Detective J. Henderson S1458, email: j_henderson@mcso.maricopa.gov, in digital format on a compact disc in Excel, PDF or TXT format / or via email. If records are sent via an email can you please include a certification of authenticity for the records provided.**

That the following facts establish probable cause for believing that grounds for the issuance of a search warrant for the aforementioned persons, places, and items of property exist:

PROBABLE CAUSE STATEMENT:

This search warrant is respectfully requested to obtain Bret Frimmel's cell phone records for his Verizon cell phone number of **602-628-9606.** Law Enforcement database checks conducted on telephone number 602-628-9606 identified Frimmel to this phone number. Further, a call to the phone number, which went to voicemail, identifies Frimmel by name. A search warrant for identity theft and forgery was executed at a local business owned by Bret Frimmel on July 7th, 2013. During the execution of this warrant, 4 out of the 9 employees(s) were convicted of identity theft and forgery charges. A free talk involving the 4 employees was established with detectives and all 4 made collaborating statements identifying Bret Frimmel had knowingly hired undocumented workers and conspired with other employees to continue employing employees using fictitious or forged identification.

Detectives want to establish a pattern of contact between Bret Frimmel and various other employees that worked for him, and to retain records of any calls that may have been deleted. It will also aid in uncovering other possible known or unknown suspect information. Additionally, it may identify the person making forged documents for Bret Frimmel and unknown suspect(s) aiding Frimmel in this conspiracy. This information will assist in the prosecution of Bret Frimmel for charges of Conspiracy, Forgery, and Identity Theft

Your Affiant, Detective Sean Locksa S1312, is a sworn Deputy Sheriff for the County of Maricopa, State of Arizona and has been so for a period of 14 years. Your Affiant is currently assigned to the Maricopa County Sheriff's Office, Special Investigations Division, where he has served as a Detective for a period of 2 months. Your Affiant has received training and has experience with the investigation of violent crimes against people and other related felony crimes. Your Affiant's training and experience lead him to believe and he does believe that persons, who engage in crimes such as Conspiracy, Trafficking, Forgery, Identity Theft, believe law enforcement cannot track and trace cellular devices. The items of evidence listed within this affidavit will aid in the identification and prosecution the person responsible for the commission of the aforementioned crime(s).

Wherefore your Affiant prays that a search warrant be issued, commanding that a search of the aforementioned places described herein, for the property and items described herein.

GR000074

Your affiant, Detective S. Locksa S1312, a certified peace officer in the State of Arizona of the Maricopa County Sheriff's Office, being duly sworn, upon oath, deposes and says that:

The provider is an electronic communication service company as defined in 18 USC § 2510(15) and is doing business in Arizona.

Pursuant to 18 USC §§ 2703(c)(1)(B), 2703(c), and 2703(d), this court may order a provider of an electronic communication service doing business in Arizona to disclose the records listed above to an officer who has established reasonable grounds to believe said records are relevant and material to an ongoing criminal investigation.

Per 18 USC § 2703(d), I certify that records that are likely to be obtained pursuant to this Order/Search Warrant are relevant to an ongoing criminal investigation being conducted by the above law enforcement agency.

It is ordered, pursuant to 18 USC § 2705(b) and A.R.S. § 13-3016 this order and the application be sealed until otherwise ordered by the court, and that **Cellco Partnership DBA Verizon Wireless** which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley Road Bedminster, New Jersey 07921 shall not disclose the existence of this order or the existence of the investigation to the listed subscriber, or to any person, unless or until otherwise ordered by the court.

Applicant's affidavit has established grounds for a non-disclosure order pursuant to 18 USC § 2705(b). Grounds for nondisclosure are based on the following:

- ✓ Jeopardize an investigation
- ☐ Flight from prosecution
- ☐ Intimidation of potential witnesses
- ☐ Danger to life or safety
- ☐ Evidence destruction or tampering

Your Affiant further says that all property and things seized during the execution of this search warrant will be retained in the custody of the Maricopa County Sheriff's Office and only disposed of in accordance to state law, A.R.S. 13-3920.

_____ #1312 _____
Detective S. Locksa S1312
Maricopa County Sheriff's Office

Subscribed and sworn to, before me this 4th day of February, 2014

_____
Judge / Commissioner
Maricopa County Superior Court

GR000075

# Exhibit "E"



# SEARCH WARRANT



## MARICOPA COUNTY SHERIFF'S OFFICE
### County of Maricopa, State of Arizona

Warrant Number: _SW 2014001136_

To any Peace Officer in the State of Arizona:

Proof by affidavit having been made this day before me by, Detective S. Locksa S1312, a sworn Deputy Sheriff for the County of Maricopa, State of Arizona, indicates that there is probable cause to believe that:

On the premises described as:

**Cellco Partnership DBA Verizon Wireless** which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley Road Bedminster, New Jersey 07921

Pertaining to the mobile telephone number of: **602-628-9606**

In the County of Maricopa, State of Arizona there is now being concealed certain property or things described as:

Subscriber information for the number **602-628-9606** including name, date of birth, mailing address, alternate phone number, and other numbers on the same account.

Subscriber's social security number, email addresses, IP addresses, types of service utilized, length of services, including start date, means and source of payment, including credit card and bank account numbers as well as payment amounts

Any and all subscriber "Notes and Footnotes" associated with the account to include where the device was purchased, any number changes, where payments were made and by what method of payment was used.

All communication for the wireless number **602-628-9606**, to include: Incoming & Outgoing calls, SMS & MMS message activity, SMS & MMS content, Internet activity to include IP session activity / Web Browsing Info, for the time period of **August 1, 2013 to January 22, 2014**. Include all tower locations and azimuth for the sectors accessed during the communications for all Element's accessed. Also indicate if the tower was Lucent or Nortel and provide a three sector layout, as well as possible maximum ranges.

By _____ MICHAEL K. JEANES, Clerk _____ Deputy
2-6-14 9:36 AM

1 | P a g e

GR000076

Any and all device information to include make and model of the device associated to this cellular number.

The Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), and Mobile Identification Number (MIN) that this carrier has captured or has on file.

The Media Access Control (MAC) address associated with the subscriber's cellular device(s).

Additionally RTT (Round Trip Time) for the cellular phone number of 602-628-9606 for the time period of August 1, 2013 to January 22, 2014.

Lastly, provide a detailed definitions page, which identifies all information in the records.

**Please provide this information to Detective J. Henderson S1458, email: j_henderson@mcso.maricopa.gov, in digital format on a compact disc in Excel, PDF or TXT format / or via email. If records are sent via an email can you please include a certification of authenticity for the records provided.**

Which property or things were:

Constitutes evidence tending to show that a public offense has been committed or tending to show that, suspect Bret Frimmel has committed a public offense, such offense being, Conspiracy, Trafficking, Forgery, Identity Theft, ARS13-1003, ARS-13-2010, ARS13-2002, ARS13-2008, which occurred on or about the 1st day of October, 2013.

You are therefore commanded:

In the daytime (The time between, 6:30 A.M. and 10:00 P.M, good cause having been shown.)

To make a search of the above names premises, for the herein described property or things and that if you find the same or any part thereof, to retain such things in your custody or in the custody of the Maricopa County Sheriff's Office as provided by A.R.S. 13-3920.

Pursuant to A.R.S. 13-3920, I hereby authorize the release of any property seized that is no longer needed for criminal prosecution, to the person/s from whom it was seized or who is identified as the lawful owner, unless such property is contraband or other wise prohibited.

Return this warrant to the issuing court within three (3) days of the date issued as directed by A.R.S. 13-3918.

2 | P a g e

GR000077

You are therefore commanded, pursuant to 18 USC §§ 2703(c)(1)(B), 2703(c), and 2703(d) and Arizona Revised Statutes, Title 13, Section 3016, Subsection A, on the date I have written below, or as soon as possible after this date, not exceeding 5 days, to serve this order on the following electronic communication service or remote computing service:

It is further ordered, pursuant to 18 USC § 2705(b) and A.R.S. § 13-3016 this order and the application be sealed until otherwise ordered by the court, and that **Cellco Partnership DBA Verizon Wireless** which is doing business within Maricopa County, State of Arizona and whose records are housed at 180 Washington Valley Road Bedminster, New Jersey 09721, shall **NOT** disclose the existence of this order or the existence of the investigation to the listed subscriber, or to any person, unless or until otherwise ordered by the court.

Given under my hand and dated this 4th day of February, 2014

_____
Judge / Commissioner
Maricopa County Superior Court

HONORABLE LISA M. ROBERTS
MARICOPA COUNTY SUPERIOR COURT

GR000078

# MARICOPA COUNTY SUPERIOR COURT JURISDICTION
## SPECIAL WARRANT

## **RETURN** of Special Warrant at (Initial Appearance Court)

| SPECIAL WARRANT NUMBER: | SW 2014- 00 1136 . |
|---|---|

### TYPE OF ORDER

| ✓ | RETURN (RSW) |
|---|---|
| | EXTENSION (EXT) |
| | ORDER (ORD) |

### ORDERED BY THE COURT

| SEAL ALL SEARCH WARRANT DOCUMENTS (including all issuance and all return documents plus all subsequent SW pleadings filed in this number) per request of Officer/State and as Ordered by the Court. NOTE: The original SW warrant is excluded and shall be unsealed, unless noted below. |
|---|
| The original SW Warrant <u>shall REMAIN SEALED</u>. |
| IT IS ORDERED UNSEALING [Previously Sealed Search Warrant documents are now to be unsealed] ALL SEARCH WARRANT DOCUMENTS IN THIS CASE. |
| |
| PURSUANT TO A.R.S. 13-3918, IT IS ORDERED UNSEALING ALL SEARCH WARRANT DOCUMENTS (including all issuance and return documents plus all subsequent SW pleadings filed in this number) unless previously ordered sealed. |

IT IS FURTHER ORDERED THAT ALL MINUTE ENTRIES/WORKSHEETS IN THIS CASE ARE NOT TO BE SEALED UNLESS SPECIFICALLY ORDERED BY THE COURT.

| 02/07/14 | 1254 hrs. Hours | _____ |
|---|---|---|
| DATE | TIME | JUDGE OR JUDGE PRO TEM |

Please forward these documents immediately to the following address:
Clerk of Superior Court, Special Warrant Desk
175 W. Madison St., RCC/EDC 4th Floor; Telephone: (602) 506-7754
Return Worksheet Form LRD 12/06/12

HONORABLE CHARLES DONOFRIO III
MARICOPA COUNTY SUPERIOR COURT

GR000079

MICHAEL K. JEANES, CLERK
BY: J. Spelgatti
DEP
FILED

14 FEB 12 PM 5: 18




## RETURN OF DISCLOSURE OF RECORDS ORDER

### Search Warrant: 2014-001136

Detective S. Locksa S1312, a sworn Maricopa County Sheriff's Office Deputy, being first duly sworn upon oath, deposes and says that on the 4th day of February, 2014, this order was executed and the following items were requested:

**Subscriber information and call, text and mobile records with historical cell site information for cellular telephone number 602-628-9606.**

Your affiant is aware that, based upon the high volume of data to be processed and examined, the recovery of data by a computer forensic analyst takes significant time. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the locations described above. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst; however, all results will be presented by your affiant or your affiant's designee and later forwarded to the prosecutorial agency as evidence, at a later date

I further certify that the foregoing is a true and accurate account of all evidence provided to me/ or my associates.

_____ S1312

Detective S. Locksa S1312
Maricopa County Sheriff's Office

SUBSCRIBED AND SWORN to before me this 7th day of February, 2014.

_____

Judge, Magistrate, Justice of the Peace
Maricopa County Superior

HONORABLE CHARLES DONOFRIO III
MARICOPA COUNTY SUPERIOR COURT        8 | P a g e

Exhibit E

BY _____ JEANES, CLERK
_____ DEP
FILED

14 MAR 31 AM 9: 17

# MARICOPA COUNTY SUPERIOR COURT JURISDICTION
## SPECIAL WARRANT

## RETURN of Special Warrant at (Initial Appearance Court)

| SPECIAL WARRANT NUMBER: | SW 2014- 00 1136 |
|---|---|

| TYPE OF ORDER | |
|---|---|
| X | RETURN (RSW) |
| | EXTENSION (EXT) |
| | ORDER (ORD) |

| ORDERED BY THE COURT | |
|---|---|
| | SEAL ALL SEARCH WARRANT DOCUMENTS (including all issuance and all return documents plus all subsequent SW pleadings filed in this number) per request of Officer/State and as Ordered by the Court. NOTE: The original SW warrant is excluded and shall be unsealed, unless noted below. <br><br> _____The original SW Warrant shall REMAIN SEALED. |
| | IT IS ORDERED UNSEALING [Previously Sealed Search Warrant documents are now to be unsealed] ALL SEARCH WARRANT DOCUMENTS IN THIS CASE. |
| | |
| X | PURSUANT TO A.R.S. 13-3918, IT IS ORDERED UNSEALING ALL SEARCH WARRANT DOCUMENTS (including all issuance and return documents plus all subsequent SW pleadings filed in this number) unless previously ordered sealed. |

*IT IS FURTHER ORDERED THAT ALL MINUTE ENTRIES/WORKSHEETS IN THIS CASE ARE NOT TO BE SEALED UNLESS SPECIFICALLY ORDERED BY THE COURT.*

3/27/2014     0922 Hours     _____
DATE          TIME          JUDGE OR JUDGE PRO TEM

Please forward these documents immediately to the following address:
Clerk of Superior Court, Special Warrant Desk
175 W. Madison St., RCC/EDC 4th Floor; Telephone: (602) 506-7754
Return Worksheet Form LRD 12/06/12    DAVID V. SEYER
COUNTY SUPERIOR COURT

GR000081



# RETURN OF DISCLOSURE OF RECORDS
## ORDER



### Search Warrant: 2014-001136

Detective C. Hechavarria S1851, a sworn Maricopa County Sheriff's Office Deputy, being first duly sworn upon oath, deposes and says that on 2-4-2014, this order was executed and the following items were obtained:

**Subscriber information and call, text and mobile records with historical cell site information for cellular telephone number 602-628-9606**

I further certify that the foregoing is a true and accurate account of all evidence provided to me/ or my associates.

_____
Detective C. Hechavarria S1851
Maricopa County Sheriff's Office

SUBSCRIBED AND SWORN to before me this ___27th___ day of ___MARCH___, 2014.

_____
Judge, Magistrate, Justice of the Peace
Maricopa County Superior Court

HONORABLE DAVID V. SEYER
MARICOPA COUNTY SUPERIOR COURT

**EXHIBIT 19**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

BRET FRIMMEL; PISHKA, INC.;    )
and BRF ENTERPRISES, LLC;      )
LISA AND WILLIAM BRUCE         )
NORTON, wife and husband,      )
                               )
        Plaintiffs,            )
                               )
            vs.                )  No. 2-15-cv-00087-SPL
                               )
JOSEPH M. AND AVA ARPAIO,      )
et al.,                        )
                               )
        Defendants.            )
_____)

VIDEO DEPOSITION OF CHRISTOPHER HEGSTROM

Phoenix, Arizona
June 29, 2016
9:29 a.m.

Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 4032 North Miller Road
Certified Realtime Reporter     Suite A-100
Certified LiveNote Reporter     Scottsdale, AZ 85251
AZ CR No.  #50574               (480) 429-7573

(COPY)

Page 43

1    A.    A print-off of an article from the Independent

2    Newsmedia written by Cecilia Chung -- Chan.

3    Q.    Have you ever spoken to Ms. Chan?

4    A.    Yes.

5    Q.    Have you sent e-mails to Ms. Chan?

6    A.    Yes.

7    Q.    Having looked at this document, does it refresh

8    your memory whether you communicated with Ms. Chan about

9    the arrest of Mr. Frimmel?

10   A.    No.

11   Q.    Do you believe that Ms. Chan is incorrect when

12   she says that -- when she quotes you saying "Mr. Hegstrom

13   said"?

14          MS. IAFRATE:  Form.  There aren't quotation

15   marks, so when you say "quote," you use that --

16          MR. JACOB:  Can you read back my question,

17   please?

18          (The following requested portion of the

19   record was read back by the reporter:

20          "QUESTION:  Do you believe that Ms. Chan is

21   incorrect when she says that -- when she quotes you saying

22   "Mr. Hegstrom said"?")

23          MS. IAFRATE:  Form.

24   BY MR. JACOB:

25   Q.    Do you believe that she's incorrect in using the

Page 44

1    phrase "Mr. Hegstrom said" in this article?

2        A.    I don't recall.

3        Q.    My question is, do you believe she's incorrect?

4        A.    I don't know.

5        Q.    Did you take any part in drafting the press

6    release concerning the arrest of Mr. Frimmel and

7    Mrs. Norton?

8        A.    I don't know.

9        Q.    If somebody were to testify that you did take a

10   part in that, you wouldn't know that that was untrue; is

11   that correct?

12               MS. IAFRATE:   Form.

13               THE WITNESS:   I don't recall.

14   BY MR. JACOB:

15       Q.    Did you participate in any meeting on a -- one

16   or two days prior to execution of the search warrants on

17   Uncle Sam's restaurant where the execution of such search

18   warrants was discussed?

19       A.    I don't remember.

20       Q.    In another matter, Lieutenant Jakowinicz gave

21   sworn testimony that he would brief Sheriff Arpaio and

22   Chief Sands, and I'm quoting him now, when a CEU

23   investigation was concluding with search warrants.  Do you

24   believe that Lieutenant Jakowinicz was correct when he

25   gave that testimony?

1              MS. IAFRATE:  Okay.  We'll read and sign.
2              THE VIDEOGRAPHER:  This concludes the
3   video-recorded deposition -- or I'm sorry.  Let me start
4   over.
5              This is end of the media number 1 in the
6   continuing of deposition of Christopher Hegstrom.  Today's
7   date is June 29, 2016.  The time is 10:32 a.m.
8              (WHEREUPON, this deposition concluded at
9   10:32 a.m.)
10
11
12
13
14   _____
15              CHRISTOPHER HEGSTROM
16
17
18
19
20
21
22
23
24
25

**EXHIBIT 20**

Print This Page

 maryland.newszap.com logo

# Sheriff's Office arrests Uncle Sam's owner at Peoria location

By Cecilia Chan
Independent Newsmedia, Inc. USA

Last Modified: Jan 22, 2014 05:20PM

WEST VALLEY. ARIZ_ The owner of Uncle Sam's restaurant chain and his manager were arrested Wednesday on suspicion of employing undocumented workers, the Maricopa County Sheriff's Office announced.

The arrests mark the first time deputies have arrested an owner/employer, who are facing criminal charges relating to identity theft for purposes of employing undocumented person, said Christopher Hegstrom, sheriff's spokesman.

Owner Bret Frimmel, 40, is suspected of trafficking the identity of another, identity theft and forgery, Mr. Hegstrom said. Mr. Frimmel was arrested at his Peoria eatery location.

Manager Lisa Norton, 53, is also suspected of trafficking the identity of another identity theft forgery, Mr. Hegstrom said. Ms. Norton was taken into custody at the north Phoenix restaurant location.

The Sheriff's Office investigation into Mr. Frimmel's two restaurants began in October 2012 after the office received a tip from a caller about the hiring of several individuals utilizing false identification documents to gain and maintain employment at the eating establishments

Deputies last July raided Uncle Sam's two locations, arresting 10 workers. The Sheriff's Office at the time suspected that as many as 121 people gained employment at Uncle Sam's through the use of falsified documents and ID theft.

The investigation into Uncle Sam's Restaurants was the 73rd workplace investigation so far conducted by the Sheriff's Criminal Employment Squad. Those 73 investigations have resulted in 762 employee arrests as well as three employer's detainment on civil charges.

Copyright © 2016 — Independent Newspapers, Inc.



EXHIBIT NO. 6
HEGSTROM
6-29-16
LHD

**EXHIBIT 21**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bret Frimmel; Pishka, Inc.; and ) | Case No. |
| BRF Enterprises, LLC; Lisa and ) | 2-15-cv-00087-SPL |
| William Bruce Norton, wife and ) | |
| husband; ) | |
| ) | |
|        Plaintiffs, ) | |
| ) | |
|    vs. ) | |
| ) | |
| Joseph M. and Ava Arpaio, et al.,) | |
| ) | |
|      Defendants. ) | |
| ) | |

VIDEOTAPED DEPOSITION OF CESAR BROCKMAN

Phoenix, Arizona
August 2, 2016
9:34 a.m.

PREPARED FOR:
THE COURT                   CARRIE REPORTING, LLC
                                   Certified Reporters
Reported by:               2415 E. Camelback Road
CAROLYN T. SULLIVAN       Suite 700
Registered Professional Reporter  Phoenix, AZ 85016
Arizona CR No. 50528       (480) 429-7573

DEPOSITION OF Cesar Brockman, 8/16/2016

```
 1               MR. JACOB:  No, he hasn't.
 2               MS. IAFRATE:  Yeah, he has.
 3               MS. BURGESS:  He has.  Twice.
 4      Q.    BY MR. JACOB:  Just answer me yes or no.  Was
 5   it more than ten?
 6               MS. IAFRATE:  Form.
 7               THE WITNESS:  I don't know.
 8      Q.    BY MR. JACOB:  Okay.  How many employers in
 9   that first year did you arrest for violating the Act?
10      A.    I don't think we arrested any that first year.
11      Q.    So now we're in the second year, 2009.  Can you
12   approximate how many employers you investigated in 2009?
13      A.    No.
14      Q.    How many employers did you arrest in 2009?
15      A.    I don't remember.  I don't know if we did or
16   not.
17      Q.    So you don't know whether you arrested any
18   employers in 2009?
19      A.    2009.  It's been seven years ago.  I don't
20   remember.
21      Q.    All right.  From -- from 2008 till you left
22   the H -- till you left the CEU, which I believe was in
23   August of 2014, how many --
24               MS. IAFRATE:  Huh-uh.
25      Q.    BY MR. JACOB:  When did you leave the CEU?
```

**CARRIE REPORTING, LLC - Certified Reporters**
**(480) 429-7573**

DEPOSITION OF Cesar Brockman, 8/16/2016

```
 1                    MR. JACOB:  This is Exhibit 2.
 2                    MS. IAFRATE:  Thank you.
 3       Q.    BY MR. JACOB:  If you look at the first page,
 4   the next to last paragraph, do you see where it says:
 5   "Today's arrests mark the first time Sheriff's deputies
 6   have taken into custody an owner/employer on criminal
 7   charges relating to identity theft for purposes of
 8   employing undocumented persons."
 9       A.    Yes.
10       Q.    Do you have any reason to disagree with that
11   statement?
12                    MS. IAFRATE:  Form.
13                    THE WITNESS:  No.  That's what it says.
14       Q.    BY MR. JACOB:  Okay.  Would you agree that that
15   statement means that while you were at the CEU, you did
16   not arrest any employers on criminal charges relating to
17   identity theft?
18                    MS. IAFRATE:  Form.
19                    THE WITNESS:  We arrested a -- now that I
20   recall, we arrested a -- I believe she was a general
21   manager of the employer who had the hiring rights to --
22   of that employer, had the right to hire.  And we did
23   arrest someone.
24       Q.    BY MR. JACOB:  Just one person?
25       A.    That I recall.
```

DEPOSITION OF Cesar Brockman, 8/16/2016

```
 1                        CERTIFICATE
 2            BE IT KNOWN that the foregoing deposition was
      taken by me pursuant to notice; that I was then and there
 3    a Certified Reporter for the State of Arizona; that the
      witness, before testifying, was duly sworn to testify to
 4    the whole truth; that the questions propounded to the
      witness and the answers of the witness thereto were taken
 5    down by me in shorthand and thereafter transcribed
      through computer-aided transcription under my direction;
 6    that the witness will read and sign said deposition; that
      the foregoing pages are a true and correct transcript of
 7    all proceedings had, all done to the best of my skill and
      ability.
 8
 9            I FURTHER CERTIFY that I am in no way related to
      any of the parties hereto, nor am I in any way interested
10    in the outcome hereof.
11
              I FURTHER CERTIFY that I have complied with the
12    ethical obligations set forth in ACJA 7-206(J)(1)(g)(1)
      and (2).
13
14            DATED at Phoenix, Arizona, this 15th day of
      August, 2016.
15
16
17            _____
                  CAROLYN T. SULLIVAN, RPR
18                Arizona CR No. 50528
19
              I CERTIFY that this Registered Reporting Firm
20    has complied with the ethical obligations set forth in
      ACJA Sections (J)(1)(g)(1) and (2).
21
22
23            _____
                  CARRIE REPORTING, LLC
24                Registered Reporting Firm R1064
                  CARRIE A. CARIATI, Owner
25
```

**EXHIBIT 22**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
BRET FRIMMEL; PISHKA, INC.;     )
and BRF ENTERPRISES, LLC;       )
LISA AND WILLIAM BRUCE          )
NORTON, wife and husband,       )
                                )
          Plaintiffs,           )
                                )
            vs.                 )  No. 2-15-cv-00087-SPL
                                )
JOSEPH M. AND AVA ARPAIO,       )
et al.,                         )
                                )
          Defendants.           )
_____  )
```

VIDEO DEPOSITION OF JOSHUA HENDERSON

Phoenix, Arizona
July 13, 2016
9:29 A.M.

```
Prepared by:                CARRIE REPORTING, LLC
MICHAELA H. DAVIS           Certified Reporters
Registered Professional Reporter  4032 North Miller Road
Certified Realtime Reporter  Suite A-100
Certified LiveNote Reporter  Scottsdale, AZ 85251
AZ CR No.  #50574           (480) 429-7573
```

(COPY)

Page 14

BY MR. JACOB:

Q.     Okay.  When did you start to work at the CEU?

A.     I believe it was October of 2012.

Q.     And when did you leave the CEU?

A.     It was December 2014, I want to say.

Q.     Why did you leave the CEU?

A.     I was promoted.

Q.     What was -- what were your assignments or duties when you worked in the CEU?

A.     I was given the position of detective and investigated businesses that we had information that might be having workers there that were utilizing other people's Social Security numbers to work there.

Q.     And you were the lead investigator in some of these cases?

A.     Yes.

Q.     How many?

A.     Two that I can recall.

Q.     One of them was the Uncle Sam's restaurant?

A.     Yes.

Q.     And what was the other one?

A.     I don't -- I don't recall what the name of that one was.

Q.     Were you a detective prior to being assigned to the CEU?

1    Q.    So if you put Mr. Frimmel into handcuffs, was it

2  because being the owner of a restaurant that had workers

3  without proper identification was reason to put him into

4  handcuffs?

5              MS. IAFRATE:  Form.

6              THE WITNESS:  I don't know.  I mean, you're

7  asking me to -- what I -- what I -- or if I told somebody

8  to put him in handcuffs, because I don't know.  But in

9  that situation back then, which I can't really recall, I

10  would have to be -- I would have to be in that situation

11  to be able to answer that question, is what I'm telling

12  you.

13  BY MR. JACOB:

14    Q.    Do you recall whether Mr. Frimmel complained

15  about discomfort in the handcuffs?

16    A.    I don't recall.

17    Q.    Have you ever put a person into handcuffs who

18  was too big whose arms you couldn't get around to fit into

19  one pair of handcuffs?

20    A.    I don't recall.

21    Q.    You've never had that problem?

22    A.    I don't -- I don't remember.  I don't recall.

23    Q.    Have you been taught that some people can have

24  shoulder problems if you pull their arms too tight behind

25  them to fit into a single pair of handcuffs?

Page 165

1      A.    I don't recall being taught that.

2            (Deposition Exhibit No. 15 was marked for

3      identification by the reporter.)

4      BY MR. JACOB:

5      Q.    Do you recognize this document?

6      A.    I believe so, yes.

7      Q.    What is it?

8      A.    It's a -- it's a letter from the law offices of

9      John Penner regarding Frimmel's missing property.

10     Q.    What did you think of when you got this letter?

11     A.    I don't know.  I don't recall.

12     Q.    Were you surprised that someone would be

13     released from jail and they wouldn't get their property

14     back?

15           MS. IAFRATE:  Form.

16           THE WITNESS:  I don't know.

17     BY MR. JACOB:

18     Q.    Did it strike you as, well, that's just the way

19     we do things here?

20           MS. IAFRATE:  Form.

21           THE WITNESS:  Are you asking me how I feel

22     about that question now or back then?

23     BY MR. JACOB:

24     Q.    Then.

25     A.    No, I don't know.

1      A.     Then yes.

2      Q.     Okay.  And now my question is, who were they

3   defrauding?

4              MS. IAFRATE:  Form, foundation.

5              THE WITNESS:  The organization.

6   BY MR. JACOB:

7      Q.     The employer?

8      A.     Yes.

9              MR. JACOB:  Thank you.

10             MS. BURGESS:  Form.

11             MR. JACOB:  No more questions.

12                  E X A M I N A T I O N

13   BY MS. IAFRATE:

14     Q.     Are you aware of a policy that if you transport

15   a prisoner, they have to be handcuffed?

16     A.     Yes.

17     Q.     Is that your standard practice?

18     A.     Yes.

19     Q.     Is that the MCSO practice?

20     A.     Yes.

21     Q.     So regardless of whether it's a misdemeanor or

22   felony, if you're going to transport, the prisoner needs

23   to be handcuffed; correct?

24     A.     Correct.

25             MS. IAFRATE:  I have nothing else.

1          They said no.

2          MR. JACOB:  Thank you.

3          MS. IAFRATE:  We'll read and sign.

4          THE VIDEOGRAPHER:  This concludes the

5    video-recorded deposition of Josh Henderson.  The time is

6    1:53 p.m.

7          (WHEREUPON, this deposition concluded at

8    1:53 p.m.)).

9

10

11

12

13          

14              JOSHUA HENDERSON

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


BRET FRIMMEL; PISHKA, INC.;   )
and BRF ENTERPRISES, LLC;     )
LISA AND WILLIAM BRUCE        )
NORTON, wife and husband,     )
                              )
        Plaintiffs,           )
                              )
            vs.               )   No. 2-15-cv-00087-SPL
                              )
JOSEPH M. AND AVA ARPAIO,     )
et al.,                       )
                              )
        Defendants.           )
_____)


VIDEO DEPOSITION OF JOSEPH M. ARPAIO

Phoenix, Arizona
June 28, 2016
9:34 a.m.


Prepared by:                CARRIE REPORTING, LLC
MICHAELA H. DAVIS           Certified Reporters
Registered Professional Reporter   4032 North Miller Road
Certified Realtime Reporter   Suite A-100
Certified LiveNote Reporter   Scottsdale, AZ 85251
AZ CR No.  #50574           (480) 429-7573


(COPY)

Page 8

1           MR. SILVER:  Yes.  Yeah.  That'll --

2           MR. EAVES:  Thank you.

3           MR. SILVER:  That'll make things a lot

4    easier.

5    BY MR. SILVER:

6       Q.   Do you have any input into the -- or I'm sorry.

7    Let me ask that differently.

8           What is your input into the county board's

9    budgeting process for the Sheriff's Office?

10          MS. IAFRATE:  Form.

11          THE WITNESS:  Well, we have our own

12   financial people who coordinate with the county people and

13   negotiate somewhat the budget.

14   BY MR. SILVER:

15      Q.   Do you ever participate in the negotiation of

16   the budget?

17      A.   Very seldom.

18      Q.   What would cause you to have to participate in

19   the negotiation of the budget?

20          MS. IAFRATE:  Form.

21          THE WITNESS:  Well, I don't think there's

22   any cause.  I delegate that authority to my subordinates.

23   BY MR. SILVER:

24      Q.   At what level subordinates do you delegate that

25   to?

Page 12

1    Q.    Your training.

2    A.    I think I get it from the Constitution as the

3    elected sheriff.

4    Q.    Okay.

5    A.    Not the Cons- -- as the elected sheriff.

6    Q.    You get your power from the -- from the --

7    A.    Yes.  I don't have any formality where I have to

8    do to train.

9    Q.    Where you have --

10   A.    But I do keep abreast somewhat of training.

11   Q.    Let me get more specific.

12         How do you keep abreast of changes in the law

13   that are relevant to your job?

14   A.    Well, usually I have personnel that may advise

15   me.  But let me just summarize.  I delegate to my staff.

16   We have almost 4,000 employees, so much of my work is

17   delegated.

18   Q.    What is the -- what is the role of the Maricopa

19   County Attorney's Office in making sure that you and

20   your -- your staff are up to date on changes in the law or

21   Supreme Court holdings and things like that?

22              MS. IAFRATE:  Form.

23              THE WITNESS:  Well, once again, I'm sure

24   that our personnel coordinate with the prosecutors doing

25   investigations.  Or if court decisions come out, I'm sure

Page 13

1  that the county attorney would let my office know.

2  BY MR. SILVER:

3      Q.    Okay.  Does someone brief you on important court

4  decisions that come out?

5      A.    No.

6      Q.    Do you read them yourself?

7      A.    No.  Not normally.  Some I do.

8      Q.    Do you read the ones that would most directly

9  relate to the performance of your duties?  Or how do you

10  decide which ones you're going to read?

11              MS. IAFRATE:  Form.

12              THE WITNESS:  Once again, I delegate to my

13  subordinates.  If they think that I should know some

14  situation, they will let me know.

15  BY MR. SILVER:

16      Q.    Can you just briefly take me through your -- the

17  training -- your work history?  Which we know; it's

18  publicized.  But I want to know what kind of training

19  you've had as a police officer and as a federal agent over

20  the years specifically relevant to the question of

21  determining when there's probable cause for an arrest.

22  Can you take me through that?

23      A.    Do you want my resume?  Is that what you're

24  trying to say?

25      Q.    I mean --

Page 15

1          MS. IAFRATE:  Form.

2          THE WITNESS:  Most of it was when I was with

3    the US Drug Enforcement Administration, plus sheriff.

4    BY MR. SILVER:

5      Q.    24 years now, Sheriff?

6      A.    At the end of this year.

7      Q.    What was your role as regards the Maricopa

8    County sheriff's human smuggling unit?

9      A.    Still acting as the Sheriff and delegating most

10   of the activity, once again, to my subordinates.

11     Q.    Same question for the criminal employment unit?

12     A.    Yes.

13     Q.    Same answer, I guess.  Yeah.

14         When you say you delegate most -- most of that

15   to the -- I'm sorry.

16         You said you delegate most of your

17   responsibility to your subordinates?

18          MS. IAFRATE:  Form.

19   BY MR. SILVER:

20     Q.    Is that the word you used?

21     A.    No.  I delegate the -- the subject matter to my

22   subordinates, and they carry out the -- if you want to

23   talk about investigations, they carry out investigations.

24     Q.    Okay.  What would be, I would say, comparable

25   subject matter units within the Sheriff's Office other

Page 20

1   whether to proceed with a raid, or did they have to get

2   your approval for that?

3                    MS. IAFRATE:  Form.

4                    THE WITNESS:  No, they don't get my

5   approval.

6   BY MR. SILVER:

7        Q.    What role do you play in deciding whether there

8   is or isn't going to be a raid when the information is

9   presented to you?

10                   MS. IAFRATE:  Form.

11                   THE WITNESS:  I don't play any role.  I say

12   I delegate.  Those are decisions made by my subordinates.

13   BY MR. SILVER:

14       Q.    Are you advised prior to these raids?

15                   MS. IAFRATE:  Form.

16                   THE WITNESS:  On occasion, yes.

17   BY MR. SILVER:

18       Q.    If you were present at a raid, certainly you

19   were advised that the raid was going to happen?

20                   MS. IAFRATE:  Form.

21                   THE WITNESS:  What was that?

22   BY MR. SILVER:

23       Q.    If it turns out that you were actually present

24   when a raid occurred, then obviously someone had advised

25   you that the raid was going to occur in advance; correct?

Page 21

1          MS. IAFRATE:  Form.

2          THE WITNESS:  Yes.

3   BY MR. SILVER:

4      Q.   All right.  Do you have -- would that -- would

5   the fact that you were present at a raid indicate that you

6   had approved the raid?

7      A.   No.

8      Q.   So you have -- has there ever been an instance

9   where you have been informed of a potential raid, and -- I

10  said vetoed it or told them, "No, I don't want you to go

11  through with this"?

12         MS. IAFRATE:  Form.

13         THE WITNESS:  I can't recall.

14  BY MR. SILVER:

15     Q.   Do you have that authority?

16     A.   Yes.

17     Q.   And the chief deputies know that you have the

18  authority to veto a raid if you don't think, for example,

19  that there is cause for a raid?

20         MS. IAFRATE:  Form, foundation.

21         THE WITNESS:  Well, I think they know who

22  the Sheriff is and -- but I do not get involved in their

23  nuts and bolts; that's my management's job.  Once again, I

24  delegate to them, and they make the decision.

25  //

Page 34

1              MS. IAFRATE:  Form.

2              THE WITNESS:  Once again, it would be the

3    supervisors.  If it had to do with any other situation, it

4    would probably be internal affairs.

5    BY MR. SILVER:

6        Q.    What brings something up to the level of having

7    to be dealt with by internal affairs?

8              MS. IAFRATE:  Form.

9              THE WITNESS:  Well, I don't have it broken

10   down, but usually if there's a complaint and it reaches a

11   level where my people think it should be internal affairs.

12   So they make the decisions, not me.

13   BY MR. SILVER:

14       Q.    At what level is that decision made?  Is that

15   immediate supervisor, or is that a level higher that makes

16   the decision to refer something to internal affairs?

17       A.    I believe it goes up through the chain.  Maybe

18   up to captain or whatever.

19       Q.    Can you tell me anything about how the criminal

20   employment unit selected targets of its investigation from

21   2012 to 2015?

22              MS. IAFRATE:  Form.

23              THE WITNESS:  Once again, I'm -- that's up

24   to the specialists that work that type of operation.  And

25   I delegate to them, and they make the decision as to when,

Page 48

1   magistrate judge despite knowing that they didn't have

2   adequate evidence so they added some statements to the

3   affidavit that weren't true to get the arrest warrant,

4   would you expect that deputy to be disciplined?

5                   MS. IAFRATE:  Form.

6                   THE WITNESS:  Once again, I'm going to say

7   it again, that I delegate that authority to my

8   subordinates.  I don't get involved in the nuts and bolts

9   of the investigations.  I have confidence in my staff, and

10  they take care of these matters.

11  BY MR. SILVER:

12      Q.   But your expectation is they would take care of

13  that matter?

14      A.   I would imagine they would, yes.

15      Q.   You wouldn't put up with deputies lying to

16  judges to get arrest warrants.  That's not the way you

17  want your office to run.

18      A.   That's correct.

19                  MS. IAFRATE:  Form.

20  BY MR. SILVER:

21      Q.   Are you familiar with the immigration hotline --

22  or the immigration tip hotline.  There was a dyslexic

23  typist.

24      A.   Yes, I believe we had a hotline for several

25  years.

Page 80

BY MR. SILVER:

1

2      Q.    Did you have any input into the timing of either

3   the raid at Uncle Sam's or the arrest of Mr. Frimmel and

4   Ms. Norton?

5      A.    No.

6      Q.    Who would have determined the timing of each of

7   those things?

8                MS. IAFRATE:  Form.

9                THE WITNESS:  I would presume it's in the

10  course of an investigation as to when they decided to

11  conclude it.  I don't know as at -- as far as timing is

12  concerned.

13  BY MR. SILVER:

14     Q.    Are you familiar with a thing called a notice of

15  claim statute?

16     A.    Yes.

17     Q.    Tell me what you understand about how that

18  works.

19     A.    Once again, I'm not a legal guy, but I presume

20  when someone sues, they file a notice of claim, and I

21  believe they try to settle the case, I'm not sure.  And

22  then I guess the -- the lawsuit follows.

23     Q.    Do you know how many days after an incident

24  occurs a person has to file a notice of claim?

25     A.    No.  I could guess at 30, 90 days.  I don't

Page 81

1   know.

2       Q.   Did anyone advise you that the Department of

3   Justice had reached out to Mr. Frimmel to assist him in

4   their investigation of your office?

5       A.   No.

6       Q.   As the criminal case went on against Mr. Frimmel

7   and Ms. Norton, did your office initiate other

8   investigations related to any of the players in that

9   criminal proceeding, including the lawyers?

10              MS. IAFRATE:  Form.

11              THE WITNESS:  Can you repeat that?

12  BY MR. SILVER:

13      Q.   Did anyone in the Sheriff's Office start an

14  investigation of Paul Charlton as a result of the defense

15  raised?

16      A.   Not that I know.

17      Q.   Not that you would mind.

18              MS. IAFRATE:  Not a question, Sheriff.

19              MR. SILVER:  It's a comment.  He was

20  chuckling about that.

21  BY MR. SILVER:

22      Q.   But -- so of anybody else?  You know, nobody

23  started an investigation of Paul Charlton, no one started

24  investigating me or the judge or anything like that?

25      A.   No.

```
 1        A.    This case?
 2        Q.    Yeah.  Against Mr. Frimmel or Ms. Norton.
 3        A.    I don't recall.
 4              MR. SILVER:  Anyone else?
 5              Because we still have the issue with some
 6   privilege log and documents that haven't been disclosed,
 7   we'll pend the ending of this --
 8              MS. IAFRATE:  Okay.
 9              MR. SILVER:  -- but we will terminate the
10   deposition for now.
11              MS. IAFRATE:  Okay.
12              MR. SILVER:  And if you want to have him
13   read, you know, and sign --
14              MS. IAFRATE:  We'll read and sign.
15              MR. SILVER:  Thank you, Sheriff.
16              THE WITNESS:  Thank you.
17              MR. SILVER:  We're done for the day.
18              THE VIDEOGRAPHER:  This concludes media 3 in
19   the continuing deposition of Sheriff Joseph M. Arpaio.
20   Today's date is June 28, 2016.  The time is 12:17 p.m.
21              (WHEREUPON, this deposition adjourned at
22   12:17 p.m.).
23
24
25                         JOSEPH M. ARPAIO
```

**EXHIBIT 24**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

LISA NORTON, et al.,              )
                                  )
        Plaintiffs,               )
                                  )
vs.                               ) No. CV
                                  ) 15-00087-PHX-SPL
JOSEPH M. ARPAIO, et al.,         )
                                  )
        Defendants.               )
                                  )

VIDEOTAPED DEPOSITION OF LISA ANNE NORTON

Phoenix, Arizona

October 17, 2016

Reported by:  Cathy A. Miccolis, RPR/CRR

Certified Reporter, No. 50068

Norton v. Arpaio                                          Lisa Anne Norton

 1        A.    He is Bret's cousin.

 2        Q.    Oh, okay.  Have you ever socialized with

 3   Mr. Bratspis?

 4        A.    No.

 5        Q.    I know I'm butchering his name as much as you.

 6        A.    (Laughter.)

 7        Q.    Since 2010 to current day, you continued to be

 8   paid for your work for the Uncle Sam's restaurants?

 9        A.    I'm sorry.  Repeat that?

10        Q.    Was there ever a time that payment was no

11   longer provided to you for your work at Uncle Sam's?

12        A.    No.

13        Q.    Are you currently working?

14        A.    Yes.

15        Q.    Do you continue to get paid?

16        A.    Yes.

17        Q.    You told me that the phone that you have is

18   paid for by Mr. Frimmel's entities; correct?

19        A.    Yes.

20        Q.    How about, do you have a car allowance?

21        A.    No.

22        Q.    Did you have a car allowance at any time?

23        A.    No.

24        Q.    How about, do you get reimbursed for mileage?

25        A.    No.

Norton v. Arpaio                                          Lisa Anne Norton

Page 115

1    STATE OF ARIZONA          )

                               )   ss.

2    COUNTY OF MARICOPA        )

3             BE IT KNOWN that the foregoing deposition was

4    taken before me, Cathy A. Miccolis, RPR, a Certified

5    Reporter, Certificate #50068, for the State of Arizona,

6    and by virtue thereof authorized to administer an oath;

7    that the witness before testifying was duly sworn by me to

8    testify to the whole truth; that the questions propounded

9    to the witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   print by computer-aided transcription under my direction;

12   that pursuant to request, notification was provided that

13   the deposition is available for review and signature; that

14   the transcript consisting of 115 pages is a full, true and

15   accurate transcript of all proceedings and testimony had

16   and adduced upon the taking of said deposition, and

17   preparation, production and distribution of the transcript

18   and copies comply with law and code as required by ACJA

19   7-206(F)(3), all done to the best of my skill and ability.

20            I FURTHER CERTIFY that I am in no way related to

21   nor employed by any of the parties hereto nor am I in any

22   way interested in the outcome hereof.

23   DATED at Phoenix, Arizona, October 2, 2016.

24   _____

     Bamford Reporting Service, Inc.   Cathy A. Miccolis, RPR/CRR

25                                     Certified Reporter #50068