**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lisa Norton, et al., ) | No. CV-15-00087-PHX-SPL |
| ) | |
| Plaintiffs, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| Joseph M. Arpaio, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

Before the Court is Plaintiffs' Motion for Summary Judgment (Docs. 196, 197,[1] 198,[2] 199[3]), Defendant Maricopa County's Opposition (Docs. 200, 202[4]), Defendants Arpaio and Henderson's Opposition (Docs. 201, 203[5]), and Plaintiffs' Reply (Docs. 204, 205[6]). For the reasons stated below, Plaintiffs' motion is denied in its entirety.

**I.    Background**[7]

   **A.  Factual Background**

Plaintiff Bret Frimmel owns and operates Uncle Sam's restaurants through Plaintiff Pishka, Inc. (Doc. 197 ¶¶ 1, 2; Doc. 202 ¶¶ 1, 2; Doc. 203 ¶¶ 1, 2.) At all times relevant to this action, Defendant Arpaio was the Sheriff of Maricopa County, Arizona. (Doc. 197 ¶

---
[1]   Plaintiffs' Statement of Facts.
[2]   Declaration of Bret Frimmel.
[3]   Declaration of Leon Silver.
[4]   Maricopa County's Controverting and Separate Statement of Facts.
[5]   Arpaio and Henderson's Controverting Statement of Facts.
[6]   Plaintiffs' Reply to Defendants' Controverting Statement of Facts.
[7]   The facts that follow are undisputed.

4; Doc. 202 ¶ 4; Doc. 203 ¶ 4.) At all times relevant to this action, Defendant Henderson was a Maricopa County Sheriff's Office ("MCSO") deputy employed by Maricopa County. (Doc. 197 ¶ 7; Doc. 202 ¶ 7; Doc. 203 ¶ 7.) At all times relevant to this action, Henderson was assigned to the MCSO Criminal Employment Unit ("CEU"). (Doc. 197 ¶ 8; Doc. 202 ¶ 8; Doc. 203 ¶ 8.) Henderson was assigned as the lead investigator of the alleged identity theft at the Uncle Sam's restaurants. (Doc. 197 ¶ 13; Doc. 202 ¶ 13; Doc. 203 ¶ 13.) Prior to working on the Uncle Sam's case, Henderson had never drafted a search warrant probable cause statement. (Doc. 197 ¶ 14; Doc. 202 ¶ 14; Doc. 203 ¶ 14.) On July 16, 2013, Henderson applied for and obtained three search warrants for two Uncle Sam's restaurants and Frimmel's personal residence. (Doc. 197 ¶ 18; Doc. 202 ¶ 18; Doc. 203 ¶ 18.) Henderson provided probable cause affidavits to support those applications. (Doc. 197 ¶ 19; Doc. 202 ¶ 19; Doc. 203 ¶ 19.)

On July 17, 2013, Henderson and other MCSO deputies executed the search warrants at two Uncle Sam's restaurants and Frimmel's personal residence. (Doc. 197 ¶ 31; Doc. 202 ¶ 31; Doc. 203 ¶ 31.) Following the raids, they took nine subjects into custody on suspected identity theft and forgery charges. (Doc. 197 ¶ 31; Doc. 202 ¶ 31; Doc. 203 ¶ 31.) Henderson subsequently conducted interviews with four cooperating witnesses. (Doc. 197 ¶ 33; Doc. 202 ¶ 33; Doc. 203 ¶ 33.)

On January 22, 2014,[8] Henderson and other MCSO deputies arrested Frimmel on charges related to trafficking in identify theft, identify theft, conspiracy, and forgery. (Doc. 197 ¶ 47; Doc. 202 ¶ 47; Doc. 203 ¶ 47.) When Frimmel was arrested, Henderson placed Frimmel in handcuffs with his arms behind his back in an unnecessarily rough manner that caused discomfort and injury in Frimmel's right arm and shoulder. (Doc. 197 ¶¶ 48, 52; Doc. 203 ¶¶ 48, 52.) Frimmel did not display any hesitancy to follow Henderson's instructions nor did he resist the arrest. (Doc. 197 ¶ 49; Doc. 203 ¶ 49.) Frimmel told Henderson that the handcuffs were causing him discomfort, were too tight, and asked him

---

[8]   Though Plaintiffs state 2016, and Defendants did not correct it, 2014 is the correct year. (*See* Doc. 199, Ex. X.)

2

to loosen the cuffs. (Doc. 197 ¶ 49; Doc. 203 ¶ 49.) Henderson ignored his complaints. (Doc. 197 ¶ 50; Doc. 203 ¶ 50.) Frimmel was in handcuffs for more than an hour and leaned forward in the police car to try to ease his discomfort. (Doc. 197 ¶¶ 51, 53; Doc. 203 ¶¶ 51, 53.) While he was restrained in the handcuffs, Frimmel's right hand swelled and went numb. (Doc. 197 ¶ 54; Doc. 203 ¶ 54.) Henderson remembers arresting Frimmel but does not remember whether he handcuffed Frimmel or if Frimmel complained of his discomfort. (Doc. 197 ¶¶ 55, 57; Doc. 203 ¶¶ 55, 57.)

On January 22, 2014, MCSO released a press release stating that Frimmel was arrested on charges related to identity theft and forgery. (Doc. 197 ¶ 68; Doc. 203 ¶ 68.) The press release also stated that "detectives have questioned several witnesses who claimed to have first-hand knowledge that Norton and Frimmel colluded together to acquire false identification documents in order to provide those IDs to undocumented workers." (Doc. 197 ¶ 69; Doc. 203 ¶ 69.) Also on January 22, 2014, Arpaio stated in an interview with Channel 10 news that Frimmel "was knowingly hiring employees with fake social security numbers." (Doc. 197 ¶ 71; Doc. 203 ¶ 71.) In another interview that day with Channel 3 news, Arpaio stated that Frimmel "was arrested for providing stolen ID's, mainly social security cards, to his workers." (Doc. 197 ¶ 73; Doc. 203 ¶ 73.)

On February 7, 2014, a grand jury indicted Frimmel based on Henderson's testimony. (Doc. 197 ¶ 78; Doc. 202 ¶ 78; Doc. 203 ¶ 78.) On May 16, 2014, Frimmel filed a motion for a *Franks* hearing in Maricopa County Superior Court. (Doc. 197 ¶ 80; Doc. 202 ¶ 80; Doc. 203 ¶ 80.) On April 15, 2015, the Superior Court found that, based on numerous errors in the affidavits, there was no probable cause to issue the search warrants and voided them. (Doc. 197 ¶¶ 81-83; Doc. 202 ¶¶ 81-83; Doc. 203 ¶¶ 81-83.) On April 23, 2015, all remaining charges against Frimmel were dismissed. (Doc. 197 ¶ 85; Doc. 202 ¶ 85; Doc. 203 ¶ 85.)

**B. Procedural History**

On January 20, 2015, Plaintiffs filed complaints in federal court. (Doc. 1 of 2:15-cv-00087-SPL; Doc. 1 of 2:15-cv-00088-SRB.) On June 5, 2015, those cases were

consolidated under this Case No. 2:15-cv-00087-SPL. On June 19, 2015, Plaintiffs filed a Second Amended Complaint (the "Complaint.") (Doc. 25-1.) On January 19 and 20, 2017, the parties filed motions for full and partial summary judgment. (Docs. 170, 173, 175.) On September 29, 2017, the Court denied those motions with leave to re-file. (Doc. 195.) On October 30, 2017, Plaintiffs filed their renewed motion for summary judgment against Maricopa County, Arpaio, and Henderson. (Doc. 196.) On November 29, 2017, Maricopa County filed its response. (Doc. 200.) Also on November 29, 2017, Arpaio and Henderson filed their response. (Doc. 201.) On December 12, 2017, Plaintiffs filed their reply. (Doc. 204.)

## II. Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant is able to do so, the burden then shifts to the non-movant who "must do more than simply show that there is some metaphysical doubt as to the material facts," and, instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III. Discussion

Plaintiffs moved for summary judgment on the following claims: (1) judicial deception violations pursuant to 42 U.S.C. § 1983 against Defendants Maricopa County,

Arpaio, and Henderson (Claims I, IV, V); (2) defamation against Maricopa County and Arpaio (Claim IX); (3) grossly negligent restraint against Henderson (Claim X); and (4) intentional infliction of emotional distress ("IIED") against Arpaio and Henderson (Claim XI). (Doc. 196.)

### A. 42 U.S.C. § 1983 (Claims I, IV, and V)

#### 1. Judicial Deception/Illegal Search and Seizure/Malicious Prosecution

The Court cannot determine which bases Plaintiffs are relying upon in regard to Claims I, IV, and V.[9] It appears that Plaintiffs attempt to argue judicial deception under Claims IV and V for their labeled "illegal search and seizure claims" and malicious prosecution as to Claim I. However, the separate causes of action under Section 1983, the basis for those separate actions, and their elements are lacking. (*See* Doc. 196 at 8.) These claims are intertwined in Plaintiffs' motion, and the Court cannot determine the appropriate standards and the requisite elements in order to match the appropriate analysis and argument. As such, the Court denies Plaintiffs' request for summary judgment as to Claims I, IV, and V as to Henderson, Arpaio, and Maricopa County. However, the Court will address the narrow issue of whether Arpaio is the final policymaker in the area of criminal law enforcement, which includes the constitutional violations here.

#### 2. Municipal Liability

Plaintiffs argue that Maricopa County is jointly liable for Arpaio's share in liability under *Monell* on its Section 1983 claims. (Doc. 196 at 15.) Plaintiffs argue that Arpaio is the final policymaker of Maricopa County in the context of criminal law enforcement, which would encompass the alleged violations in this action. (Doc. 196 at 15.) Maricopa County argues that Arpaio is the final policymaker for the State and not for Maricopa County. (Doc. 200 at 10.) Because the Court is not determining liability as to Arpaio or Maricopa County in this motion, *see supra*, this analysis is limited to the determination of whether Arpaio is the final policymaker for Maricopa County in the area of criminal law

---

[9]   This was also an issue at the motion to dismiss stage. (*See* Doc. 42, n. 2, 3, 5, 6.)

enforcement, to include the areas of obtaining and executing search and arrest warrants and testifying in grand jury proceedings. Because the Court finds that he is, Maricopa County will be liable for Arpaio's unconstitutional actions committed in his official capacity in that area.

A county is liable only for the actions of "its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Cortez v. Cty. of Los Angeles*, 294 F.3d 1186, 1188-89 (9th Cir. 2002) (citing *Monell v. Dep't of Soc. Servc. Of the City of N.Y.*, 436 U.S. 658, 694 (1978)). "To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority 'concerning the action alleged to have caused the particular constitutional or statutory violation at issue' and (2) was the policymaker for the local governing body for the purposes of the particular act.'" *Cortez*, 294 F.3d at 1188-89 (quoting *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000)). Further, "municipal liability may be premised on a single decision by a municipal official with final policymaking authority, and that whether an official has such authority depends upon state law." *Guillory v. Greenlee Cty.*, No. CV05-352-TUC-DCB, 2006 WL 2816600, at *4 (D. Ariz. Sept. 28, 2006).

"Authority to make municipal policy may be granted directly by a legislative enactment or delegated by an official who possesses such authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). A municipal policy may arise where a government "chooses a course of action tailored to a particular situation" that is "not intended to control decisions in later situations." *Id.* at 481. Thus, the course of action must be "made from among various alternatives by the official…responsible for establishing final policy" on the subject matter in question. *Id.* at 483; *see McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) (stating that the court looks to whether the individual had final policymaking authority "in a particular area, or on a particular issue.").

The Arizona Constitution, Art. XII, grants powers to each county, creates the elected office of sheriff, and explains that the sheriff's "duties, powers, and qualifications" are

prescribed by law. §§ 3, 4. A.R.S. Section 11-401 names the sheriff as an officer of the county. A.R.S. § 11-401(A)(1). A.R.S. Section 11-441 enumerates the sheriff's powers, which includes the power to "[a]rrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." § 11-441(A)(2). "The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest." *Guillory*, 2006 WL 2816600, at *4. A.R.S. § 11-201 states that, "[t]he powers of a county shall be exercised only by the board of supervisors or by agents and officers acting under its authority and authority of law." § 11-201(A). Additionally, under A.R.S. Section 11-444, the local county is in charge of paying the "actual and necessary expenses incurred by the sheriff in pursuit of criminals…." § 11-444(A).

The Court finds that Arpaio, as his duty is fixed by law, is the final policymaker regarding criminal law enforcement. *Guillory*, 2006 WL 2816600, at *4 (holding that "the Sheriff is the designated and final policymaker for the County regarding the needs of its officers for the prompt and orderly administration of criminal justice"). In this case, the relevant area of policymaking is criminal investigation because the constitutional violation was the obtaining of unlawful search and arrest warrants and providing false testimony to grand juries in the Uncle Sam's investigation. This decision was within the purview of the Sheriff under Arizona law—whether to submit search and arrest warrants based on probable cause, to carry them out, and to testify in grand jury proceedings.

Maricopa County's analysis of *Guillory* is unpersuasive. First, the section cited by Maricopa County relates to the court's analysis of that plaintiff's state tort claims—not its analysis of the plaintiff's Section 1983 claims. *Id.*, at *12 (stating that "[u]nlike the federal claim under 42 U.S.C. § 1983, where the Court's determination that the Sheriff was a policymaker for the County subjected the Defendant to liability for his policy decisions, here Plaintiff presents no independent theory of negligence against the County."). Second, Maricopa County's analysis of *respondeat superior* and A.R.S. Section 11-251 is correct.

However, as stated, that analysis relates to the court's rejection of the plaintiff's *respondeat superior* theory for its state tort claim. *Id.*, at * 13 (holding that, because the county had no control over the statutory duties of the sheriff or his officers pursuant to A.R.S. Section 11-441(A)(2), the county could not be held liable under the doctrine of *respondeat superior*). Here, Plaintiffs bring claims against Arpaio individually and in his official capacity, which triggers *Monell* liability. Third, whether officer training is a statutory duty defined by A.R.S. Section 11-441(A) is not important. The *Guillory* court analyzed the alleged inadequate training under *Monell* liability. *Id.*, at *4. The court found that the sheriff *was* the final policymaker of officer training, and, thus, the alleged inadequate training was a policy of the county and, as such, the county was liable. *Id.*, at *5.

As to Maricopa County's analysis of *McMillian*, that too is misplaced. (Doc. 200 at 6-8.) *McMillian* is easily distinguishable—there, the Supreme Court analyzed *Alabama state law*, which did not explicitly designate the sheriff in that county as a county officer. 520 U.S. 781. Here, A.R.S. Section 11-441(A)(1) does designate the sheriff as a county officer, and, under Arizona law, Maricopa County has been found liable under a Section 1983 analysis. *See Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2015 WL 1432674, at *1-3 (D. Ariz. Mar. 27, 2015); *Guillory*, 2006 WL 2816600, at *4; *Flanders v. Maricopa Cty.*, 203 Ariz. 368, 377 (Ct. App. 2002).

Thus, Maricopa County is liable for constitutional violations regarding criminal law enforcement committed by Arpaio in his official capacity as a matter of law.

**B. Defamation (Claim IX)**

**1. Legal Standard**

"One who publishes a false and defamatory communication concerning a private person…is subject to liability, if, but only if, he (a) knows that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Dube v. Likins*, 216 Ariz. 406, 417 (Ct. App. 2007) (citing *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306 (App. 1988)). Truth is a defense. *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341 (1989).

**2. Discussion**

    **a. Arpaio**

Plaintiffs argue that Arpaio, in a 2014 press release, stated that the MCSO "questioned several witnesses who claimed that Mr. Frimmel and Mrs. Norton colluded together to acquire and provide fake ID documents to workers." (Doc. 196 at 15, internal quotations omitted.) Because Arpaio had no evidence supporting the truth of that statement, Plaintiffs argue it was recklessly false. (Doc. 196 at 15.) They also allege that Arpaio stated in a Channel 10 interview that Frimmel and Norton "were knowingly hiring employees with fake social security numbers" and, in a Channel 3 interview, that Frimmel provided stolen IDs to his workers. (Doc. 196 at 15.) Plaintiffs argue that those statements were false and that, if Arpaio had properly looked into the matter, he would have known that his statements were false. (Doc. 196 at 16.)

Arpaio argues that "some of the statements Plaintiffs cite are simply true." (Doc. 201, citing Doc. 197, ¶ 68.) He argues that none of the statements cited by Plaintiffs are demonstrably false, and Plaintiffs offer no evidence to support a finding that Arpaio had reason to doubt the accuracy of the information he was provided. (Doc. 201 at 12.) Arpaio argues that he relied on other people handling the investigations to accurately report information to him. (Doc. 201 at 11-12.)

As to the 2014 press release, it is disputed whether the statement is simply true, whether Arpaio knew the information in the press release was false (if it is), whether he recklessly disregarded the alleged falsity, or negligently failed to determine its accuracy. (Doc. 196 at 15; Doc. 201 at 12.) In Arpaio's deposition, he testified that he "delegated these type[s] of operations, and [he] presume[s his] public information officer is going on what they were told by the people handling the investigation." (Doc. 199, Ex. AA, p. 73.) He also testified that he normally, but not 100 percent of the time, would approve all press releases that contained a quote from him. (Doc. 199, Ex. AA, p. 31.) A reasonable jury could find that it is indeed true that someone in the MCSO "questioned several witnesses" claiming to have knowledge about Norton and Frimmel's alleged misconduct, which lead

to the conspiracy charge. (Doc. 197 ¶¶ 19, 20, 31, 33.) Thus, there is a genuine dispute as to whether the statement is true or whether Arpaio's actions were reckless or negligent, as a reasonable jury could find in his favor. Accordingly, the Court denies summary judgement as to the 2014 press release statement.

Similar to the press release statement, it is disputed whether Arpaio knew the information in the Channel 10 interview was false, whether he recklessly disregarded the alleged falsity, or negligently failed to determine its accuracy. (Doc. 196 at 15; Doc. 201 at 12.) Arpaio testified that he did not recall making the statement in an interview but relies on his subordinates and other people who know about the case to verify the accuracy of statements. (Doc. 199, Ex. AA, p. 74.) He testified that he does not "double check everybody" and did not "do an audit to find out whether [the statement] was true or not. [He] just report[s] the circumstances of the investigation and conclusion." (Doc. 199, Ex. AA, p. 74.) Thus, there is a genuine dispute as to whether Arpaio's actions were reckless or negligent, and a reasonable jury could find in his favor. Accordingly, the Court denies summary judgement as to Arpaio's Channel 10 statement.

As to Arpaio's Channel 3 interview statement, this statement is true as a matter of law. First, to clarify, Arpaio stated that Frimmel "*was arrested for* providing stolen ID's, mainly social security cards, to his workers." (Doc. 197 at 13, ¶ 73; Doc. 198 at 1, ¶ 5.) The statement written in Plaintiffs' motion is incomplete. (Doc. 196 at 15.) As Plaintiffs' Complaint and Statement of Facts reflect, Frimmel was indeed arrested for knowingly taking the identity of another, knowingly trafficking the identity of another, forgery, and conspiracy to take the identity of another. (Doc. 25-1 ¶ 87; Doc. 197 ¶ 47, citing Doc. 199, Ex. X.) Those charges were based on the social security cards of Frimmel's employees. Further, the 2014 press release details the precise basis for this statement, which Plaintiffs' do not argue to be false or defamation. (Doc. 199, Ex. ZZ.) The press release states that the owner of Uncle Sam's restaurants was taken into custody and "arrested for trafficking stolen IDs" and that the operation involved "hiring of several individuals utilizing false identification documents to gain and maintain employment at the eating establishments."

(Doc. 199, Ex. ZZ.) No rational jury could conclude that the statement was false. Thus, the Court finds, as a matter of law, that Arpaio's statement to Channel 3 is true and denies summary judgment as to this statement.

### b. Maricopa County

Maricopa County argues that all state law claims, including the defamation claim, against Maricopa County have been dismissed by this Court. (Doc. 200 at 4-5, citing Doc. 42 at 10-11.) Accordingly, Maricopa County argues that the defamation claim (Claim IX) against it must be dismissed. Plaintiffs argue that they are not alleging a state law claim. (Doc. 196 at 16.) Rather, they argue that, although they did not label their claim as "defamation-plus" under Section 1983 in their Complaint, that fact does not matter because they pleaded defamation in their Complaint based on indictments and arrests for which there was no probable cause. (Doc. 196 at 16.) Thus, since Plaintiffs pled and proved defamation against Arpaio, and because Maricopa County ignored this argument in their response, Maricopa County is liable under *Monell* for a Section 1983 defamation-plus claim. (Doc. 196 at 16.)

Although Plaintiffs name Maricopa County as a party liable under their "Defamation (Arizona Law)" claim in their Complaint, (Doc. 25-1 at 37, ¶ 306), there is no separate claim pled under Section 1983 for "defamation-plus" against Maricopa County. Plaintiffs cite to *Herb Hallman Chevrolet, Inc. v. Nash-Holmes*, 169 F.3d 636, 645 (9th Cir. 1999) for the proposition that they do not need to "label" their federal defamation-plus claim in their Complaint as long as they pled the appropriate elements. They are wrong. The plaintiff in that case *pled* a defamation claim under a Section 1983 theory—it was cognizable. *Id.* Nothing in the record here suggests that Plaintiffs have ever attempted to put forth such a claim, and, in any event, they did not adequately plead it. *Id.* (stating that a plaintiff must "(1) allege that the injury to reputation was inflicted in connection with a federally protected right or (2) the injury to reputation caused the denial of a federally protected right"). It is true that a defamation-plus claim might share facts with other Section 1983 claims or a defamation claim. But, a plaintiff cannot first allege a Section 1983

defamation-plus claim at summary judgment based on the facts that properly allege other claims in the Complaint, *i.e.,* Section 1983 malicious prosecution, illegal search and seizure, and a state law defamation claim.[10]

It is simply not appropriate at this stage to allege new claims that have not been properly pled. Instead, it seems as though Plaintiffs are alleging a federal claim of defamation-plus *now* because this Court dismissed their state law defamation claim in 2015. (*See* Doc. 42 at 11.) Accordingly, the Court denies summary judgment and dismisses the defamation-plus claim against Maricopa County.

### C. Grossly Negligent Restraint (Claim X)

#### 1. Legal Standard

Under Arizona law, gross negligence "is action or inaction with reckless indifference to the result or the rights or safety of others. A person is recklessly indifferent if he or she knows, or a reasonable person in his or her position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probably that harm will result." *Wilson v. Maricopa Cty.*, 463 F. Supp. 2d 987, 999 (D. Ariz. 2006) (quoting *Armenta v. City of Casa Grande*, 205 Ariz. 367 (Ariz. Ct. App. 2003)).

#### 2. Discussion

Plaintiffs argue Henderson was grossly negligent in restraining Frimmel in handcuffs. Plaintiffs allege that: (1) Henderson placed Frimmel in handcuffs, which caused him substantial discomfort in his right arm and shoulder; (2) Frimmel complained of his pain to Henderson; (3) Henderson ignored his complaints; and (4) Frimmel suffered an injury caused by the handcuffing. (Doc. 196 at 18.) Plaintiffs also argue that Henderson is liable under Section 1983. (Doc. 196 at 17.) Once again, Plaintiffs have never alleged this. Thus, the Court only addresses the properly pled claim of gross negligence under state law and dismisses any claim of excessive force under Section 1983.

---

[10] This is even more problematic where Plaintiffs' "clearly labeled" Section 1983 claims are already difficult to identify.

Henderson argues that handcuffing arrestees is standard policy. (Doc. 201 at 14.) He argues that Plaintiffs do not specify where Frimmel was hurt and that "nothing about Frimmel's handcuffing would have alerted the officer to peril or a probable injury." (Doc. 201 at 14.) He argues that Frimmel only alleges that he was experiencing "substantial discomfort" and that he "calmly and timely complained." (Doc. 201 at 14.)

Based on the facts before the Court, a reasonable jury could find that Henderson or someone in his position should not have known that his action or inaction would create an *unreasonable* risk to Frimmel. (*See* Doc. 199, Ex. E.) The evidence presented simply does not show the level of gross negligence necessary at the summary judgment stage. It is for the jury to decide if Frimmel's ignored but "calm and timely" complaints, and then his injury while in the handcuffs for over an hour, was unreasonable to Henderson or a reasonable person in his position. Even if finding an *unreasonable* risk, a reasonable jury could also find that the risk was not *so great* as to result in a high probability of harm to Frimmel. A reasonable jury could find that even though Frimmel alerted Henderson to "significant discomfort" because his handcuffs were too tight, and then Henderson ignored him, that his "significant discomfort" was not so great as to result in a *high probability* of harm. The probability of the risk is an issue for the jury. Thus, the Court denies summary judgment as to Plaintiffs' Claim X for grossly negligent restraint.

### D. IIED Claims (Claim XI)

#### 1. Legal Standard

To recover on an IIED claim in Arizona, a plaintiff must prove that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that distress would result from the conduct; (3) the conduct caused the plaintiff to suffer emotional distress; and (4) the emotional distress was severe. *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516 (2005) (citing *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987)); *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 76, 79 (1986).

### 2. Discussion

Plaintiffs argue that Henderson and Arpaio engaged in misconduct that was nearly certain to result in emotional distress. (Doc. 196 at 19.) They argue it is undisputed that (1) Henderson lied in his search warrant affidavits and charging summary; (2) that he pursued criminal charges without probable cause; and (3) that he either intended or recklessly disregarded the risk that this would cause substantial emotional distress. (Doc. 196 at 18.) Because Arpaio tolerated, if not encouraged, Henderson's misconduct, Arpaio is also liable. (Doc. 196 at 19.) Arpaio and Henderson argue that Plaintiffs do not and cannot demonstrate that Henderson and Arpaio engaged in the necessary extreme and outrageous conduct that an IIED claim requires. (Doc. 201 at 15.)

Plaintiffs' uncontroverted evidence is, however, controverted. Whether Arpaio tolerated or encouraged Henderson's misconduct is disputed (*see* Doc. 203, Ex. 3), as is whether Henderson lied or intended or recklessly disregarded the risk that allegedly caused Frimmel's emotional distress (*see* Doc. 203, Ex. 1). Indeed, Henderson stated in his deposition that he reported the basis for his search warrants and that the search warrants were carried out. (Doc. 199, Ex. E.) Henderson also testified that he believed his warrants were based on probable cause and that the Superior Court was wrong in its decision to void them. (Doc. 199, Ex. E, p. 78; Doc. 208, Ex. E, p. 68.) This Court has already denied summary judgment as to Counts I, IV, and V, which are counts encompassing the alleged liability that caused the distress. Simply put, Plaintiffs have not sufficiently stated that either Arpaio's or Henderson's actions were so *extreme* and *outrageous* that either of them intended or recklessly disregarded the near certainty of the resultant distress or that their conduct *actually* caused *severe* emotional distress. Plaintiffs do not address the necessary "severe" element—substantial may not be enough. (*See* Doc. 196 at 18.) Thus, a reasonable jury could find in Arpaio and Henderson's favor. Accordingly, the Court denies summary judgment as to Claim XI against Henderson and Arpaio.

**IV.     Conclusion**

For the reasons stated above, Plaintiffs' motion for summary judgment is denied as to Claims I, IV, V, IX, X, and XI.

Accordingly,

**IT IS ORDERED:**

1. That Plaintiff's Motion for Summary Judgment (Doc. 196) is **denied in its entirety** as set forth in this order.

Dated this 25th day of September, 2018.

Honorable Steven P. Logan
United States District Judge