IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Lisa Norton, et al., | ) | No. CV-15-00087-PHX-SPL |
| | ) | |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Joseph M. Arpaio, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court is Defendants Penzone, Arpaio, Henderson, Jones, Hegstrom, Gandara, Locksa, and Hechavarrias' (together, the "Defendants") Partial Motion for Summary Judgment (Docs. 215, 213[1]), Plaintiffs' Response (Docs. 218, 219[2]), and Defendants' Reply (Doc. 220). For the reasons stated below, Defendants' motion is denied in part and granted in part.[3]

**I. Background[4]**

This case involves the investigation and ultimate arrest and prosecution of Bret Frimmel ("Frimmel"), owner of the Uncle Sam's restaurants ("Uncle Sam's"), and his manager, Lisa Norton ("Norton"), by the Maricopa County Sheriff's Office's ("MCSO").

---

[1] Defendants' Statement of Facts.

[2] Plaintiffs' Supplemental Separate Statement of Facts and Controverting Facts.

[3] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

[4] The facts that follow are undisputed.

(Doc. 213 ¶ 2.) Detective Joshua Henderson ("Henderson") led the investigation that resulted in the arrests and prosecution of Frimmel and Norton for various felonies, including Trafficking in the Identity of Another, Conspiracy to Commit Taking the Identity of Another, Taking the Identity of Another, and Forgery. (Doc. 213 ¶ 3.) A Grand Jury ultimately indicted Frimmel and Norton. (Doc. 213 ¶ 4.) Both Frimmel and Nortons' criminal cases were dismissed without prejudice in 2015, and Plaintiffs subsequently filed this lawsuit. (Doc. 213 ¶ 5.)

**A. The Investigation**

On August 2, 2012, Henderson received a tip from a former Uncle Sam's employee alleging that employees were using other people's identities to gain and continue employment. (Doc. 213 ¶ 6.) Upon investigating Uncle Sam's employment records, Henderson discovered over fifty discrepancies regarding employees' names and social security numbers. (Doc. 213 ¶¶ 7, 16.) Henderson then obtained search warrants for the two Uncle Sam's restaurants, located in Phoenix and Scottsdale, and Frimmel's residence. (Doc. 213 ¶ 8.) As a result of the investigation, MCSO arrested nine Uncle Sam's employees. (Doc. 213 ¶ 9.) A Grand Jury ultimately indicted four employees. (Doc. 213 ¶ 10.) The indicted employees agreed to participate in "free talks" with Henderson. (Doc. 213 ¶ 11.) Deputy County Attorney Jamie Oliver ("Oliver") was present at the free talks. (Doc. 213 ¶ 12).

On January 22, 2014, MCSO arrested Frimmel and Norton.[5] (Doc. 213 ¶ 15.) On the same day, MCSO executed search warrants for Norton's cell phone records and the data contained on both Frimmel's and Norton's cell phones. (Doc. 213 ¶ 26.) MCSO also issued a press release covering the investigation and arrests. (Doc. 213 ¶ 31.) On February 4, 2014, MCSO obtained a search warrant for Frimmel's cell phone records. (Doc. 213 ¶ 27.) Deputy Sergeants Daniel Gandara ("Gandara"), Christopher Hechavarria

---

[5]     At the time of his arrest, Frimmel complained that Henderson, the arresting officer, applied the handcuffs in a grossly negligent way that caused him discomfort. (Doc. 213 ¶¶ 62, 64.)

("Hechavarria"), and Sean Locksa ("Locksa") drafted and signed the probable cause statements for the search warrants of Frimmel and Norton's cell phones and records. (Doc. 213 ¶ 45.) Gandara, Hechavarria, and Locksa did not investigate Frimmel or Norton and relied on the information provided to them by Henderson, the case agent, in drafting their probable cause statements. (Doc. 213 ¶¶ 44, 47.)

On February 7, 2014, a Grand Jury indicted Frimmel for Trafficking in the Identity of Another, Conspiracy to Commit Taking the Identity of Another, Taking the Identity of Another, and Forgery. (Doc. 213 ¶ 28.) Norton was also indicted for Conspiracy to Commit Taking the Identity of Another and Taking the Identity of Another. (Doc. 213 ¶ 29.) Oliver conducted the Grand Jury, where Henderson testified and was the only witness. (Doc. 213 ¶¶ 30, 31.)

### B. Criminal Cases

On January 15, 2015, the criminal court dismissed the "Taking the Identity of Another" charges without prejudice against both Norton and Frimmel. (Doc. 213 ¶ 33.) There were no other charges pending against Norton. (Doc. 213 ¶ 33.) On March 6, 2015, the criminal court conducted a *Franks* hearing in Frimmel's case. (Doc. 213 ¶ 34.) On April 15, 2015, the criminal court found that there was no probable cause to support the search warrants as amended. (Doc. 213 ¶ 35.) The court reached this conclusion after determining that information was unreasonably and recklessly included in or excluded from the warrants. (Doc. 213 ¶ 36.) On April 23, 2015, the remaining charges were dropped against Frimmel. (Doc. 213 ¶ 37.)

### C. Current Case

On January 20, 2015, Frimmel and Norton each filed a Complaint. (Doc. 213 ¶ 39.) On June 12, 2015, the two matters were consolidated, and Plaintiffs filed a joint Second Amended Complaint. (Doc. 213 ¶ 40.) In their Second Amended Complaint, Plaintiffs allege various 42 U.S.C. § 1983 claims and related state law claims. (Doc. 213 ¶ 41.)

## II.  Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant is able to do so, the burden then shifts to the non-movant who "must do more than simply show that there is some metaphysical doubt as to the material facts," and, instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III.  Discussion

Defendants moved for summary judgment, based on qualified immunity, as to Plaintiffs' Section 1983 Claim I (malicious prosecution and arrest theories), Claim IV (Fourth Amendment Search and Seizure re cell phones), and Claim V (Fourth Amendment Search and Seizure re Frimmel residence) against various defendants.[6] (Doc. 213, Ex. 1; Doc. 215.) Defendants also moved for summary judgment on the following state law claims: (1) malicious prosecution against Arpaio, Henderson, Gandara, Locksa, and Hechavarria (Claim II); (2) abuse of process against Arpaio and Henderson (Claim III); (3) defamation against Arpaio, Henderson, Jones, and Hegstrom (Claim IX); (4) grossly

---

[6]     On Claim I, Defendants move for summary judgment as to Arpaio, Henderson, Gandara, Locksa, and Hechavarria. On Claims IV and V, Defendants move for summary judgment as to Arpaio, Gandara, Hechavarria, and Locksa. (Doc. 215 at 6 n.7.)

negligent restraint against Henderson (Claim X); (5) intentional infliction of emotional distress ("IIED") against Arpaio and Henderson (Claim XI); and (6) grossly negligent supervision against Arpaio (Claim XII). (Doc. 213, Ex. 1; Doc. 215.) Defendants also move to dismiss Plaintiffs' state law claims, pursuant to A.R.S. Section 12-821.01, for failure to comply with the Notice of Claim statute. (Doc. 215 at 21-22.)

### A. Qualified Immunity

"The court applies a two-prong analysis to determine whether officials are entitled to qualified immunity: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) if so, whether that right was clearly established at the time of the event." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011)). These two questions may be considered in either order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "The linchpin of qualified immunity is the reasonableness of the official's conduct." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)) (stating that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the *objective legal reasonableness* of the action, assessed in light of the legal rules that were clearly established at the time it was taken"). Here, Defendants seek summary judgment, based on qualified immunity, as to all of Plaintiffs' federal claims: Claims I, IV, and V.

### 1. False Arrest (Claim I)[7]

It is well established that "an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." *Rosenbaum*, 663 F.3d at

---

[7]      Defendants argue that Plaintiffs concede in their response that there is not sufficient evidence to support a claim for false arrest against Defendants Gandara, Hechavarria, or Locksa. However, the Court finds that Plaintiffs only concede that there is not sufficient evidence to support a claim for malicious prosecution against those Defendants. (*See* Doc. 218 at 14-15.) In any event, Plaintiffs do not analyze a false arrest claim as to Gandara, Hechavarria, or Locksa. Therefore, the Court grants summary judgment on Claim I for a false arrest claim as to Gandara, Hechavarria, and Locksa.

1076 (quoting *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988)). Qualified immunity for a claim of false arrest requires the Court to look at the facts the officer knew at the time of the arrest to determine if he (1) had probable cause for the arrest and (2) whether it is *reasonably arguable* that there was probable cause to arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity. *Id.* (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)); *see Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 964-65 (9th Cir. 2001).

An arrest is supported by probable cause if, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010). The crime need not be the crime ultimately charged nor contemplated at the time of arrest. *See Rosenbaum*, 663 F.3d at 1076; *Davenpeck v. Alford*, 543 U.S. 146, 153-55 (2004) (rejecting the "closely related offense" rule); *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006); *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091, 1124 (D. Ariz. 2013) (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1230 n.19 (9th Cir. 2009)). Moreover, an officer can make an arrest without probable cause, and he will be entitled to qualified immunity so long as he reasonably believed he had probable cause. *Rosenbaum*, 663 F.3d at 1076.

### a. Probable Cause

"An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." *Rosenbaum*, 663 F.3d at 1076 (citing *Crowe v. Cty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 905, 907 (2011)). Here, Defendants argue that Henderson had probable cause, at the time of arrest, to believe Norton and Frimmel committed Conspiracy to Commit Taking the Identity of Another, a violation of A.R.S. Sections 13-2008 and 1003, and, as against Frimmel, for Obstructing a Criminal Investigation by Misrepresentation, a violation of

A.R.S. Section 13-2409.[8]  (Doc. 215 at 7.) Because the Court finds that Henderson had probable cause to arrest Norton and Frimmel for taking the identities of others, the Court need not address whether there was also probable cause for conspiracy to take identities or obstruction of justice.

At the time of the arrests, the taking of identity statute prohibited a person from knowingly taking, purchasing, manufacturing, recording, possessing or using another's identity without their consent for any unlawful purpose or with the intent to obtain or continue employment. A.R.S. § 13-2008(A) (2008). A review of the free talks' transcripts, as referenced by Defendants and discussed below, satisfies the Court that Henderson, at the time of arrest on January 22, 2014, had probable cause to arrest Plaintiffs for taking the identities of another person. Here, Henderson could conclude that there was a "fair probability" that Frimmel and Norton, the owner and manager of Uncle Sam's, respectively, were hiring employees, knew employees were undocumented, sought out undocumented workers to work at Uncle Sam's, and used that information to hire and employ undocumented workers. *See* A.R.S. § 13-2008 (2008).

Specifically, one of the indicted employees who participated in the free talks, Victor Vargas, stated that "everyone" at the restaurant knew about the lack of papers (Doc. 213, Ex. 5 at MELC629421-23), that Norton would make fun of employees' illegal statuses (Doc. 213, Ex. 5 at MELC629424-2; MELC629435-37), and that Frimmel and Norton would treat the "illegals" badly because "they knew that [the illegals] were going to put up with all that because [they] wouldn't be able to find a job anywhere else" (Doc. 213, Ex. 5 at MELC629435; MELC629444-47). Vargas stated that a friend told him "there was no problem" with him getting a job at Uncle Sam's even though he did not have "work papers" because "[Frimmel] knew how to do it so [he] could get a job there." (Doc. 213, Ex. 5 at

---

[8]     The Court rejects Plaintiffs argument that Defendants may not offer these crimes as grounds for reviewing probable cause. In any event, Plaintiffs were charged with taking the identities of others at the time of their arrests and were ultimately charged by the Grand Jury for both taking the identities of others and for conspiring to commit taking identities.

MELC629430-31.) Vargas explained that, upon meeting Frimmel, Vargas told him he did not have "papers," and Frimmel said he could bring them within three days, which he did, and Frimmel accepted them. (Doc. 213, Ex. 5 at MELC629431-32.) Vargas also said that Frimmel and Norton were looking to hire five employees, and that Norton told the cooks to "tell [their] friends [that,] even though [Frimmel and Norton] knew they didn't have papers, they could work there." (Doc. 213, Ex. 5 at MELC629432.)

Similarly, another indicted employee in the free talks, Fernando Abundez Gonzalez, stated that he also did not present identification at the time of hire, but was told three days into the job that he needed to provide identification "however [he] could." (Doc. 213, Ex. 5 at MELC629456-57, 73.) Though he said "Lalo" was the employee who gave him an application and told him about needing to get a social security card, Gonzalez said that Frimmel was close by at the time of hire. (Doc. 213, Ex. 5 at MELC629456-57.) He said that "Lalo" went to Frimmel and told him that Gonzalez wanted to work at Uncle Sam's, and Frimmel said, "Okay. Um, tell him tomorrow." (Doc. 213, Ex. 5 at MELC629456-57.) He also stated that, once a new food handler's permit law went into effect requiring holders to get a license, Gonzalez asked Norton would what happen to [the undocumented workers] (because they did not have licenses), and she said, "Whatever. There's no problem." (Doc. 213, Ex. 5 at MELC629459-60, 63.) Gonzalez stated that Frimmel and Norton mentioned his immigration status "many times," and he believed Frimmel actually knew about the undocumented statuses because Frimmel "began treat[ing them] very badly." (Doc. 213, Ex. 5 at MELC629464.) He stated Frimmel would call them illegals. (Doc. 213, Ex. 5 at MELC629465.) He also stated that when Frimmel got married, "it seemed like he left … Norton in charge" and that Norton was "[Frimmel's] right hand." (Doc. 213, Ex. 5 at MELC629465-66, 76.) Specifically, he said that Norton flipped him off and laughed when sheriffs would come into the restaurant, and he would ask her why she did not tell the sheriffs that the workers were illegals. (Doc. 213, Ex. 5 at MELC629466-67, 75-76.) He also stated that, for approximately fifty potential applicants, he told Norton that those applicants did not have papers, and she would say "whatever," and they would be hired.

(Doc. 213, Ex. 5 at MELC629469-71.) He stated that Frimmel was also present for some of those encounters. (Doc. 213, Ex. 5 at MELC629471.) He stated that both Frimmel and Norton would specifically ask him to recruit undocumented workers. (Doc. 213, Ex. 5 at MELC629483-86.)

Likewise, a third indicted employee in the free talks, Valentin Villanueva Fernandez, told Henderson that Norton called the undocumented workers "stinky, smelly, illegals" and would otherwise make fun of their undocumented status. (Doc. 213, Ex. 7 at 7, 15.) He also said Frimmel and Norton would tell employees to bring friends to come work at Uncle Sam's, knowing they were undocumented, because "they're the people who work the most and – and [Uncle Sam's can] pay them less." (Doc. 213, Ex. 7 at 9-10, 16.) He also stated that Frimmel and Norton knew he could not get a food handler's card because he was undocumented and could not provide a license to receive one. (Doc. 213, Ex. 7 at 12-13, 19-21.) Finally, Emigdio Gonzalez, the fourth indicted employee in the free talks, stated that he was "pretty sure [Frimmel and Norton] did" know he was undocumented, and "[y]ou know, if they didn't ask me, I wouldn't say nothin.'" (Doc. 213, Ex. 8 at Transcript 36-37.) He stated that he did not want to speak with Frimmel about his legal status (or anyone else's) for fear of being fired. (Doc. 213, Ex. 8 at Transcript 44.)

Based on these free talk interviews, Henderson could reasonably conclude that Plaintiffs were in violation of A.R.S. Section 13-2008 (2008). All four employees told Henderson outright that they believed both Frimmel and Norton knew employees were undocumented and three of the employees stated that Frimmel and Norton would tell employees to bring undocumented individuals to come work at Uncle Sam's. It is reasonable to conclude on the facts here that Frimmel, Uncle Sam's owner, and Norton, its manager, had authority to hire employees, were involved in hiring applicants, knew employees were undocumented, were recruiting undocumented workers, and allowing such workers to continue working knowing they possessed false documentation. Though there is evidence that Frimmel and Norton were not physically present at the time each indicted worker was hired, there is evidence that they both were approving and involved in

9

the hiring process, if not physically present. Further, though Frimmel and Norton were not said to have affirmatively told the indicted workers themselves to bring fraudulent papers as identification, it can be inferred that other workers who were ultimately hired did possess fraudulent identification because Frimmel and Norton sought to hire undocumented workers. This is even more so where the "culture" appears rampant with knowledge that both Frimmel and Norton were aware of their current workers' undocumented statutes. Moreover, though employee Emigdio Gonzalez said he did not want to speak with Frimmel about his legal status (or anyone else's), that hesitation does not negate that he also told Henderson he was "pretty sure" Frimmel and Norton knew he has undocumented. This is further supported by the other employees' statements about their belief of the knowledge Frimmel and Norton possessed regarding the employees' statuses.

Thus, Henderson had probable cause to arrest Frimmel and Norton for a violation of A.R.S. Section 13-2008 (2008). Plaintiffs do not raise a genuine issue of material fact here nor do they analyze probable cause at all for that matter. Their analysis focuses on the materiality and alleged deficiencies in Henderson's charging summary and other related materials. (Doc. 218 at 4.) However, it is not germane to this probable cause determination that Henderson may have affirmatively or materially mischaracterized key evidence in that summary, which was drafted *after* he made the arrests, or in whatever other materials Plaintiffs might be referring to in their motion. Again, the analysis is simply whether the information Henderson knew at the time of the arrests could lead a prudent person to believe the suspects had committed a crime. Plaintiffs simply do not refute that Henderson knew the facts revealed in the free talks and that those facts could, indeed, lead a reasonable officer to believe he had probable cause to arrest Frimmel and Norton for violating A.R.S. Section 13-2008 (2008).[9]

---

[9]     Further, Plaintiffs have not alleged nor shown that the reliability, basis of knowledge, and veracity of the information provided by the employees was insufficient. *See United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 214 (1983)). Indeed, the indicted employees were represented by counsel at the free talks, worked at Uncle Sam's for many years, and otherwise appeared to be reliable.

Therefore, under the totality of the circumstances and construing the facts in the light most favorable to Plaintiffs, no reasonable jury could determine that there was not at least a "fair probability" that both Frimmel and Norton had committed a crime at the time of their arrests. *Luchtel*, 623 F.3d at 979. Because Henderson did not violate Plaintiffs' rights, the Court need not consider the second factor of the qualified immunity analysis. *Peebles v. Yamhill Cty.*, 26 F. App'x 643, 645 (9th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)) (holding that if no constitutional right is violated, "there is no necessity for further inquiries concerning qualified immunity"). Accordingly, the Court grants summary judgment on Claim I for false arrest as to Defendants Arpaio, Henderson, Hechavarria, Gandara, and Locksa. *See Arntsen v. Clark*, 357 F. App'x 98, 99 (9th Cir. 2009) (stating that a finding of probable cause defeats a claim of false arrest).

### 2. Malicious Prosecution (Claim I)

Because the Court has found probable cause to arrest, it need not address a malicious prosecution claim. The claim fails because a finding of probable cause is a complete defense to a malicious prosecution claim. *Peebles*, 26 F. App'x at 644; *Mosqueda v. Cty. of Los Angeles*, 171 F. App'x 16, 17 (9th Cir. 2006). Plaintiffs concede in their Response that there is not sufficient evidence to support a claim for malicious prosecution against Defendants Gandara, Hechavarria, or Locksa. (Doc. 218 at 14-15.) In any event, the Court grants summary judgment on Claim I for malicious prosecution as to Defendants Arpaio, Henderson, Hechavarria, Gandara, and Locksa.

### 3. Illegal Search and Seizure (Claims IV & V)

#### a. Legal Standard

The Fourth Amendment establishes the right against unreasonable searches and seizures. U.S. Const. amend. IV. It mandates issuance of warrants with "probable cause,

---

Moreover, as to a "beneficial" argument, it appears that MCSO was apparently not involved in the granting or denying of the employees' benefit applications, and no decision had been made at the time the affidavits for the cell phone search warrants were written (which was after the free talks). (*See* Doc. 199-1 at 299.)

supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Morse v. Cty. of Merced*, No. 116CV00142DADSKO, 2017 WL 2958733, at *13 (E.D. Cal. July 11, 2017) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

"Section 1983 liability extends to those who perform functions 'integral' to an unlawful search, even if their individual actions do not themselves rise to the level of a constitutional violation." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1089-90 (9th Cir. 2011) (citing *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004)). In other words, an officer must have "some fundamental involvement in the conduct that allegedly caused the violation" and, thus, cannot be held liable if he is a mere bystander. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

### b. Discussion[10]

Defendants argue that Hechavarria, Gandara, and Locksa are entitled to summary judgment because they were not involved in the investigation nor present in either the search or seizure and, thus, were not integral participants. (Doc. 215 at 14.) Rather, they argue that they were simply asked by a Criminal Employment Unit supervisor to assist in filling out "search warrant documents to obtain cellular telephone records." (Doc. 215 at

---

[10]    Plaintiffs appear to concede that Gandara, Hechavarria, and Locksa are not liable on Claim V for illegal search and seizure of Frimmel's residence. (*See* Doc. 218 at 7-8.) Accordingly, the Court will grant summary judgment in favor of Defendants on Claim V for Gandara, Hechavarria, and Locksa.

14.) In other words, they argue they were "scribes" filling out search warrants based on information provided to them by Henderson, the case agent, (and, in one instance, another detective). (Doc. 215 at 15.) Moreover, they argue that it is commonplace for officers to rely on each other for information supporting probable cause and that doing so here, *i.e.*, filling out and attesting to a finding of probable cause based on another officer's provided information, is nonetheless reasonable. (Doc. 215 at 15; Doc. 220 at 5-6.)

Plaintiffs argue that Gandara, Hechavarria, and Locksa were integral participants in the alleged illegal search and seizure of the cell phones because they each signed a cell phone probable cause affidavit in support of a search warrant. (Doc. 218 at 7.) They argue that the act of signing and attesting to the probable cause affidavit was necessarily "integral to the searches that subsequently were conducted under the authority of those warrants." (Doc. 218 at 7.) They argue that the affidavits contain material defects and that the three officers had a duty to make sure their affidavits contained true and complete information. (Doc. 218 at 7-8.) Particularly, they argue that Defendant Hechavarria must answer for his own unfounded statement regarding drug activity and all three Defendants must answer for their decision to omit the fact that the cooperating witnesses were provided the right to remain and work in the United States. (Doc. 218 at 8.)

The Court finds that Defendants Hechavarria, Gandara, and Locksa were "integral participants" in the alleged illegal search and seizure because they were the officers who drafted, submitted, and obtained the search warrants at issue. It is of no consequence that they were not physically present at the time of the search and seizure nor participated in its execution. The three Defendants necessarily reviewed the information given to them by Defendant Henderson, or should have, and were aware of their affidavits' contents, or should have been. In other words, a reasonable jury could find that their acts were sufficient to establish their fundamental involvement that ultimately lead to the alleged illegal search and seizure. Therefore, they may be held liable for the alleged constitutional violation here.

However, Defendants argue that, even if the Court finds that Hechavarria, Gandara, and Locksa were integral participants, they are entitled to qualified immunity because their

actions of relying on Henderson's probable cause affidavit was reasonable. It is well established that a well-trained officer should not seek a warrant when he knows or should have known his affidavit failed to establish probable cause. *See Malley v. Briggs*, 475 U.S. 335, 3456 (1986) (holding that an officer applying for a warrant must first exercise reasonable professional judgment in determining whether his affidavit established probable cause). However, it appears it is not well established whether it is unreasonable for an officer to rely on another officer's information when determining probable cause. It also appears that Plaintiffs allege that Defendants Hechavarria, Gandara, and Locksa either included or omitted material information in their affidavits that did not come from Henderson. (*See* Doc. 218 at 8; Doc. 219 ¶¶ 1-3.) Defendants do not address this argument in their reply. Rather, they argue that Plaintiffs have not pointed to clearly established law showing that it is unreasonable for officers to rely on their case agent for information supporting probable cause. (*See* Doc. 220 at 5.) Therefore, there is a genuine issue of fact as to whether Hechavarria, Gandara, and Locksa reasonably exercised proper judgment when drafting and submitting their probable cause affidavits, at least as to the information not provided to them by Henderson. Accordingly, the Court denies summary judgment on Claim IV for illegal search and seizure of the cell phones as to Defendants Hechavarria, Gandara, and Locksa. Of course, Defendants are free to raise the issue of qualified immunity again at trial.

### 4. Arpaio's Liability[11]

The only claims left that could affect Arpaio's liability are those for illegal search and seizure (Claims IV and V). This Court discussed the uncontroverted evidence relevant to these claims in its prior Order (*see* Doc. 231 at 4-5), which Defendants also discuss in this motion (*see* Doc. 215 at 12). Construing the facts in the light most favorable to

---

[11] The Court finds, and Plaintiffs have not argued to the contrary, that Plaintiffs are not bringing a failure to train claim. (Doc. 215 at 12-13.) Instead, the "failure to train" facts in Plaintiffs' response appears to be provided as additional support to find Arpaio individually liable for Section 1983 claims. (Doc. 218 at 6.) As such, the Court will not address any failure to train claim.

Plaintiffs, a reasonable jury could find that Arpaio was personally involved or should have known about and stopped the alleged illegal search and seizures. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). It is undisputed that Arpaio was briefed on the Uncle Sam's case during the investigation, was told about the plans to arrest Frimmel and Norton, and physically attended one of the raids and met with his deputies to discuss the investigations, the search warrants, and to give approvals for arrests. (*See* Doc. 231 at 4-5; Doc. 215 at 12; Doc. 218 at 6.) Though it appears that Plaintiffs did not dispute that Arpaio was "not involved in the budgeting, decision of whom to investigate, the authoring, presentation, or validation of the search warrants or the execution of them" (*see* Doc. 213 ¶ 65), they have pointed to evidence to raise a genuine issue of material fact as to what exactly Arpaio knew and was involved in during the relevant times. Moreover, Defendants own facts also raise an issue. (*See* Doc. 213 ¶ 43; Doc. 231 at 4-5.) Accordingly, the Court denies summary judgment on Claims IV and V for illegal search and seizure as to Arpaio.

### B. Qualified Immunity on State Law Claims

Arizona generally grants public officials either absolute or qualified immunity for "acts reasonably within the employee's discretionary authority." *Chamberlain v. Mathis*, 151 Ariz. 551, 555 (1986). "Qualified immunity protects government officials from liability for acts within the scope of their public duties unless the official knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights." *Id.* at 588.

### 1. Malicious Prosecution (Claim II)

Defendants argue that all Defendants are entitled to summary judgment for their malicious prosecution claim because there was probable cause for Plaintiffs' prosecutions. (Doc. 215 at 16.) Plaintiffs did not address this argument in their response. Therefore, the Court will grant summary judgment for Henderson, Arpaio, Hechavarria, Gandara, and Locksa as to Plaintiffs' state law claim for malicious prosecution.

### 2. Abuse of Process (Claim III)

Defendants argue that Henderson and Arpaio are entitled to summary judgment on the abuse of process claim because there is no evidence Defendants misused the criminal justice system to achieve an improper purpose. (Doc. 215 at 17.) Indeed, they argue that Arpaio testified to having no knowledge that Plaintiffs were allegedly cooperating with the Department of Justice. (Doc. 215 at 17.) Plaintiffs did not address this argument in their response. Therefore, the Court will grant summary judgment for Henderson and Arpaio as to Plaintiffs' state law claim for abuse of process.

### 3. Defamation (Claim IX)[12]

#### a. Legal Standard

"[I]n a defamation case [in Arizona], qualified immunity will protect a public official if the facts establish that a reasonable person, with the information available to the official, could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which justified the privilege." *Pinal Cty. v. Cooper ex rel. Cty. of Maricopa*, 238 Ariz. 346, 350 (Ct. App. 2015) (quoting *Chamberlain v. Mathis*, 151 Ariz. 551, 559 (1986)). Whether a defendant is entitled to immunity is a question of law when the underlying facts are undisputed. *Id.* (citing *Carroll v. Robinson*, 178 Ariz. 453, 456 (App. 1994)). However, "when the existence of immunity depends on disputed factual issues, a jury must resolve those issues before the court may decide whether the facts are sufficient to establish immunity." *Id.*

"One who publishes a false and defamatory communication concerning a private person … is subject to liability, if, but only if, he (a) knows that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Dube v. Likins*, 216 Ariz. 406, 417 (Ct. App. 2007) (citing *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306 (App. 1988)). "Substantial truth

---

[12] Plaintiffs concede summary judgment as to all Defendants except Arpaio. (Doc. 218 at 8 n.2.)

is an absolute defense to a defamation action in Arizona." *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 355 (1991) (citing *Heuisler v. Phoenix Newspapers, Inc.*, 168 Ariz. 278, 285 n.4 (App. 1991)).

### b. Discussion

Defendants argue Plaintiffs cannot demonstrate that Arpaio's statements were false or that Arpaio had any reason to doubt their accuracy. (Doc. 215 at 18-19; Doc. 218 at 7-8.) Plaintiffs argue that Arpaio's statements were false, that he had no evidence to support the truth of those statements, and, thus, stating them was recklessly false. (Doc. 218 at 9.)[13] Specifically, the Plaintiffs refer to a press release where Arpaio stated that MCSO "'questioned several witnesses who claimed that Plaintiffs colluded together' to 'acquire' and 'provide' fake ID documents to workers." (Doc. 218 at 9, citing Doc. 197 ¶ 69.) They also refer to two televised interviews where Arpaio stated that Plaintiffs "were knowingly hiring employees with fake social security numbers" and that Frimmel "provided" "stolen ID's" to his workers. (Doc. 218 at 9, citing Doc. 197 ¶¶ 71, 72.)

Here, there is a factual issue as to what Arpaio knew at the time of the press release and televised interviews. (Doc. 213 ¶¶ 42, 43, 65, 66; Doc. 219 ¶ 10.) Moreover, the Court addressed these exact statements in its prior Order where the parties maintained the same arguments. (*See* Doc. 230 at 9-10.) There, the Court found that there were material issues of fact as to the press release statement and Arpaio's statement that Plaintiffs "were knowingly hiring employees with fake social security numbers." (Doc. 230 at 9-10.) As to the statement that Frimmel "provided stolen ID's" to his workers, the Court noted the incompleteness of the statement as cited in Plaintiffs' motion and found that it was true as a matter of law. (Doc. 230 at 10.)[14] As such, summary judgment is denied, though

---

[13]    They also argue that Arpaio is not entitled to qualified immunity because the statements were made in connection with an unconstitutional arrest. (Doc. 218 at 8, 9, citing *Cooper v. Dupnik*, 924 F.2d 1520, 1537 (9th Cir. 1991), *on reh'g*, 963 F.2d 1220 (9th Cir. 1992)). However, the Ninth Circuit was not determining state tort claims on appeal in that case, and, thus, it is not applicable here. *Id.* at 1525.

[14]    Though Plaintiffs here cite to Doc. 197 ¶ 72 for reference to that statement, it is

Defendants are not foreclosed from raising qualified immunity again at trial.

### 4. Grossly Negligent Restraint (Claim X)

#### a. Legal Standard

Under Arizona law, gross negligence "is action or inaction with reckless indifference to the result or the rights or safety of others. A person is recklessly indifferent if he or she knows, or a reasonable person in his or her position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probably that harm will result." *Wilson v. Maricopa Cty.*, 463 F. Supp. 2d 987, 999 (D. Ariz. 2006) (quoting *Armenta v. City of Casa Grande*, 205 Ariz. 367 (Ct. App. 2003)).

#### b. Discussion

Defendants argue that handcuffing arrestees is standard policy. (Doc. 215 at 19.) They argue that nothing about Frimmel's handcuffing would have alerted Henderson to peril or a probable injury. (Doc. 215 at 19.) They argue that Plaintiffs do not sufficiently state whether the handcuffs hurt Frimmel's shoulders, wrist, or elsewhere. (Doc. 215 at 19.) Plaintiffs argue that Henderson placed Frimmel in handcuffs in an unnecessarily rough manner, which caused Frimmel significant discomfort in his right arm and shoulder. (Doc. 218 at 11.) They argue that Frimmel calmly complained of his pain, Henderson ignored him, and Frimmel sustained an injury. (Doc. 218 at 11.) They argue that Frimmel was in handcuffs for more than an hour, that both of Frimmel's arms were pulled behind his back, and the handcuffs were tight. (Doc. 218 at 11.) They also argue that Frimmel attempted to lean forward in the police car to relieve his discomfort and that his hands went numb. (Doc. 218 at 11.) They argue that Frimmel saw a physician the next day and was diagnosed with "acute compression, right thoracic outlet syndrome." (Doc. 218 at 11.) Plaintiffs also argue that Henderson used excessive force in violation of § 1983. (Doc. 218 at 11.)

Here, neither party argues for or against qualified immunity, and, thus, the Court denies summary judgment as to that finding. As to the merits of the claim, neither party

---

incorrect. (Doc. 218 at 9.) The statement is referenced at Doc. 197 ¶ 73, which is the same statement the Court found, as a matter of law, was true in its prior Order. (Doc. 230 at 10.)

engages in any meaningful analysis, and, actually, Plaintiffs refer to federal, excessive force case law. As the Court noted in its prior Order, Plaintiffs have never alleged an excessive force claim, and no such claim is before the Court now. (Doc. 230 at 12.) Further, the Court finds that Defendants' conclusory argument does not establish, as a matter of law, that "nothing about Frimmel's handcuffing would have alerted [Henderson] to peril or probable injury." (Doc. 215 at 19.) Based on these facts and construing the facts in the light most favorable to Plaintiffs, a jury could find that Frimmel's communication of his significant discomfort to Henderson, which was ignored, could lead to an unreasonable risk of harm to which a reasonable person should have known. Likewise, a jury could find that being in handcuffs for over an hour when one has alerted the officer to significant discomfort could result in a high probability of harm. Therefore, construing the facts in the light most favorable to Plaintiffs, the Court denies summary judgment on Claim X for gross negligence as to Henderson.

### 5. IIED (Claim XI)

#### a. Legal Standard

To recover on an IIED claim in Arizona, a plaintiff must prove that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that distress would result from the conduct; (3) the conduct caused the plaintiff to suffer emotional distress; and (4) the emotional distress was severe. *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516 (2005) (citing *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987)); *Lucchesi v. Frederic N. Stimmell, M.D., Ltd*., 149 Ariz. 76, 79 (1986). "Extreme and outrageous conduct goes 'beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community.'" *Adams v. Estrada*, No. 2 CA-CV 2013-0074, 2014 WL 265660, at *7 (Ariz. Ct. App. Jan. 23, 2014) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc*., 183 Ariz. 550, 554 (App. 1995)). Further, even "unjustifiable" conduct does not necessarily rise to the level of "atrocious" and "beyond all possible bounds of decency." *Id.* (quoting *Nelson v. Phx. Resort Corp*., 181 Ariz. 188, 199 (App. 1994)); *Reynolds v.*

19

*Mitchell*, No. 1 CA-CV 06-0803, 2007 WL 5463507, at *5 (Ariz. Ct. App. Dec. 27, 2007) (stating that a defendant's conduct must "fall at the very extreme edge of the spectrum of possible conduct"). Only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury. *Mintz*, 183 Ariz. at 554.

### b. Discussion

Here, neither party argues for or against qualified immunity, and, thus, the Court denies summary judgment as to that finding. As to the merits, Defendants argue that Plaintiffs do not and cannot demonstrate that Henderson and Arpaio engaged in the necessary extreme and outrageous conduct that an IIED claim requires. (Doc. 215 at 20.) They argue that the only conduct Arpaio engaged in was related to Plaintiffs' defamation claim and that stating accurate facts cannot support an IIED claim. (Doc. 215 at 20.) They argue that even if the Court were to find that Henderson recklessly included or omitted statements in his probable cause affidavits and charging summary, that his conduct does not rise to the level of IIED identified by Arizona's courts. (Doc. 215 at 20.) Plaintiffs argue that, like the Superior Court judge's finding in the underlying criminal case, there is probative evidence that "Henderson intentionally lied (or showed a reckless disregard of the truth) both in his affidavits for the premises search warrants and in his summaries of the witness interviews that he provided to the prosecutor." (Doc. 218 at 12.) They argue that Henderson should have known Plaintiffs would suffer severe stress if they were prosecuted for multiple felony counts, with lengthy prison terms, and which required expensive litigation fees to defend against. (Doc. 218 at 12.) As to Arpaio, Plaintiffs argue that there is ample evidence that he closely approved and reviewed operations of the Criminal Employment Unit and of the search and seizures at issue. (Doc. 218 at 13.) Further, they argue there is evidence that Arpaio "encouraged his deputies to disregard basic civil rights" by citing to other cases involving Arpaio. (Doc. 218 at 13.)

After reviewing the evidence, the case law, and construing the facts in the light most favorable to Plaintiffs, the Court finds that, as a matter of law, the conduct complained of

here—that Henderson intentionally or recklessly disregarded the truth in his affidavits for the premises search warrants and his summaries of the witness interviews—does not rise to the high level of outrageousness required by Arizona courts. *See Al-Asadi v. City of Phoenix*, No. CV-09-47-PHX-DGC, 2010 WL 3419728, at *7 (D. Ariz. Aug. 27, 2010) (finding that an officer's conduct, including writing a misleading police report while knowing that plaintiff had been assaulted by a different officer and furthering the "cover up" of that police officer's wrongful conduct, was not so outrageous and extreme); *Mintz*, 183 Ariz. at 563. This is so for Arpaio's alleged misconduct as well.

The Superior Court's finding that Henderson either intentionally or recklessly disregarded the truth in his search warrant affidavits for the premises does not rise to the egregious level needed for an IIED claim. Likewise, assuming Henderson intentionally or recklessly included or omitted information in his charging summary, that conduct, while unjustifiable, is not outrageous or extreme. *See Pankratz v. Willis*, 155 Ariz. 8, 18 (Ct. App. 1987) (citing Restatement § 46 cmt. d) (stating that conduct "may be otherwise tortious, and even illegal, and not be outrageous"). As to Arpaio, his statements in the press releases and interview do not rise to the necessary level. *See Adams v. Estrada*, No. 2 CA-CV 2013-0074, 2014 WL 265660, at *8 (Ariz. Ct. App. Jan. 23, 2014) (finding that a defendant's publicly announced false statements against a police officer and subsequent demonstrations in support of those false accusations was not outrageous and extreme). Similarly, his conduct in past cases is not probative of whether, in this case, his conduct was sufficiently extreme and outrageous. There is simply no evidence in the record to suggest Henderson's or Arpaio's actions "fall at the very extreme edge of the spectrum of possible conduct." *Reynolds*, 2007 WL 5463507, at *5. Plaintiffs cite to no cases to suggest otherwise, let alone analyze the facts accordingly. As such, the Court finds that, as a matter of law, no reasonable jury could find that Henderson's or Arpaio's actions in this case rise to the high level needed for an IIED claim. Accordingly, summary judgment is granted on Claim XI for intentional infliction of emotional distress as to Henderson and Arpaio.

### 6.  Grossly Negligent Supervision (Claim XII)

Defendants argue that Arpaio is entitled to summary judgment on Plaintiffs' grossly negligent supervision claim because there is no evidence Arpaio knew or should have known Henderson lacked competency as a detective before Plaintiffs were investigated and arrested. (Doc. 215 at 21.) Plaintiffs did not address this argument in their response. Therefore, the Court will grant summary judgment on Claim XII for grossly negligent supervision as to Arpaio.

### C.  A.R.S. § 12-821.01 (Notice of Claim)

Defendants argue that Norton did not provide facts adequate to support her alleged damages in her Notice of Claim, as is required by A.R.S. Section 12-821.01. (Doc. 215 at 21-22.) Plaintiffs argue that, under *Backus v. State*, 220 Ariz. 101 (2009), Norton was only required to offer facts in support of her claim, which Defendants concede she did. (Doc. 218 at 14.) The notice of claim statute directs that all claims "shall contain facts sufficient to permit the public entity … to understand the basis upon which liability is claimed" and "shall also contain a specific amount for which the claim can be settled and the facts supporting that amount." A.R.S. § 12–821.01.A. "A claimant complies with the supporting-facts requirement of § 12–821.01.A by providing the factual foundation that the claimant regards as adequate to permit the public entity to evaluate the specific amount claimed." *Backus*, 220 Ariz. at 106-07. The claimant need not provide an exhaustive list to meet this standard; rather, the claimant simply needs to provide facts to support the amount claimed. *Id.* at 107. Further, *Backus* instructs that courts "should not scrutinize the claimant's description of facts to determine the 'sufficiency' of the factual disclosure." *Id.*

Defendants' argument is unfounded. Preliminarily, the Court may not "scrutinize the claimant's description of facts to determine the sufficiency of the factual disclosure." *Backus*, 220 Ariz. at 107. And, in any event, it need not do so. Even a cursory review of Norton's Notice of Claim reveals that she provided ample facts supporting her argument, which allowed, or should have allowed, Defendants to understand the basis for their alleged liability. (*See* Doc. 213-4 at 87-106.)  Accordingly, the Court will not dismiss Norton's

state law claims on this basis.

**IV.     Conclusion**

For the reasons stated above, Defendants' Partial Motion for Summary Judgment is **denied in part** and **granted in part** as set forth above.

Accordingly,

**IT IS ORDERED:**

1. That Defendants' Partial Motion for Summary Judgment (Doc. 215) is **denied in part** and **granted in part** as set forth below:

   a. Claim I: Summary judgment is **granted** as to Defendants Arpaio, Henderson, Gandara, Locksa, and Hechavarria on the theories of false arrest and malicious prosecution.

   b. Claim II: Summary judgment is **granted** as to Defendants Arpaio, Henderson, Gandara, Locksa, and Hechavarria.

   c. Claim III: Summary judgment is **granted** as to Defendants Arpaio and Henderson.

   d. Claim IV: Summary judgment is **denied** as to Defendants Arpaio, Hechavarria, Locksa, and Gandara.

   e. Claim V: Summary judgment is **granted** as to Defendants Gandara, Locksa, and Hechavarria. Summary judgment is **denied** as to Defendant Arpaio.

   f. Claim IX: Summary judgment is **granted** as to Defendants Hegstrom, Jones, and Henderson. Summary judgment is **denied** as to Defendant Arpaio.

   g. Claim X: Summary judgment is **denied** as to Defendant Henderson.

///
///
///

h.  Claim XI: Summary judgment is **granted** as to Defendants Henderson and Arpaio.

i.  Claim XII: Summary judgment is **granted** as to Defendant Arpaio.

Dated this 28th day of March, 2019.

Honorable Steven P. Logan
United States District Judge